```
1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
2                              WACO DIVISION

3   THETA IP, LLC                    *   December 16, 2021
                                     *
4   VS.                              *  CIVIL ACTION NO. W-20-CV-160
                                     *
5   SAMSUNG ELECTRONICS ET AL        *

6             BEFORE THE HONORABLE ALAN D ALBRIGHT
                    MOTION HEARING (via Zoom)
7
    APPEARANCES:
8
    For the Plaintiff:         Denise M. De Mory, Esq.
9                              Corey Johanningmeier, Esq.
                               Aaron R. Hand, Esq.
10                             Hillary N. Bunsow, Esq.
                               Bunsow De Mory LLP
11                             701 El Camino Real
                               Redwood City, CA 94063
12
                               B. Russell Horton, Esq.
13                             George, Brothers, Kincaid & Horton LLP
                               114 West 7th Street, Suite 1100
14                             Austin, TX 78701

15  For the Defendant:         Martin J. Black, Esq.
                               Dechert LLP
16                             2929 Arch Street, Cira Center
                               Philadelphia, PA 19104
17
                               Ruffin B. Cordell, Esq.
18                             Fish & Richardson P.C.
                               1000 Maine Avenue, SW, Suite 1000
19                             Washington, DC 20024

20                             Seungtaik Michael Song, Esq.
                               Michael H. Joshi, Esq.
21                             Dechert LLP
                               3000 El Camino Real
22                             Five Palo Alto Square, Suite 650

23                             James Travis Underwood, Esq.
                               Gillam & Smith
24                             102 N. College, Suite 800
                               Tyler, TX 75702
25
```

1    Court Reporter:            Kristie M. Davis, CRR, RMR
                                PO Box 20994
2                               Waco, Texas 76702-0994
                                (254) 340-6114
3

4            Proceedings recorded by mechanical stenography,

5    transcript produced by computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          DEPUTY CLERK:  Motion hearing in Civil Action W-20-CV-160,

2     styled Theta IP, LLC versus Samsung Electronics Company,

3     Limited and others.

4          THE COURT:  Announcements from counsel, starting with the

5     plaintiff, please.

6          MR. JOHANNINGMEIER:  Hello, Your Honor.  This is Corey

7     Johanningmeier with Bunsow DeMory.  And with me is Denise

8     De Mory.  And we have Russ Horton on the line.  We have Aaron

9     Hand.  And then we also have our client representative,

10    Demetris Paraskevopoulos.  And I believe earlier we had our

11    client representative, Bruce Bourbon on, I'm not sure if he is

12    right now.  We also have a couple other lawyers from our firm

13    watching, Hillary Bunsow and Mike Flynn-O'Brien.

14         THE COURT:  And Mr. Cordell?  Or whoever else is going to

15    announce.

16         MR. CORDELL:  Good afternoon, Your Honor.  Ruffin Cordell

17    from Fish & Richardson.  And with me are my colleagues, Marty

18    Black and Michael Song of the Dechert firm, and Travis

19    Underwood from Gillam & Smith.  And I believe we have a client

20    representative, Mr. Tim Jezek.

21         THE COURT:  And welcome to him, of course.

22         I have down -- I don't have really a chart.  I know we

23    have three different issues to take up.  The one that I have

24    that just popped up first is Theta's motion regarding lack of

25    noninfringing alternatives.

1          But if there's something else you all wanted to argue

2     before that, I'm agnostic in what order we take them up.

3          MR. JOHANNINGMEIER:  We're happy to do that one first,

4     Your Honor.

5          THE COURT:  Okay.  Then let's do that one first.

6          MR. JOHANNINGMEIER:  I reckon that one will me talking.

7     We also -- we prepared some slides which I believe Mr. Hand is

8     going to attempt to display and run.  So we'll see if that

9     works or not.  I don't know if those are --

10          THE COURT:  Works for me.  I can see them.

11          MR. JOHANNINGMEIER:  All right.  Great.  And so I'll just

12     call out slides as we go along.

13          So this is a motion for partial summary judgment that

14     Samsung has not presented any noninfringing alternatives, and

15     cannot do so at trial.

16          Let's go to Slide 23.

17          The fundamental issue here is that acceptability of

18     noninfringing alternatives must be considered in order for them

19     to be noninfringing alternatives.  They don't work as

20     noninfringing alternatives if they're not acceptable --

21          THE COURT:  I think you can skip over this part.

22          MR. JOHANNINGMEIER:  All right.  So I have two slides of

23     cases saying that.  And so we'll go --

24          THE COURT:  I'm up to speed on this issue.

25          MR. JOHANNINGMEIER:  Right, right.  So the -- let's go

1   then to Slide 26 and the specific testimony here.

2       So this is just a basic that it's Samsung's burden and

3   it's -- they failed to produce evidence on the specific issue

4   of -- on a number of issues, but specifically on acceptability.

5       So there's three categories of noninfringing alternatives

6   that they at least mentioned along the way.  The first of which

7   here is the sort of ambiguous prior art solutions.  They, all

8   the way through, even depo, refused to identify which prior art

9   references they were going to rely on here.

10      In fact, when I asked direct questions to their expert

11  about that, he couldn't tell me specific ones.  But the bottom

12  line here is that, you know, we asked him straight out did he

13  consider whether or not any of those prior art solutions would

14  be technically feasible for Samsung to implement.  That's not

15  in his report.  I mean, that's his testimony.  He didn't do it.

16      So there's no analysis from Samsung's expert, or anyone in

17  the case, about the feasibility of those arguments.  So it's

18  just a straight up failure of proof.  They don't get to present

19  those things as alternatives at trial without presenting

20  testimony about their feasibility.  You know, whether or not

21  they'd be -- would work and all of that.

22      There's some mention in the opposition brief of, you know,

23  Samsung having pointed a few of these things out to our

24  witnesses in deposition.  But, you know, their response to it

25  coming up for the first time live in a deposition was to say

1   things like, well, that isn't going to work.

2       But, of course, this is not our burden and they can't

3   shift the burden to us by putting these things in front of our

4   experts and asking them what they think.  What they think is

5   this stuff doesn't work, but that's not the issue.  The issue

6   here is that these prior art solutions aren't alternatives

7   unless Samsung does the work to show that -- you know, at least

8   a minimal showing that they would be commercially and

9   technically feasible.  They haven't done anything on that

10  front.  So these are just straight out.

11      The next slide is the -- Slide 27.  So this is similar.

12  Here there's two prior art Theta patents, the '330 and the '728

13  that were in, you know, of -- the Court will -- may recognize

14  were in the prior case, the Eastern District of Texas case

15  there, the one that ended with the covenant and that we've been

16  discussing all along.

17      Now, those two patents, they've suggested that, you know,

18  because they have a license to those through the covenant, that

19  those are noninfringing alternatives.  And the -- you know,

20  they, I guess, would have the right to practice those, of

21  course.  But that isn't enough.  And, in fact, there's cases in

22  our brief that say that that's not enough just to say you have

23  a license to something.  You have to show you could actually do

24  it, that it would actually be feasible --

25          (Clarification by the reporter.)

1        MR. JOHANNINGMEIER:  So you have to actually, then, show

2    that the alternative would be feasible, that they could

3    practice this.  Now, no one in this case has analyzed whether

4    or not the accused products in this case practice those --

5    these patents.  Samsung didn't do that.  So we don't know.

6        They -- you know, they insist they didn't infringe before

7    in the prior case with different products.  There's no overlap.

8    But with the different products they didn't infringe.  With

9    these products that we're accusing now, they haven't done the

10   analysis.

11       But more importantly, they haven't even opined that

12   it's -- would be feasible to do.  We asked the straight

13   question, would it -- you know, have you done any analysis of

14   it, whether or not it would be technically feasible for them to

15   implement those patents?

16       I don't have the details of that in my report.

17       He didn't do the analysis.  They can't come in as

18   noninfringing alternatives without some analysis that they

19   would be feasible, that they would work.

20       Again, we have expert testimony that they wouldn't, but

21   that's not the issue because this is Samsung's burden.  And

22   Samsung didn't produce any actual cogent evidence of this.

23       So now, the third one on the next slide, 28, so Samsung

24   in -- I guess it was in August, gave a list of technical

25   solutions that they thought were noninfringing alternatives.

1   And they really only pursued one of those, in terms of actually

2   having their expert talk about it or having anyone say

3   anything.  And that's this idea of, well, just use a larger

4   battery.

5       Now, here we have the same problem, though.  Mr. Kiaei did

6   not look at the feasibility of using a larger battery.  We

7   asked him if it was an insignificant effort to increase the

8   battery size, why wouldn't they have already done that, right?

9       And then he says, well, first, he says, I think you're

10  asking the wrong person, which I guess is a cute response,

11  given the lack of information we got from Samsung on this.  But

12  then he says, there's a number of other things I would need to

13  look at, and to do a cost analysis of various different issues.

14      So he understands what he'd have to do.

15      Then the question:  Did you do any of that analysis in

16  your report?

17      No.  I was not asked to do that.

18      All right.  He did not -- he focused on infringement and

19  invalidity.  He did not consider the technical feasibility of

20  putting in a different battery, right?  He just said, ah,

21  that'd be trivial, right?

22      And based on his experience, which is exactly the kind of

23  expert testimony that Daubert is meant to get rid of.  Because

24  you can't just have an expert come in and say, look at me, I'm

25  credentialed.  In my experience this would be simple.  That

1   isn't reliable testimony.  It's not based on any facts.  The

2   actual facts that he could have done, he didn't do.

3       So on the next slide, 29, we have some more on that.  He

4   didn't talk to anyone at Samsung, none of their witnesses about

5   any issue in this case, but definitely not about this one.  He

6   didn't ask them about the possibility of increasing the battery

7   size.  He didn't ask them how much it would cost, whether or

8   not there were bigger batteries available.  He just didn't do

9   that analysis.

10      And then he also -- we asked him again, you didn't do any

11  analysis of how much it might cost in engineering time to

12  change to a different battery?  He didn't do that analysis.

13      So we don't know how much it cost Samsung to develop a

14  bigger battery and put it in a phone.  It's -- you know, that

15  could be a $1 million effort.  It could be a $200 million

16  effort.  We don't know that, because we don't have any

17  testimony from anyone.  And their expert didn't ask and didn't

18  do the analysis.  So they fall down on this one as well.  Just

19  a failure of proof on feasibility of this alternative.

20      Now, there is -- you'll hear about some testimony, and we

21  went over it in our brief.  A Mr. Choi from Samsung said that,

22  you know, there's many different batteries and we changed

23  batteries.  But then when he was asked direct questions about

24  have you ever used, in any of these accused products, a battery

25  that was smaller than the biggest one you could find?

1      And he initially said, that's not a yes-or-no question,

2  started mirroring counsel's objections and, you know, refusing

3  to answer.  We've got that in our brief, that testimony.

4      And then Samsung realized they weren't happy with that,

5  and so they had him go and talk to Dr. Ugone, the damages

6  expert about this, and, you know, tell him more than he told us

7  during depo, which is also very problematic.  And then

8  Dr. Ugone has an opinion based on things that, you know, he

9  reportedly heard from Dr. Kiaei and from Mr. Choi about this

10  issue.  But it all falls down on the fact --

11      THE COURT:  Does he express those opinions in a report

12  anywhere?

13      MR. JOHANNINGMEIER:  Yes.  And we have that in our brief,

14  the citations to -- I believe to his report -- and if it's not

15  in ours, it's in theirs -- where he essentially says he talked

16  to Mr. Choi and Mr. Choi said that they have options on

17  batteries.  And that it -- he's basically said this idea of

18  using a smaller one happens all the time.

19      But then when we asked him about that in deposition, about

20  whether or not he had any example of an accused product doing

21  that, he did not.  So even though he did talk to Mr. Choi, they

22  still couldn't come up with an example in any of the accused

23  products of that happening.  And that's all -- that's detailed

24  in the briefing.

25      Now, I will say, though, that that only gets to part of

1   the question, right?  Whether or not it's something that could

2   be done, or whether or not they could develop a bigger battery

3   is one aspect of this.  How much would it cost?  Would it be

4   feasible?  Would it cost less than paying Theta?  None of that

5   is in the report.  So they still have a fatal flaw in terms of

6   acceptability for this battery, even with the, you know, paltry

7   testimony that they've offered.

8        So now, the -- I guess the next slide.

9        Slide 30, just to make it -- the point here about

10  discovery.  You know, we asked for this with a high degree of

11  specificity back in January.  You know, describe in detail all

12  facts, including technical, commercial and financial details

13  and concerning any acceptable noninfringing alternative.  That

14  was the rog.

15       The first meaningful response we got for this -- if you

16  show the next slide -- was in August.  And this is what they

17  said on the battery.  They said, an alternative is to include a

18  larger capacity battery.  Okay.  Well, that doesn't have much

19  detail.  And then they also say in this one that they could get

20  this for free by waiting a year or two for a bigger battery.

21       Now, that, of course --

22       THE COURT:  I can ask you -- I need to -- about

23  30 seconds.  I'll be right back.

24       MR. JOHANNINGMEIER:  Yeah.  Okay.

25       THE COURT:  Thank you very much for that.  I'm happy for

1    you to continue.

2         MR. JOHANNINGMEIER:  Okay.  Thank you, Your Honor.

3         So I was just pointing out there, a couple aspects of

4    their rather short interrogatory response on this issue that,

5    you know, it has no details.  But n one of the details they do

6    attempt to raise is the idea of waiting a year or two for a

7    significantly larger battery.

8         Now, I mean, I think anyone that has been to even anywhere

9    close to this business knows that Samsung is not going to wait

10   a year to release a phone for a bigger battery.  So this gets

11   at the whole point of why it has to be commercially acceptable,

12   right?

13        You know, no one would -- you know, it hardly meets

14   reputation that that's not an option.  And that isn't

15   ultimately what they argued, that they were going to wait a

16   year.  But, you know, this was the response we got in

17   discovery, so this is what we had to work with going into the

18   deposition.  And then when we got to the deposition, we got,

19   well, we didn't do the analysis.

20        So the point here, and I think I have it on the next

21   slide, Slide 32, is that, you know, the failure to disclose

22   these facts in discovery on its own is -- warrants exclusion

23   under the MLC case which people are citing a lot these days.

24        But the point there was the party had facts in their

25   possession that they didn't put in their responses.  And they

1   got dinged and excluded for that.  And this is, you know -- it

2   was, you know, based on -- but the Federal Circuit affirmed the

3   district court's discretion to exclude that.

4        So -- and then, again, also on the facts, they didn't

5   present enough to be -- to get above that bar, the discovery

6   bar.  And on the expert opinion they gave nothing.  And so, you

7   know, we have a whole list of cases in our brief.  There's one

8   here on the screen, the LaserDynamics case where failure to

9   look at whether or not these alternatives would be feasible or

10  whether the company could implement them or how much they cost

11  is grounds for exclusion.

12       So I guess that is, in sum, our argument.  And then I

13  will -- I'll let Mr. Cordell talk.  And then we'll, I guess,

14  reserve a little time for rebuttal, if necessary.

15       THE COURT:  Mr. Cordell, is it you or someone else?

16       MR. CORDELL:  I -- it'd be me, Your Honor.  Good

17  afternoon.  Ruffin Cordell from Fish & Richardson on behalf of

18  Samsung.

19       You know, this issue is one that comes up a lot.  And, you

20  know, we --

21       (Clarification by Reporter.)

22       MR. CORDELL:  This headset and I don't get along very

23  well, it turns out.

24       So we spent a lot of time in the briefing discussing who

25  shot John.  But the way this case unfolded is pretty profound.

1   You know, counsel just brought up my MLC Micron case and said

2   you know, gosh, they should have put this in their discovery

3   responses early on.

4        But we did.  We put in the noninfringing alternatives that

5   we could ascertain, because the difficulty we were having is

6   that Theta, right at the outset, didn't say anything about

7   their theory of infringement or what it was worth.

8        And if we're going to talk about MLC Micron, they should

9   have put these disclosures in their Rule 26 submission.  It

10  should have come right at the outset of the case.  And that's

11  what MLC tells us the plaintiff is supposed to do.  And had

12  they done that, we wouldn't be having any of these discussions,

13  because a complete record would have been created.

14        Instead what we got is, you infringe.  And, in fact, they

15  pointed to a different instrumentality.  They pointed to the

16  IntelliCeiver portion of what they thought was in the Qualcomm

17  chip in Samsung's phones.

18        Turns out they were wrong.  And in June of this year they

19  finally gave us new infringement contentions and switched their

20  theories altogether.  But the suggestion that somehow we should

21  have been able to predict, you know, some kind of divining

22  process about exactly what it is they were going to claim

23  simply just -- it's not supported in this record.  Just the

24  opposite is true.

25        What happened is they tell us finally -- well, in

1   discovery they tell us, we're not going to give you any

2   disclosure about our damages.  You're just going to have to

3   wait.  And you're going to have to wait until the expert

4   reports have happened in September.

5        And in their expert report they actually gave us something

6   that was a little bit of a surprise.  Because Your Honor has

7   seen a lot of these cases, and typically the plaintiffs come in

8   and while the valuation they asked for, the $200 million, was

9   substantial, they claim that the (audio disruption) in this

10  case contributes to battery life by 2.6 percent.  A very modest

11  amount, what counsel accurately called trivial.  This was a

12  trivial change in the amount of power savings that we're

13  talking about.

14       And so yes, our experts --

15       (Clarification by the reporter.)

16       MR. CORDELL:  But what we found is that they deposed our

17  expert, and he said, yes, I've got a lot of experience in

18  choosing batteries.  I worked at Motorola for many years.  I've

19  been through this process a great deal.  And it's not a big

20  deal that, you know, you talk to the vendors and they tell you

21  what's available.  And you kind of pick a battery based on a

22  lot of things.

23       But what he said very specifically is that 2.6 percent

24  doesn't require a significant amount of work.  It just doesn't.

25  And they deposed Mr. Choi and they asked him.  And he went

1    through lots of the processes that Samsung goes through as

2    they're choosing batteries.  And very little of it has to do

3    with a 2.6 percent increase in the capacity of the battery.

4         But the evidence that came from those two witnesses is

5    that what you're talking about is a couple of human hairs, that

6    if you made the battery two human hairs thicker, you would

7    achieve this 2.6 percent capacity increase.

8         Plaintiff doesn't like that.  They want NASA-level

9    analysis to support that kind of evidence.  But they can't deny

10   that these two witnesses have a great deal of experience in

11   acquiring these batteries and implementing these batteries, in

12   putting them in exactly these systems.  And that's the evidence

13   they offered.

14        I looked back through all of what plaintiff pointed to,

15   and I looked beyond it in the depositions and whatnot, and at

16   no time did they ask them a straight-up question, how much

17   would it cost to implement a 2.6 percent increase in battery

18   capacity?  They danced around it.  They asked lots of

19   background questions.  They asked about how the process works,

20   but they never put that question straight up.

21        And so Dr. Ugone, when he was doing his actual

22   noninfringing alternatives analysis, did that -- did that very

23   analysis.  And he went right at it chapter and verse.

24        And let me see if I can share my screen, which is always a

25   dangerous thing.

1          This is Exhibit 8 to the motion papers, Your Honor.  And

2     you can see this is from Dr. Ugone's report, our damages

3     expert.  And he specifically talks about Alternative 8, using a

4     higher capacity battery.  And he immediately says, I understand

5     that Samsung could have obtained the additional battery life

6     attributed by Theta to the patents-in-suit through a small

7     increase in the size of the batteries in the accused products.

8          And then he goes through it in great detail.  And he

9     points out that he did have a conversation with Mr. Choi, and

10    relates much of what's in Mr. Choi's deposition about how

11    Samsung gets bids from multiple battery suppliers for a

12    particular size battery.  And then they do a comparison, and

13    that capacities can differ by 2 to 3 percent across suppliers.

14    And that they pick a battery based on lots of different

15    factors.  But some of which may be charging or other things

16    that Mr. Choi mentions.  But that they ultimately make that

17    decision.

18         And he made it very clear that battery size and battery

19    capacity are variable rather than fixed during the development

20    of the phone.  That it is -- it's not only possible that you

21    would choose a different one, but it often happens.  That it's

22    a variable you can fix, up or down or however it is that you

23    choose.

24         He then goes into the fact that the plaintiff's expert,

25    Dr. Larson, somehow -- and we've got a motion on this -- but he

1  somehow divines that this -- these patents-in-suit that deal

2  with somehow changing the amplification of certain signals

3  extends battery life by 20.9 minutes.  It really is a

4  breathtaking analysis, and I look forward to the day when we

5  argue that motion.

6      But taking that for what it is, he then goes into a very

7  specific analysis of discussions with our witness and Dr. Kiaei

8  about what it would take to achieve the same result.  And what

9  he concludes here is that you need an increase in the range of

10 1 percent to 3 percent of the battery capacity in order to

11 achieve the results that the plaintiff is claiming.

12     He then goes into a very detailed analysis where he looks

13 at the costs of the batteries.  And using a proportionality he

14 ends up with a table here, Table 12 which I've got on the

15 screen, where he does a very precise calculation of what this

16 additional battery capacity would cost.  If, in fact, one were

17 to need to adopt it instead of the patented approach.

18     So the bottom line is there is an enormous amount of

19 evidence here.  There's an enormous amount of information that

20 was available to the plaintiff.  They explored it to the extent

21 they wanted to.  And what I'm left with, as I look at this, is

22 that it really is a -- it's the subject of perhaps vigorous

23 cross-examination.  But the decision we're talking about here

24 is trivial.  It's why did you pick Coke versus Pepsi?  Nobody

25 denies that you could pick Coke versus Pepsi.  And you may have

1   lots of reasons, one way or the other, that we --

2       THE COURT:  I don't take the decision of Coke versus Pepsi

3   as a trivial decision.

4       (Laughter.)

5       THE COURT:  That may be one of the most important

6   decisions I have to make every day at lunch.  So -- because I

7   won't drink Pepsi, ever.

8       MR. CORDELL:  Well, not to pander to Waco, but I'm a

9   Dr. Pepper guy myself.

10      THE COURT:  So, very good.

11      MR. CORDELL:  But it's still a decision.

12      With respect to the other sort of classes of noninfringing

13  alternatives, there are really two.  One is the prior art.  And

14  counsel says, you know, there's no evidence that you could have

15  gone back and used the Hutchinson patent, the Qualcomm

16  patent -- patented approach as part of your -- as a

17  noninfringing alternative.

18      But there is a stark admission from his expert,

19  Dr. Larson.  It's a stark admission that that was not only

20  available, but it would probably have worked.  It's at

21  Exhibit 14, 288, 15 through 291, 20.

22      So, you know, again, what we're talking about here is

23  whether or not there is evidence in the record of that

24  acceptability, and it's certainly there.

25      And then finally, with respect to the parent patents, I

1    really got a kick out of this, Judge.  Because if you remember

2    what we're arguing about here is they sued us in 2016 on two

3    patents.  And they -- we went through -- on to litigation.  We

4    had experts.  We had about 18, 20 months of fighting about

5    this.  And we go to depose their expert on infringement on

6    these patents.  And what does he say?  He ends up conceding

7    that there is no infringement.  And the case kind of founders,

8    of course.  I mean, their expert admits that he thinks there's

9    no infringement.

10       We, then, negotiated a covenant not to sue.  You've heard

11   a lot of these facts before.  And we executed the covenant not

12   to sue.  So we have the God-given right now to practice those

13   two patents.

14       What, now, Theta says is, well, wait a minute.  You're on

15   the horns of a dilemma.  You can't have it both ways.  You

16   can't have not infringed those and yet choose it as a

17   noninfringing alternative today.  Because -- and by the way, we

18   think maybe the patents are the same.  The patents from the old

19   case and the patents in this case are the same.

20       But really, Your Honor, they're the ones that have the

21   dilemma.  They're the ones that are facing either double

22   patenting invalidity or an admission that, in fact, they're

23   different.  And they're going to have to choose that, and I

24   suspect they're going to choose that the patents are different.

25       The issue for a noninfringing alternative is not whether

1   or not we're using it today.  It's not whether or not anybody

2   ever actually used it.  The issue is could it be used?  And the

3   reality is the entirety of that first case, the entirety of

4   their allegations and the entirety of their assertions in that

5   case support one basic notion, which is, it is a viable system.

6   And the idea that we have to somehow prove that with extrinsic

7   evidence is not part of the case law.

8       What Grain Processing tells us is that it's got to be a

9   viable alternative.  But it doesn't have to be proven to the

10  level that plaintiff, you know, asks.  The Grain Processing

11  case, of course, they were 12 years beyond when the

12  implementation actually happened.  So it really isn't that kind

13  of a didactic analysis.

14      So with that, Your Honor, unless there are other

15  questions, I'll pass the podium.

16      THE COURT:  Response from plaintiff?

17      MR. JOHANNINGMEIER:  Yeah.  I have a couple of things.

18      First I'll just start where counsel did with the -- I

19  guess, the discovery record in this case.  So, you know,

20  battery savings is a claim element here.

21      He mentions our Rule 26 disclosures.  So I just kind of

22  want to read something from that that we have here, about

23  whether or not we disclosed our theory.  So "Plaintiff

24  preliminarily identifies potential royalty bases associated

25  with the implementation of the patents-in-suit as including

1  incremental revenue and/or cost savings" -- there it is on the

2  screen -- "associated with power savings associated with such

3  implementation, including, e.g., reduction in power

4  requirements, battery capacity, size, et cetera."  So it's just

5  nonsense that we didn't disclose our theories of this case.

6      Now, we've heard a lot over this case about our

7  contentions and whatever.  As Your Honor knows, we had three

8  rounds of contentions in this case, because -- and we had

9  motion practice after our second round in which Your Honor

10 ordered them to produce more documents and we volunteered to

11 give additional contentions in June.

12     So, you know, we've disclosed everything that we had to

13 disclose all along, including in our Rule 26.  There is no

14 question here.

15     What actually happened in this case is that Samsung didn't

16 believe that they need to show feasibility, or didn't

17 understand that they didn't, and did not, right?  Mr. Cordell

18 said the question is, could it be used?  Well, you have a

19 license to it, right?  In the case of the prior patents.  Could

20 you build it?  Well, no.  I mean, we don't know, right?

21     What Mr. Larson said about the Hutchinson reference the

22 first time he was shown it was that, you know -- because it had

23 not been identified prior to his deposition as a noninfringing

24 alternative.  He was shown it and he said, well, I mean, maybe

25 you'd save some power, but that's not a very good solution.

1      But, again, it's not our burden to demonstrate this stuff,

2   it's theirs.  They have the burden to show noninfringing

3   alternatives, and they didn't meet it.  They did not analyze

4   the cost.  Is it viable?  We don't know, because we don't have

5   any testimony from them.

6      So our speculation about, you know, the fact that we might

7   say it's not, that we might say, well, you know, those prior

8   patents aren't as good these patents which we have.  And that,

9   you know, that these ones we have now are better.  That isn't

10   the issue.

11      The issue here is that they have to show feasibility,

12   viability, whether it could be used, availability,

13   commercial -- I mean, however you want to say it.  They have to

14   show that they actually have it as an available alternative,

15   and they have not done so with the specific reference to

16   Mr. Ugone's testimony and Mr. Choi.

17      So Mr. Choi told us -- we asked them direct questions

18   like, would your group ever pick a battery that did not meet

19   the largest capacity of the options presented?  Or do you

20   always choose the option with the highest capacity?

21      Then there was an objection:  Compound.  Calls for

22   speculation.

23      His answer:  I agree.  It depends on the circumstances and

24   it does require speculation.

25      I mean, we have this exchange in our brief that basically

1   he was refusing to answer.  All of this stuff that's in Ugone's

2   report from Mr. Choi is not testimony.  It's his conversation

3   with Mr. Choi, right?  And that is not admissible evidence,

4   right?

5        So they want to come in at trial and have him present

6   things that he talked to Mr. Choi about.  But when we talked to

7   Mr. Choi, he was evasive and couldn't answer these questions.

8        So we put the direct question of costs to Mr. Kiaei who

9   put himself out as an expert who worked on batteries at

10  Motorola.  And he said, well, I'd need to do a cost analysis.

11       And then we said:  Did you do it?

12       No.  He didn't do it.

13       So what else is there for us to do at that point, right?

14  It's their burden.  They put up an expert that says he didn't

15  analyze the costs.  That should be the end of it.  He shouldn't

16  get to come to trial with a cost analysis, right?

17       And as far as Mr. Ugone goes, I think Mr. Cordell

18  described it as a complicated analysis.  He took the percentage

19  that we put forward as what we put forward a percentage for

20  battery savings.  Their expert used some different numbers and

21  calculated it the same way to get a lower percentage.  And then

22  Mr. Ugone just subtracted that percentage from the cost of the

23  battery, right?  That's his analysis.

24       He said, well, okay, it's 1.whatever percent.  Here's

25  1.whatever percent of the battery costs.  That's not an

1   analysis of whether or not it would be feasible.  Its not an

2   analysis of whether or not they could put a bigger battery in.

3   And it's not an analysis of how much it would cost them in

4   engineering time, lost market opportunity and whatever else to

5   actually build that.  That's the thing they're missing, not the

6   price of the battery.  We know the price of the battery.  We

7   can figure out a percentage and a price.  But what they're

8   missing is the actual analysis.

9        So with that, I don't have anything else unless Your Honor

10  has questions.

11       THE COURT:  I don't.  I'm going to deny that motion.

12       Let me turn to the next motion.  Give me one second.

13       And to the extent there's a motion to strike that is

14  overlapping with this, I'm going to deny that as well.

15       The next motion we have is -- and, again, I think there

16  are two motions left.  I don't care what order we take them up

17  in.  The one opened -- when I opened it was Samsung's motion

18  for summary judgment of indefiniteness.  Is that the one that's

19  best to take up next?  I don't care.

20       MR. BLACK:  Yes, Your Honor.  I'm going to take that one.

21       THE COURT:  Okay.

22       MR. BLACK:  We appreciate your jumping on this, Your

23  Honor.  We were looking at the preparation for trial last week,

24  and with all the motions pending, we thought we ought to single

25  out the ones that could have the most importance to shaping the

1    trial coming up.  And of course when we got on, Mr. Cordell, my

2    co-counsel, stole my thunder by getting his motion argued

3    first, but of course that was inevitable.

4         But we actually asked for this hearing to have this motion

5    heard.

6         THE COURT:  Well, as at least some of you know, if you

7    clerked, I get no credit for this.  I played no role in the

8    decision to set this hearing.  I just -- I asked what I was

9    doing on Thursday afternoon and y'all are up.  So credit goes

10   to my favorite law clerk, whichever one it is that is working

11   on this case that set this.  So he gets all the credit.  They

12   don't -- they learned it's better, you know, to just get in

13   trouble later than to ask for permission ahead of time.  So

14   we're all here today together.

15        MR. BLACK:  All right.  Well, I've heard he's an

16   extraordinary clerk, Your Honor, from people in doubt.

17        So we asked for the hearing because of a serious problem

18   in claim construction which has arisen as a result of moves

19   that the plaintiff has made during the course of the case.

20   They originally filed this case based on one theory and one

21   instrumentality called IntelliCeiver and then they amended

22   their contentions and their theories dramatically in the middle

23   of the case.  And as that's happened, the claim construction

24   has moved, and then by the time we got to expert reports, we

25   got expert depositions with some pretty remarkable admissions

1   which I'd like to show you in a moment.

2        But let me just share my screen and I can show you where

3   we started the case.  Can everybody see that?

4        THE COURT:  I cannot.

5        MR. BLACK:  Okay.  Try again.  How's that?

6        THE COURT:  Yes, sir.  I've got it.

7        MR. BLACK:  Okay.  Thank you, Your Honor.

8        So we started the case -- the issue in these claims is

9   that they have signal strengths that are defined as high or

10  low, and there's the desired signal which is the signal that

11  you want to receive at the phone and then there's interference

12  which can get in the way, and the patents deal with how you

13  address the interference.

14       So here's some sample signal levels on the left.  Typical

15  phone might go from negative 20 dBm down to a negative 110 dBm,

16  and the desired signal and the interfering signals would be

17  measured at those levels and various things done in the claim.

18  So the whole thing starts, the whole alleged invention starts

19  with determining what's the signal level?  Is it a high level

20  or a low level?

21       So no real dispute that negative 20, the highest that the

22  phone could hear would be a high, and that negative 110, which

23  is just a whisper, about to lose the signal, would be a low.

24  But we said, look.  You need an upper bound for low and a lower

25  bound for high which is objective in order to meet Section 112

1   indefiniteness requirements.  And that there was a big question

2   mark because there is nothing in the claim on these terms of

3   degree which would tell you where the lower boundary of high

4   was and where the upper boundary of low was.

5        And Theta responded and said -- they brought in an expert

6   Mr. Goldberg, and he said, well, you could do it.  An engineer

7   could -- there's nothing in the spec and there's no -- nothing

8   that would tell you, but you could look at standard or an

9   engineer could figure it out and therefore you should go with

10  plain meaning.

11       And that's what the Court did, and we understand that and

12  we continued litigating the case.

13       Mr. Goldberg, who was their infringement -- the claim

14  construction expert at the beginning of the case, had this

15  testimony where he clearly said that he understood the claims

16  we did, that you were trying to figure out which signal levels

17  were high and which ones were low.  And he said here at the

18  bottom, well, I'd look at -- we would need to look at the

19  requirements of the receiver, the bit error rate, the

20  sensitivity, a bunch of other things listed in my report,

21  et cetera, to determine what low is.  And so that's how one

22  would know what low is.

23       And then the same thing with the interferer signal.

24       So plain meaning was, we look at a number, an engineer

25  would know which ones of the numbers that the receiver could

1  handle were high and which ones were low, and we disagree with

2  that because we thought the upper boundary of low and the lower

3  boundary of high were indefinite, but we understood they got a

4  plain meaning construction and we moved on.

5      Then they changed their infringement contentions and went

6  with this new theory and they didn't say anything in the expert

7  reports about how they were interpreting high or low.  We did

8  not get a report that said, well, we would look at the LTE

9  standard X to determine what high levels are and what low

10  levels are or an engineer would do this or that, and it was

11  extremely puzzling because they had a plain meaning

12  construction but they had absolutely no description of how an

13  engineer would go about determining high and low.

14      So Mr. Song asked at the depositions.  And this is the

15  deposition of Dr. Larson and the question was, what are the

16  boundaries?  That was the question beginning of the case.  And

17  he said, so -- so there's no unambiguous boundary, and,

18  therefore, in my opinion, between high and low, except that

19  clearly in the order of magnitude that's high and equal is not

20  high, and where the exact boundary occurs is ambiguous.

21      This is their expert, their evidence, not our expert,

22  saying that the boundary's ambiguous twice.

23      He said it again in the section at the bottom.  And that

24  there's a transition from high to low equal where the

25  transition is is unclear.  And, you know, I -- we could --

1   people could genuinely and honestly disagree about that.

2       When POSAs can genuinely and honestly disagree about

3   something, when there's no objective standard when a line in a

4   claim term that you need in order to determine the metes and

5   bounds of the -- in the mention are unclear and ambiguous, that

6   is a definition of indefiniteness.

7       So by changing their case and changing their position on

8   what high and low meant, they have rendered the claims

9   indefinite in their application.

10      Now, this was not an accident.  Dr. Larson said also that

11  his order of magnitude construction was, quote, "approximate."

12  Still kind of, you know, low.

13      And then their invalidity expert said that their

14  construction, which is that any signals which measure ten

15  decibels apart, that's an arbitrary number.  So here's their

16  invalidity guy -- their infringement guy saying it's ambiguous,

17  their validity guy saying the infringement guy's numbers are

18  arbitrary.  That's the summary judgment record.

19      So based on the way they've applied the claims, they have

20  rendered the claims indefinite, and we, therefore, seek a

21  summary judgment of indefiniteness.

22      Now, in the alternative, Your Honor, what they've done

23  here is issued a -- only through the -- only through the

24  deposition testimony -- they've taken a very odd position.

25  They now say that high and low are not numbers, that they're

1   not specific numbers, but the negative 20, negative 30,

2   negative 40, they're saying that you compare the two signals

3   against each other, and the louder one is high and the softer

4   one is low.  So that any signal could be both high and low.

5   And there's no objective way to determine when.

6        So, for example, let's saw there's a negative 60 db

7   signal.  The construction that we were discussing during claim

8   construction was, well, we don't know whether that's high or

9   medium, and they said, don't worry about it.  Our expert will

10  be able to definitively tell you at the time we get to the end

11  of this case by looking at specifications, by looking at

12  standards, by looking at other things, but that's not the

13  position they've taken now.  The position they've taken now is

14  that the 60 dBm desired signal would be high if the

15  interferer's lower, but that same 60 dBm signal would be low if

16  the interferer is higher.  They're really reading these to

17  things as higher and lower rather than high and low.  These are

18  relative -- they've turned this claim into a relativity problem

19  when before we had a basis for at least having a discussion

20  about which signal levels fell within which category.

21       This is a serious issue.  It is a claim construction issue

22  that should have been raised at claim construction time and it

23  was not.  It is not a plain meaning construction.  And what

24  that means is that their expert report on infringement is

25  founded on a -- not on your construction, which was plain

1  meaning, but on a construction that they made up and first told

2  us about during the deposition.  The prejudice here is severe.

3  Had we known this was their position, we would have had

4  additional prior art issues.  We would have had additional 112

5  issues because there's no support for this in the specification

6  at all.  And it would have led to other depositions and other

7  things that could have been done in the case, but it wasn't.

8       So our request, Your Honor, is that the claims be held

9  indefinite as applied by Theta.  That in the alternative, the

10  Court find noninfringement because they did not apply a plain

11  meaning construction.  And if that fails, Your Honor, we've got

12  an 02 Micro where we need a construction, we need some guidance

13  from the Court on what construction is going to be applied at

14  trial so that we can resolve the issue definitively.  But given

15  the way they've applied it, given the admissions of their

16  experts that the claim language is ambiguous, this case is the

17  rare one that meets the definition of summary judgment on

18  indefiniteness based on the expert's own admission.

19       That's our submission, Your Honor.

20       THE COURT:  If you guys would hold on just a second.

21  Obviously I'm going to let plaintiff respond, but I'm going to

22  take just a minute or two break.  I'll be right back.

23       (Pause in proceedings.)

24       THE COURT:  If we could go back on the record.

25       I don't want to seem unfair to the plaintiff, but -- and

1    not give them a chance to argue.  If you -- let me tell you

2    what I'm thinking about doing and then you can tell me what --

3    whether or not you think it's the most efficient way.

4         I think, given the argument that I just heard, and I'm

5    not -- I'm making no decision in terms of the merits at this

6    second about what Mr. Black just said.  But it seems to me that

7    the appropriate thing to do is to have you all brief -- have

8    the plaintiff brief why its infringement -- its expert's

9    application of plain and ordinary meaning to this claim term

10   with respect to the infringement of these products is plain and

11   ordinary meaning.  And the defendant can argue that it's not.

12        In essence, I'm happy to have another Markman on this to

13   determine whether or not the plaintiff's infringement -- I'm

14   calling it contention, it's not really that, but it is the

15   infringement position -- is consistent with what is the plain

16   and ordinary meaning or whether or not the expert's gone

17   astray.

18        That seems to me to be the most efficient and fair and

19   effective way of doing this.  Let me hear from the plaintiff

20   about what you think about going about it in that manner.

21        MR. JOHANNINGMEIER:  Well, Your Honor, so, I mean, I am --

22   I was prepared to, you know, a number of -- I'll just say a

23   number of things that Mr. Black just said I completely disagree

24   with and think are misrepresenting what happened.  But I was

25   prepared to rebut this and talk about it now and to talk about

1    with our meaning is.  You know, we have a number of slides, a

2    whole list of -- so I can either -- I'm sorry.

3         THE COURT:  I'm sorry.  If you'd like to do that right

4    now -- I'm just saying that I want to -- I'm trying to protect

5    y'all's record on both sides.  And so if you think -- and

6    Mr. Black, you know, unless Mr. Black's violently opposed to

7    this, you know, I'm happy to hear you make that -- an argument

8    that is -- entwines what I just said as well.

9         And then I may hold off on ruling today and make that one

10   of the things -- I think that's one of the options Mr. Black

11   gave me, was determination that it -- your opposition was not

12   consistent.  I'm totally happy to take it up today.  I just

13   wanted to make sure you all had an adequate time to brief it.

14   If you think you're prepared to move forward with it today

15   because of the briefing, I'm happy to move forward with it

16   today, and we can get something done much quicker.  I'm fine

17   with that.

18        MS. DE MORY:  Your Honor, could we have just a moment to

19   discuss?

20        THE COURT:  Sure.  Again, I want to do two things:  One,

21   make sure I'm fair to everybody in giving you all time to brief

22   what is most beneficial to me, and, number two, to not have you

23   all go up on appeal where there was a fight over what the plain

24   and ordinary meaning was.  I get that, and I'm going to avoid

25   that.

1      MR. JOHANNINGMEIER:  And I appreciate that, Your Honor.  I

2 mean, I guess -- I mean, this obviously is a case dispositive

3 issue.  I mean, it's essentially a -- they're asking to

4 reconsider Your Honor's Markman ruling.  You know, I think it's

5 very clear that we didn't do what they just accused us of

6 doing.  I can explain that, but, I -- again, I agree I would

7 not want to go up on appeal with sort of a ruling from the

8 bench today.  So on one hand I would very much like to respond

9 to Mr. Black, but, you know, if Your Honor would be more happy

10 to have briefing and maybe even a separate hearing, then we're

11 fine with that as well.

12      THE COURT:  I'm happy to do whatever.  And I'm not saying

13 this to cover myself.  I really want you all to do what's the

14 most prophylactic for both of your sides' cases.  What happened

15 in my first trial was probably because it was my first trial,

16 we wound up having the experts fighting during trial over

17 whether or not the other had used the plain and ordinary

18 meaning of a word, and that doesn't work.  And so in one of my

19 last two trials we had this situation and I did the Markman

20 during the trial to try and get it right.  So all I want to do

21 is if there's a fight over whether or not -- if -- Mr. Black

22 can help me if I've got this wrong, but one of his arguments is

23 that the way your expert has construed the plain and ordinary

24 meaning of a claim term falls outside of the ambit of plain and

25 ordinary meaning and that is something that is as a matter of

1   law that I need to decide, and I am -- I am going to decide

2   that and not have the jury figure that out.

3       MR. JOHANNINGMEIER:  Of course, Your Honor.  And I think

4   that the issue here what we have is actually -- maybe I should

5   just present really quickly what I have and then we can take

6   the issue off because I do want to respond and clarify

7   something here.  I don't think there is an expert dispute

8   because their expert honestly hasn't really taken issue.  What

9   we're dealing with here is counsel has an argument about what

10  we're doing and then we have a bunch of testimony that says

11  what a person of ordinary skill would understand.  So I can

12  explain -- let me just walk through that briefly, I guess, and

13  then, you know, we're very happy to -- because this is such a

14  significant issue, if Your Honor thinks there is a potential

15  for a dispute at trial, which honestly, you know, there could

16  well be that it might make sense to brief it and have a

17  decision and have a clear instruction from the Court about what

18  can and can't be said on this issue at trial.  We're very

19  interested in that because, otherwise, you know, we could be

20  having -- you know, to the extent what counsel just argued is

21  going to come out of the mouth of their expert at trial, that

22  would be inappropriate.  So I do think it's an important issue.

23  So let me just --

24      MR. BLACK:  I was just going to say just to answer Your

25  Honor, I do believe that protecting the record for everybody is

1    important and that some clarity in briefing would be very

2    beneficial.  We did want to -- when I was looking at this, I

3    saw, you know what?  We're going to have a train wreck at this

4    trial if we don't sort this, and that's why we asked for the

5    motion last week, and we think briefing was a very good idea.

6         THE COURT:  Yeah.  I think I'm going to go ahead and do

7    that.  I'm just going to put a pause -- I don't want --

8    Mr. De Mory (sic), I'm worried that you're thinking, gosh, I've

9    only heard one side of it and that's not fair.  I know you want

10   to get yours out too, but truly, fortunately for you all, I

11   actually had some cases that involve this technology.  So as

12   you were going through the arguments, I actually understood

13   what you were saying.  And so I -- in other words, I understand

14   what the fight is.  And so what I would propose we do on this

15   one, and Mr. -- I'm curious for a second, Mr. Black.  What is

16   the other last of the motions that we have?

17        MR. BLACK:  The last motion is a motion to deal with trial

18   management really.  We had earlier in the case filed a motion

19   to bifurcate the implied license defense.  Actually filed a

20   motion asking for certification on appeal which hasn't been

21   acted on.  It's a little late for that.  But we do think that

22   that's an issue for the bench, not for the jury and that we

23   kind of need that sorted before January 4th which is six days

24   before trial.  We think the most efficient thing would be to

25   have Your Honor try that issue because it's equitable, try it

1   first, but if not, we need to make sure the evidence that comes

2   in in front of the jury only is related to evidence that's

3   necessary.

4        THE COURT:  Mr. Black, let me tell you the way I've done

5   this in the past, and this may not make you happy, but it's the

6   way it's been most efficient for me and then tell me what you

7   think of this.  I've had several cases now where we've had

8   inequitable conduct which I don't submit to the jury.  What

9   we've done in those cases is we have tried the case, and then

10  while the jury is deliberating, I've tried the bench trial on

11  the equitable issues.  That way we don't lose time, but I also

12  have kept out evidence if it -- for example, if there's

13  evidence that only went to the inequitable conduct claim and

14  someone objected, I kept it out from the jury.  So to me that

15  would make the most sense to me, given how close we are to

16  trial, but if you're telling me that a -- if I heard your case

17  first on this to the bench, I might say we don't need a trial.

18  Obviously, there is some appeal to that as well.

19       MR. BLACK:  That is exactly right, Your Honor.  If you

20  hear the --

21       (Simultaneous conversation.)

22       MR. BLACK:  -- implied license defense goes to -- I'm

23  sorry.  Go ahead.

24       THE COURT:  No, no.  Please.  Go ahead.

25       MR. BLACK:  I was going to say the implied license defense

1   goes back to the really central issue in the case which is in

2   the first litigation they sued us on these two patents and then

3   dropped it, gave us a license and a covenant not to sue.  Then

4   they made some minor changes to the claims and sued us again.

5   And we're saying -- to the extent we're operating at all, we're

6   operating within that license and we're allowed to do what

7   we've done.

8        So there's some case law on this.  Your Honor issued a

9   summary judgment ruling against us and said there's a triable

10  issue.  Our view is, okay.  We understand that's the law of the

11  case, but that's a triable issue for the Court to decide and it

12  would be a one day trial probably and could -- definitely a one

13  day trial and could sort out this whole case and --

14       THE COURT:  Let me make this offer.  I'll keep bidding and

15  see how this goes.  I mean, and so -- and, you know,

16  remembering when you're giving your Yelp reviews how

17  cooperative I was.  So...

18       But what if we did this?  And the reason -- if this were

19  any other day other than the 3rd, you know, the problem is we

20  don't have that week before.  Here's what I'm thinking we could

21  do.  We could -- if you think you could get that part of the

22  case tried in the morning, we'll pick the jury when we pick the

23  jury.  I'm assuming we're doing it sometime ahead of the trial,

24  and ordinarily I would start Monday morning at 9:00 with the

25  jury trial.  What we could do is we could just have the jury

1   come in at 1:00 and you all could try that case, your -- that

2   bench trial in the morning at 9:00.  And you'd have three hours

3   to try it, and then, you know, we'd have the -- obviously if I

4   decided in your favor, then the jury would come in for a very

5   short time.  If I decided not in your favor, then we would try

6   the case.  And that way we wouldn't lose too much time -- oh,

7   wait.  In fact, even -- oh, no.  I was going to say we could do

8   this, but y'all will actually be attending the jury picking.

9   So let's see.

10       MS. DE MORY:  Your Honor, can I --

11       THE COURT:  Are y'all on the 10th or the 3rd?

12       MS. DE MORY:  We're on the 10th.

13       MR. BLACK:  We're on the 10th.

14       MS. DE MORY:  May I be heard briefly on this, Your Honor?

15       THE COURT:  Sure.

16       MS. DE MORY:  This is on behalf of Theta.  Good morning or

17   good afternoon, as the case may be.

18       So we oppose bifurcation of this issue going first.  The

19   issue here has already been litigated twice fully, and the

20   Court issued a summary judgment order in which it unequivocally

21   said there are disputed questions of fact.  And those questions

22   of fact are not the questions of fact that should be resolved

23   by the Court.  They are questions of fact that actually go

24   essentially to contract formation.  What was the deal between

25   Samsung and Theta?  Was there a deal?  So the Court has already

1    determined that there was no integrated contract here, that

2    parol evidence is coming in to determine what the intent of the

3    party is.  Under Texas law this formation issue is a question

4    of fact.  It goes to the jury.  So although ultimately the

5    Court may decide based on some findings from the jury that in

6    fact whatever the jury finds there was a deal and it had, you

7    know, these -- you know, this was the meeting of the minds,

8    this was the mutual intent, then the Court may say, okay.  Then

9    I'm going to direct a result, but the summary judgment order is

10   very clear and the Court has actually considered this twice

11   already.

12       There was a motion to dismiss and then there was a summary

13   judgment motion on this issue.  And the Court in the summary

14   judgment order said a number of things.  It said first,

15   however, a fact issue exists as to the mutual intent of the

16   parties precluding summary judgment.  But Theta demonstrated a

17   material issue of fact, that these -- the cases that Samsung

18   relies on are distinguishable because there's clear contrary

19   evidence here of intent of the parties which this Court sees as

20   a fact issue precluding summary judgment.

21       So this is not one of those issues where it's a bench

22   trial on just the documents, and Samsung has already had that

23   bench trial on the documents twice.  And the Court has reached

24   its determination.  In fact, in the summary judgment order, the

25   Court also says that Samsung argues Theta rejected Samsung's

1   request for a broad piece and, therefore, it's entitled to this

2   presumption that it should have an implied license.  But the

3   record evidence shows that Theta expressly reserved the right

4   to sue for infringement on the continuation patents or, rather,

5   every patent other than those named in the C&S and strong

6   enough to defeat a presumption and raise a fact issue for the

7   jury.

8          So we -- we've already -- I mean, you've already actually

9   considered this issue twice and determined that there was a

10  fact issue that should go to the jury.

11         And in addition to that, it's not just that this -- that

12  you've made that determination.  It's that all of these facts

13  are going to the jury anyway.  Because these issues -- the

14  Court just denied the motion on noninfringing alternatives.  So

15  that means the covenant is coming in, and we're talking about

16  whether or not Samsung could feasibly practice the patents that

17  were from the prior litigation.

18         We -- these are method claims, so we're talking about

19  inducement.  And our evidence of inducement is completely

20  linked in the same as the evidence relating to the implied

21  license defense.

22         We resolved the last -- the last suit ended when

23  Samsung -- we gave Samsung a covenant.  It came back to us.  It

24  asked us, will you expand that covenant to cover the pending

25  continuations which Samsung knew about and Samsung admits?  We

1    said no.  And so there's -- that's going to be evidence of

2    knowledge, willful blindness, and it also comes in as to

3    willfulness.

4         So these issues are fully intertwined with the trial.

5    They are not going to simplify anything, and the Court has

6    already decided that there are disputed questions of fact that

7    should go to the jury on this.  And so --

8         THE COURT:  I got it.  If y'all will give me just a

9    second, I need to check something with my clerk.  I'll be back

10   in just a few seconds.

11        (Pause in proceedings.)

12        THE COURT:  Okay.  Here's what we're going to do.  The

13   pretrial conference is January 4th.  I need you all to get

14   together and figure out how you're going to do the briefing on

15   this claim term issue.  Again, it seems to me the way to do it

16   is for the plaintiff to get me a short brief on why the --

17   explaining why the expert believes that the product -- Samsung

18   products infringe and what he did in terms of his analysis, why

19   it infringes this claim term, and then why the claim term is,

20   in fact, plain and ordinary meaning within the context of the

21   patent and the specification.  That needs to be done quickly.

22   I don't know how many days, but it needs to be done quickly.

23   Then I need a response from the defendant, and that needs to be

24   done quickly, and then if the plaintiff wants to have a very,

25   very short reply, that needs to be done and to us by

1  December 3rd (sic) because my understanding is our pretrial

2  conference is on the 4th.

3      So that's what we're going to do with that part.  On the

4  other part we are going to -- I'm going to not take up the

5  issue of -- that Mr. Black raised until like -- I'm going to do

6  it in my ordinary course of business which is if at the end of

7  trial there still is an issue that I believe I need to take up

8  and that it should not go to the jury, then I'll do that at a

9  bench trial while the jury is out.

10     And as we go through the course of the trial, if there's

11 evidence that one side believes is or is not admissible based

12 on it not pertaining to an issue that's going to be tried by

13 the jury, we'll just -- the lawyers can object during the

14 trial.

15     So I think that resolves everything that we had today.

16 But I'll start with Mr. Black who's in my screen and ask if

17 there's anything else -- oh, I'm sorry.  My clerk just pointed

18 out.  We need -- I'm going to deny the motion for interlocutory

19 certification as well.

20     So is there anything else that we need to take up today?

21     MR. BLACK:  I did not have high hopes for the motion for

22 interlocutory appeal, Your Honor, and I thank you for jumping

23 on this and your creativity in dealing with that.

24     I will say one thing, that under English common law, which

25 is what actually governs through the Seventh Amendment, what we

1  have a right to trial by jury on, the fact that there's intent

2  and other issues involved, like for inequitable conduct, makes

3  no difference.  This issue, Your Honor, implied license, it is

4  for you, and we look forward to trying it to you.

5      THE COURT:  Well, you have Mr. Horton who may be the only

6  one of you all that has appeared recently in the Supreme Court.

7  So maybe when he and I are at lunch someday, I'll ask him to

8  explain to me the English common law because -- I'm kidding.

9      (Off-the-record discussion.)

10     THE COURT:  Well, this is just more evidence of why since

11 just about everyone on this call is a thousand times sharper

12 than I am why it's a good thing I got this alternative job and

13 don't have to practice law and compete against any of you.

14     So it's -- but it's -- so I'm going to amend what I said.

15 I'm going to invite both you and Mr. Horton to lunch and we can

16 all talk about the common law and find it fascinating.  So...

17     MR. BLACK:  That'll be fabulous, Your Honor.

18     THE COURT:  Is there anything else we need to take up

19 today?

20     MR. CORDELL:  Just one little nit, Your Honor, if I may.

21 This is Ruffin Cordell.  And I don't know anything about the

22 English common law because all I know is the principle code.

23 So I'm stuck in a different world, but...

24     (Laughter.)

25     MR. CORDELL:  We had a little bit of a problem in that we

1  had our corporate representative slated for trial, and he's got

2  a bunch of conflicts.  And so we're -- we would like to propose

3  someone else from the same department so that it's as close a

4  match as possible, but we want to be able to allow him to be

5  deposed now out of time.  Does the Court have a problem with

6  that?

7       THE COURT:  I have no problem with that.

8       MR. CORDELL:  So we'll put him up.

9       MS. DE MORY:  Your Honor?

10      THE COURT:  Look.  I mean, this stuff happens.  You know,

11  we're all doing the best we can.  We've got -- you know, I

12  don't know what a corporate representative is going to say.

13  And so, you know, I don't know that he's even going to be

14  called.  I don't know what you would depose him about.  And

15  so -- other than he's going to come in and say, I work for

16  Samsung.  And so...

17      MR. CORDELL:  We gave them a proffer just to try to

18  short-circuit the process, but we'll get it done.

19      MS. DE MORY:  That's all good.  We'll work it out.  It's

20  not a problem.

21      THE COURT:  I would do the same with you.  I've allowed

22  witnesses to appear by Zoom, you know, where it's a time when

23  we've just all had to be limber and get things done.

24      MS. DE MORY:  We'll work it out.

25      I think there's one other small issue that would help us

1   all avoid sending you more paper, which is that we have

2   motions -- oppositions to motions in limine and the draft

3   pretrial order due tomorrow.  I know everyone on all sides has

4   been very distracted by getting ready for this hearing.  So we

5   all collectively proposed that we move that date till Tuesday,

6   and so I would just ask --

7        THE COURT:  No way.

8        (Laughter.)

9        THE COURT:  I was going to spend my weekend going through

10  those.  No.

11       MS. DE MORY:  It'll just save a motion.

12       THE COURT:  No.  That's -- that is 100 percent fine with

13  me.  As far as I'm -- yeah.  No.  I don't -- I really don't

14  need -- not to let you behind the Wizard of Oz' door, but I

15  will look at the motions in limine on whatever the date our

16  pretrial hearing is.  I will go through -- I'll be reading them

17  as I'm -- I'll go through them and tell you what I'm going to

18  do as I read through them.  And if I have any questions about

19  why -- if there's something where I think I don't know why they

20  want that, I'll ask you, but that part of this will go -- the

21  motions in limine will go very quick.

22       And so you understand, this is the way I see motions in

23  limine, which is on 99 percent of it I'm just saying you can't

24  bring it up during opening argument or without asking

25  permission of the Court.  I'm not typically ruling that it's

1    inadmissible.  Now, if there's something different, you know,

2    can you turn and ask opposing counsel what they said to their

3    client?  No.  That's a motion in limine that's kind of one of

4    the permanent ones, but if it's case specific, my view of

5    motions in limine is this:  They're out until someone comes up

6    and says, Judge, we'd like -- this is why this is going to come

7    in, and that's fine.

8         Also, I have recently had more people objecting during

9    opening arguments and closing arguments than I had seen in the

10   past.  I am a schizophrenic on this.  On the one hand, like

11   most judges, I don't like it very much.  On the other hand,

12   it's your client you're protecting, and if you feel like you

13   need to object to something, then that's your right and you

14   should do it.  You should not not object during opening or

15   closing because you're worried what I'm going to do.  You need

16   to protect your client.  And so that's the way I see the world.

17   And so that's the way to deal with openings and closings.

18        So is there anything else we need to take up today?

19        MS. DE MORY:  Nothing else, Your Honor.  Thank you.

20        MR. CORDELL:  Nothing from defendants, Your Honor.  Thank

21   you.

22        THE COURT:  Well, as always, I have the best job in the

23   world.  I get to work with great lawyers over interesting

24   stuff, and I don't have to bill hours.  So those two things are

25   pretty wonderful.

1        So I hope you all have a Merry Christmas or a happy

2   holiday or whatever it is -- whatever it is you observe, I hope

3   you have a wonderful holiday season.  I hope that you have a

4   wonderful new year.  I hope those of you who are more local, I

5   hope I see you in person in the near future at some point, and

6   if there's anything else we need take up before the pretrial

7   hearing, just let Jeff Melsheimer know and we'll do it.  So

8   take care, everyone.

9        (Hearing adjourned at 3:19 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS    )

3

4        I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of Texas, do

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8        I certify that the transcript fees and format comply with

9   those prescribed by the Court and Judicial Conference of the

10  United States.

11       Certified to by me this 16th day of December 2021.

12
                              /s/ Kristie M. Davis
13                            KRISTIE M. DAVIS
                              Official Court Reporter
14                            800 Franklin Avenue
                              Waco, Texas 76701
15                            (254) 340-6114
                              kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25
```