```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                          WACO DIVISION

 3   THETA IP, LLC                *    January 4, 2022
                                  *
 4   VS.                          * CIVIL ACTION NO. W-20-CV-160
                                  *
 5   SAMSUNG ELECTRONICS ET AL    *

 6            BEFORE THE HONORABLE ALAN D ALBRIGHT
                   FINAL PRETRIAL CONFERENCE
 7
     APPEARANCES:
 8
     For the Plaintiff:        Denise M. De Mory, Esq.
 9                             Corey Johanningmeier, Esq.
                               Aaron R. Hand, Esq.
10                             Henry C. Bunsow, Esq.
                               Hillary N. Bunsow, Esq.
11                             Michael Flynn-O'Brien, Esq.
                               Bunsow De Mory LLP
12                             701 El Camino Real
                               Redwood City, CA 94063
13
                               B. Russell Horton, Esq.
14                             George, Brothers, Kincaid & Horton LLP
                               114 West 7th Street, Suite 1100
15                             Austin, TX 78701

16   For the Defendant:        Martin J. Black, Esq.
                               Dechert LLP
17                             2929 Arch Street, Cira Center
                               Philadelphia, PA 19104
18
                               Seungtaik Michael Song, Esq.
19                             Michael H. Joshi, Esq.
                               Madeleine Ball, Esq.
20                             Dechert LLP
                               3000 El Camino Real
21                             Five Palo Alto Square, Suite 650

22                             Derek J. Brader, Esq.
                               Dechert LLP
23                             2929 Arch Street, Cira Center
                               Philadelphia, PA 19104
24

25
```

```
 1                              Chet Campbell, Esq.
                                Fish & Richardson, P.C.
 2                              One Marina Park Drive
                                Boston, MA 02210
 3
                                Ruffin B. Cordell, Esq.
 4                              Michael J. McKeon, Esq.
                                Daniel A. Tishman, Esq.
 5                              Ryan M. Teel, Esq.
                                Matthew Mosteller, Esq.
 6                              Fish & Richardson, P.C.
                                1000 Maine Avenue. S.W., Suite 1000
 7                              Washington, DC 20024

 8                              Francis J. Albert, Esq.
                                Fish & Richardson, P.C.
 9                              12860 El Camino Real, Suite 400
                                San Diego, CA 92130
10
                                Melissa Richards Smith, Esq.
11                              Gillam and Smith, LLP
                                303 South Washington Avenue
12                              Marshall, TX 75670

13   Court Reporter:            Kristie M. Davis, CRR, RMR
                                PO Box 20994
14                              Waco, Texas 76702-0994
                                (254) 340-6114
15

16          Proceedings recorded by mechanical stenography,

12:13 17   transcript produced by computer-aided transcription.

12:29 18

19

20

21

22

23

24

25
```

3

| | | |
|---|---|---|
| 08:21 | 1 | (January 4, 2022, 8:35 a.m.) |
| 08:35 | 2 | THE BAILIFF:  All rise. |
| 08:35 | 3 | (Call to Order of the Court.) |
| 08:35 | 4 | DEPUTY CLERK:  Final Pretrial Conference in Civil Action |
| 08:35 | 5 | W-20-CV-160, styled Theta IP, LLC versus Samsung Electronics |
| 08:36 | 6 | Company, Limited and Samsung Electronics America, Incorporated. |
| 08:36 | 7 | THE COURT:  Good morning, everyone.  If I could have |
| 08:36 | 8 | announcements from counsel, please. |
| 08:36 | 9 | MS. DE MORY:  Good morning, Your Honor.  Denise De Mory on |
| 08:36 | 10 | behalf of plaintiff Theta IP, LLC.  With me are Aaron Hand, |
| 08:36 | 11 | Henry Bunsow. |
| 08:36 | 12 | MR. BUNSOW:  Good morning, Your Honor. |
| 08:36 | 13 | THE COURT:  Good morning. |
| 08:36 | 14 | MS. DE MORY:  Russ Horton, Mike Flynn-O'Brien, Corey |
| 08:36 | 15 | Johanningmeier and Hillary Bunsow as well. |
| 08:36 | 16 | THE COURT:  Welcome, all. |
| 08:36 | 17 | And for Samsung?  Mr. Cordell? |
| 08:36 | 18 | MR. CORDELL:  Good morning, Your Honor.  Ruffin Cordell. |
| 08:36 | 19 | THE COURT:  I think this is your first time in my |
| 08:36 | 20 | courtroom. |
| 08:36 | 21 | MR. CORDELL:  It is, indeed, and it's beautiful.  You |
| 08:36 | 22 | know, I don't know what took me so long. |
| 08:36 | 23 | THE COURT:  Well, welcome here. |
| 08:36 | 24 | MR. CORDELL:  Well, good.  So I'm here on behalf of |
| 08:36 | 25 | Samsung this morning with Martin Black, Michael Song, Melissa |

4

08:37 1   Smith, Michael McKeon, Dan Tishman.

08:37 2        We also have a -- one of our lawyers tested positive for

08:37 3   COVID and is sequestered in his hotel room.  He feels fine, but

08:37 4   out of an abundance of caution, we're leaving him back.

08:37 5        THE COURT:  Well, I had -- Christmas eve morning I tested

08:37 6   positive for COVID.  So I spent my Christmas quarantined by

08:37 7   myself which was not the greatest Christmas ever.  So I'm very

08:37 8   sympathetic to your partner.

08:37 9        MR. CORDELL:  If the Grinch had only thought of that, that

08:37 10  would have been a better thing.  Frank Albert might, with the

08:37 11  Court's permission, might appear for a couple of the arguments

08:37 12  remotely.

08:37 13       THE COURT:  Absolutely fine.

08:37 14       MR. CORDELL:  And then we have our client representative

08:37 15  here, Mr. Anthony Kahng, is with us from Samsung.

08:37 16       THE COURT:  Welcome.

08:37 17       Are we ready to proceed?

08:37 18       MR. CORDELL:  Yes, Your Honor.

08:37 19       MS. DE MORY:  We are, Your Honor.

08:37 20       THE COURT:  I think the first issue is -- let me just get

08:37 21  my cheat sheet.  So the first issues have to do with claim

08:38 22  construction.  And I'm happy -- there's a motion to adjourn

08:38 23  which I guess is moot or -- since we're taking this up today,

08:38 24  correct?

08:38 25       MR. CORDELL:  We don't believe it's moot, but we are

08:38  1    taking it up today, hopefully.

08:38  2        THE COURT:  Well, then I think it's going to be denied.

08:38  3    But let's go ahead and take up the motions.

08:38  4        MS. DE MORY:  Your Honor, Mr. Johanningmeier will be

08:38  5    handling this.

08:38  6        THE COURT:  Okay.

08:38  7        MR. CORDELL:  And I believe it's our motion, Your Honor.

08:38  8        THE COURT:  Yeah.  I think they get to go first.

08:38  9    Good morning.

08:38  10       MR. BLACK:  Good morning, Your Honor.

08:39  11       (Off-the-record discussion.)

08:39  12       MR. BLACK:  There we go.  Thank you, Your Honor.

08:39  13       So this is our motion.  We started this off with a motion

08:39  14   for summary judgment of indefiniteness or noninfringement for

08:39  15   failure of their expert to use plain meaning.

08:39  16       The standard for indefiniteness, of course, is that a

08:39  17   claim must have reasonable certainty to it.  And the issue in

08:39  18   this case is whether or not the claim is drafted, the high and

08:39  19   low relative terms of degree are sufficiently definite to allow

08:39  20   us to proceed and whether their expert used a plain and

08:39  21   ordinary meaning construction, which is what they asked for

08:39  22   during claim construction and Your Honor granted.

08:39  23       Now, the important point here is that it is not enough to

08:39  24   draw part of the boundary around a claim.  It is not enough for

08:39  25   someone to be able to look at these claims and identify one

08:39  1   high condition where the device is at the highest possible

08:40  2   power level.  You've got to be able to draw all the boundaries

08:40  3   around the fence, around the claim for it to be definite.

08:40  4       So if you have a situation like this where you've got

08:40  5   multiple possible ways to complete the fence, you do not have a

08:40  6   definite claim.  That's the law.

08:40  7       The Supreme Court said in Nautilus in 2014, they tightened

08:40  8   up the standard, which means all the cases that came before

08:40  9   that and were cited in Theta's brief are largely irrelevant.  A

08:40  10  patent claim has to be sufficient to inform those of skill in

08:40  11  the art about the scope of the invention with reasonable

08:40  12  certainty.

08:40  13      The Federal Circuit has said you must have objective

08:40  14  boundaries, and the Western District of Texas has said it

08:40  15  cannot fall inside the scope of the claim term but also it

08:40  16  falls outside of it.  Both have to be known, got to have the

08:40  17  full scope of the claim.

08:40  18      The fact that the parties can do part of the work in this

08:40  19  case on infringement, part of the work on validity is

08:41  20  insufficient if the claim is not drawn completely.

08:41  21      So what are the claims that we have in this case?  We've

08:41  22  got a method for power dissipation reduction in a receiver that

08:41  23  causes improvement in a drain on battery life.  That's Claim 1

08:41  24  of the '962.

08:41  25      This is the basic functionality here, and this again is

7

08:41  1    from Claim 1 of the '962:  Wherein the wireless transceiver

08:41  2    comprises a circuit for determining two things, a signal

08:41  3    strength of the interferer signal and a signal strength of the

08:41  4    desired signal.

08:41  5         So what we have on the left is you have the signal coming

08:41  6    in.  You've got the desired in sort of green and the interferer

08:41  7    in red.  They're mixed together.  They go into the circuit.

08:41  8    There are sensors inside the phone that determine the signal

08:41  9    strength.  And those spit out values, two numerical values, a

08:41  10   signal strength for the interferer and a signal strength for

08:41  11   desired signal.

08:41  12        Now, the question is:  What do you do with those two

08:42  13   values?

08:42  14        Now, what the patent says is, you then have to determine

08:42  15   whether or not those values are high values or low values, and

08:42  16   there must be an algorithm for doing that.  The device must

08:42  17   have a way to determine which are high and which are low.  And

08:42  18   the experts applying infringement analyses in this case must be

08:42  19   able to state what that algorithm is, show that it's described

08:42  20   in the patent and that it creates reasonable certainty.

08:42  21        And those things are simply not present here.  You have

08:42  22   two numbers that are spit out by the circuit.  Are they high,

08:42  23   or are they low?  That's the question.

08:42  24        Now, the patent teaches pretty straightforwardly with a

08:42  25   series of diagrams and text that the signal strength is graphed

08:42  1    on the Y-axis of this diagram here.  Frequency on the right, on

08:42  2    the X-axis going to the right and signal strength going up.

08:42  3    These are values.  The patent teaches at Column 5, Line 33 that

08:43  4    in each of these figures the signal strength is plotted along

08:43  5    the Y-axis 204 or 254 as a function of frequency along the

08:43  6    X-axis.

08:43  7        So, again, very straightforward, numerical values on the

08:43  8    Y-axis.  If they're sufficiently high on the Y-axis, those are

08:43  9    high values.  If they're near the bottom, near the origin,

08:43  10   those are low values.  That's what the patent teaches.  That's

08:43  11   plain meaning.  You got numbers.  Some are high and some are

08:43  12   low.  That concept, easy enough.

08:43  13       The trouble is when you come to the point of trying to

08:43  14   determine which of those X and Y values are actually high or

08:43  15   low.  There is no consensus, there is no standard for doing so,

08:43  16   there is nothing in the patent which teaches you which ones are

08:43  17   high and which ones are low.

08:43  18       Now, there's no debate that the highest and the lowest

08:43  19   satisfy the high and the low.  But as soon as you come away

08:43  20   from the top, as soon as you start moving up from the bottom,

08:43  21   there's ambiguity in the claim.

08:44  22       Now, we pointed this out at claim construction and Theta

08:44  23   made a promise.  They promised that they were going to bring

08:44  24   standards, that they were going to bring certainty during the

08:44  25   course of the case to this question.  They referred to the LTE

08:44  1    standard.  They referred to other standards and said that they

08:44  2    would bring that evidence to the Court in their expert reports,

08:44  3    and they didn't do that.

08:44  4        Now, during the briefing -- and this is Theta's Markman

08:44  5    brief, they agreed, and this is the law when a word of degree

08:44  6    is used -- and high and low are words of degree -- the Court

08:44  7    must determine whether the patent provides some standard for

08:44  8    measuring it.  That was the debate at Markman.  It wasn't about

08:44  9    whether engineers understand high or low.  It wasn't about

08:44  10   whether someone in a course might write up on a board, well, if

08:44  11   it's high, do this, if it's low, do that.

08:44  12       The question is, what is the objective standard?  What is

08:44  13   the algorithm that an expert can use to determine which of

08:44  14   those values, X and Y values, are high and which are low.

08:45  15   There must be an objective standard.

08:45  16       Now, they told you at Markman that they were going to

08:45  17   provide that information to us and to the Court.  These are

08:45  18   quotes from their Markman briefing.  They said, "A POSITA would

08:45  19   readily understand that reference to the relevant specification

08:45  20   or standard would be expected."  They said, "Wireless standards

08:45  21   and specifications typically set forth required minimum

08:45  22   operating conditions in the context of the standards and/or

08:45  23   requirements documents applicable to a particular embodiment."

08:45  24       They said that a POSITA would interpret the claims with

08:45  25   reference to applicable wireless standards and specifications.

10

08:45  1    What they told the Court is, they were going to bring in

08:45  2    standards like the LTE standard which would inform the Court

08:45  3    and provide the reasonable certainty about which values were

08:45  4    high and which values were low.

08:45  5         Now, we said at the time that that was the wrong way to

08:45  6    approach it because the standard that's published after the

08:45  7    patent is filed does not become part of the specification and

08:45  8    cannot be used to inform reasonable certainty, but you ruled

08:46  9    against us.  We accept that.

08:46  10        However, they broke their promise.  They did not bring in

08:46  11   their expert reports the standards or anything objective from

08:46  12   which you could tell which of those X and Y values are high and

08:46  13   which are low.

08:46  14        Instead, when their experts arrived for their

08:46  15   deposition -- and I want to point out, there's no section on

08:46  16   claim construction in their report.  We waited for their expert

08:46  17   report because in their initial infringement contentions, the

08:46  18   amended contentions, the amended contentions, which changed

08:46  19   their case entirely, they took no position on how one is to

08:46  20   determine whether X and Y are high or low.

08:46  21        We waited for the expert report.  We opened the report.

08:46  22   444 pages failed to identify any standard for determining high

08:46  23   and low.  They did that intentionally.

08:46  24        Now, the first step in an infringement analysis, we always

08:46  25   say -- and it's the law and you'll give an instruction on that

08:47   1    to the jury -- is, you must first construe the claims, then you

08:47   2    apply the accused product against the language.

08:47   3         But here we didn't get a construction from them.  They

08:47   4    just said plain meaning, and that's it.  They didn't tell us

08:47   5    how you calculate X and Y and how you determine whether they're

08:47   6    high or low.

08:47   7         So we finally had an opportunity to get the answer from

08:47   8    their expert, Dr. Larson, when we took his deposition.  And he

08:47   9    said a couple of really interesting things.  He said:  There's

08:47   10   no unambiguous boundary between high and low, and, therefore,

08:47   11   in my opinion, between high and low.  Except that clearly, an

08:47   12   order of magnitude, that's high.  And equal is not high.

08:47   13        Well, let's break that apart.

08:47   14        No unambiguous boundary.  The boundary is required to make

08:47   15   a claim definite.  It's not enough that you can point to an

08:47   16   example that might be high.  Those who are in the field, those

08:47   17   who are in the area have a right to know.

08:47   18        The public notice function of the patent requires that we

08:47   19   be able to determine with certainty every single limitation,

08:48   20   every single embodiment that is within the claim and without

08:48   21   the claim.  That's the law.  That's Nautilus.  That's the

08:48   22   Supreme Court.

08:48   23        He struggled, and then he said, well, you know what, if

08:48   24   I'm pressed, how about an order of magnitude?  Meaning that the

08:48   25   claims are -- for high and low would be sufficient if the high

08:48    1   is 10 dB, an order of magnitude above the low.  That creates

08:48    2   absurd results.  It's not in the patent and it is definitely

08:48    3   not plain meaning, which was your construction.

08:48    4         So if that is the construction that he applied, and that's

08:48    5   the only evidence we have, he did not apply the Court's

08:48    6   construction and they therefore cannot present that

08:48    7   infringement opinion.  Does not comply with the Court's

08:48    8   construction.

08:48    9         He also said that there's a transition from high to low to

08:48   10   equal, where the transition is unclear.  And then he said

08:48   11   people could genuinely honestly disagree about that.  That is

08:48   12   the definition of indefiniteness.  An expert can't come in and

08:49   13   say I don't know what the scope of the claim is and then apply

08:49   14   that claim and ask for ████████.  That is not the way the

08:49   15   process works.

08:49   16         This was not an accident.  This was a plan on the part of

08:49   17   Theta.  Dr. Larson repeated it again later in his deposition.

08:49   18   He says, "As I've said, you know, this order of magnitude

08:49   19   thing, it's approximate."  Order of magnitude.

08:49   20         You didn't hear about that in the most recent briefing at

08:49   21   all.  They've come up with new constructions.  But he applied

08:49   22   the order of magnitude construction.

08:49   23         When we got to their invalidity expert, he used the same

08:49   24   construction.  This was a setup.  They come to the depositions

08:49   25   and they provide a construction that wasn't given to us and

08:49  1   wasn't plain meaning.  And he says, "I would say that a low

08:49  2   signal would be 10 dB or less smaller than the interferer in

08:49  3   this case.  But, you know, that's an arbitrary number."  An

08:49  4   arbitrary number.

08:49  5        Eventually we're going to go to Washington and the Federal

08:49  6   Circuit's going to hear an appeal in this case.  Arbitrary

08:50  7   number.  These claims are indefinite, and they are indefinite

08:50  8   because Theta is struggling to come up with an infringement

08:50  9   case that makes sense.  They can't build one.

08:50  10       But more fundamentally, they got a plain meaning

08:50  11  construction.  We all accepted that as the law of the case.

08:50  12  They didn't use plain meaning when they prepared their expert

08:50  13  reports.  This is the wrong construction and it's not plain

08:50  14  meaning, and it means they have no infringement case to put on.

08:50  15       Look at what that construction would do to the case.  You

08:50  16  have a -20 dBm signal is high and then a -30 dBm signal is low

08:50  17  because it's 10 dBm apart, one order of magnitude.  You've got

08:50  18  two signal strengths in the middle with -60 and -70.  Those are

08:50  19  medium.  They're neither high nor low.

08:50  20       And then you've got a low signal of -110 dBm.  You got a

08:50  21  high signal of -100.  The receiver can barely interpret that.

08:50  22       That's the construction they picked.  That's the

08:51  23  construction that they built their expert report around and

08:51  24  they built the case around, and that's the construction they

08:51  25  want to go to the jury with.  But it is not a valid

14

08:51  1    construction.  It is not supported by the specification,

08:51  2    extrinsic evidence.  And more importantly, it's not what they

08:51  3    asked for and not what your Court granted which was a plain

08:51  4    meaning construction.

08:51  5         This case, as a result of all this, is a mess.  You've got

08:51  6    a situation where you had a plain meaning construction and they

08:51  7    took advantage of that.  They built ambiguity into their expert

08:51  8    reports.  We've nailed them down to a construction at the

08:51  9    depositions, and now we're somewhere else.

08:51  10        Now, we argued this two weeks ago, and Your Honor asked

08:51  11   for a very straightforward and reasonable thing:  A short brief

08:51  12   from Theta on how its expert applied plain meaning and what its

08:52  13   infringement theory was.

08:52  14        We got a 25-page brief in response which started with a

08:52  15   jury argument about why their inventor's such a great guy, how

08:52  16   he's been pictured on IEEE Magazine, Columbia professor,

08:52  17   eminent professor.  All that's true.  He's an impressive guy.

08:52  18   But it has nothing to do with whether the claims in this case

08:52  19   are definite and what they actually got out of the Patent

08:52  20   Office.

08:52  21        What they did not address is the order of magnitude

08:52  22   construction that their expert used.  They then proposed on

08:52  23   Pages 6 to 7 of their brief, two days before -- three days

08:52  24   before Christmas, a set of new constructions which make no

08:52  25   sense whatsoever.

08:52   1       When we pointed that out -- and Your Honor had ordered new

08:52   2   claim construction.  You ordered them to tell them what claim

08:52   3   construction to actually apply, which they didn't do.  When we

08:52   4   pointed out that their constructions were not only wrong but

08:52   5   inconsistent with what their expert had done and there was no

08:52   6   support for, they then, on Sunday of this week, removed the

08:53   7   noise floor and the $S_{MAX}$ , rewrote the constructions again.

08:53   8       Now, we can't keep up with this dizzying array of

08:53   9   construction after construction after construction.  We've had

08:53  10   at least four constructions in this case, though, from Theta.

08:53  11       First, what they promised at Markman, we'll show you the

08:53  12   standards that'll resolve any ambiguity.  Didn't happen.

08:53  13       Second, compare the desired and the interferer signal to

08:53  14   each other, where the higher one is roughly 10 dB order of

08:53  15   magnitude stronger.  Well, they've abandoned that too.  That

08:53  16   was the one they used in their expert reports.

08:53  17       Now, on December 22nd, they say compare the signals to

08:53  18   each other and to the noise floor and the $S_{MAX}$  in some weird

08:53  19   undefined way.  We got a brief a couple days later and they

08:53  20   retracted that.

08:53  21       And now, on January 2nd, a few days before trial, two days

08:53  22   ago, on Sunday, they tell us that we should just compare the

08:53  23   signals to each other to see if they're near each other,

08:53  24   creating ambiguity upon ambiguity upon ambiguity.

08:54  25       What does this show?

16

08:54   1    This shows that Theta does not know what their claims

08:54   2    mean.  This shows that these claims are indefinite.  This is,

08:54   3    in fact, the strongest evidence of indefiniteness in the case,

08:54   4    that even the plaintiff cannot decide what its own claims mean

08:54   5    from day to day.

08:54   6         The latest set of constructions, meaningless, indefinite.

08:54   7    We haven't had an opportunity to respond to them.  Their brief

08:54   8    is chock-full of extrinsic evidence, which we haven't had an

08:54   9    opportunity to examine.

08:54   10        It's not in comport with the intrinsic evidence.  It's not

08:54   11   in comport with the specification or the file history here,

08:54   12   which did not grant Dr. Tsividis what he would've liked to

08:54   13   have, the patent on dynamic signal changing.  He did not get

08:54   14   that.  He had something much narrower.

08:54   15        So here's what they say now -- and I point out and it's

08:54   16   highly prejudicial that we have to do this Tuesday, two days

08:55   17   after getting the constructions, when this is a

08:55   18   case-dispositive issue.

08:55   19        What they say for the low-low, for instance, case is that

08:55   20   the signal -- desired signal is low, combined with the signal

08:55   21   strength of the interferer signal that is near the desired

08:55   22   signal.

08:55   23        So we first have to determine whether desired signal is

08:55   24   low.  That's a question begging if there ever was one.  The

08:55   25   "signal strength of the desired signal low" is the claim term,

08:55 1    and their definition is "a signal strength of the desired

08:55 2    signal that is low."

08:55 3         What kind of construction is that?  That's

08:55 4    nonconstruction.  That's going backwards.

08:55 5         And then for the interferer, now they've got a new

08:55 6    construction.  It's just "near the desired signal strength."

08:55 7         There's no objective standard.  There's no reasonable

08:55 8    certainty here.  We're going backwards, not forwards.

08:55 9         What does "near" mean?  We have no idea.  Does it mean an

08:55 10   order of magnitude, 10 dB?  I don't know.  How can we tell from

08:56 11   this?  And how can you enter these constructions when, most

08:56 12   importantly, these are not the constructions that were used by

08:56 13   their expert during the expert phase of this case?  That's the

08:56 14   critical point, Your Honor.

08:56 15        They did not answer your question about what constructions

08:56 16   their expert actually used.  Instead, they proposed new

08:56 17   constructions twice in the last two weeks.  But the one thing

08:56 18   that we know must be true is that because these words are

08:56 19   different, because these are new constructions, these are not

08:56 20   the constructions that their expert used.

08:56 21        And what that means is they would like to go to trial and

08:56 22   put on an infringement case based on expert opinion that is not

08:56 23   based on a construction that their expert used or provided to

08:56 24   us.  That cannot possibly be done, that cannot possibly be

08:56 25   fair.

08:56  1       And that's our principal reason, Your Honor, for asking

08:56  2   for either indefiniteness here or that a finding of no plain

08:56  3   meaning was used, and that the case should be dismissed on

08:57  4   summary judgment.

08:57  5       If we're going to have some sort of claim construction

08:57  6   procedure, we've got to have it fairly, we've got to have an

08:57  7   opportunity to respond to it and we've got to have an

08:57  8   opportunity to put the case back into position for trial.  It

08:57  9   cannot be tried next week on these constructions.

08:57  10      Thank you.

08:57  11      THE COURT:  I'll hear a response.

08:57  12      MR. JOHANNINGMEIER:  Your Honor, we have paper copies of

08:57  13  our slides.  Would you like some for you and the clerks?

08:57  14      THE COURT:  I can see it on the screen here.  I don't

08:57  15  need --

08:57  16      MR. JOHANNINGMEIER:  Okay.  All right.

08:57  17      Well, good morning, Your Honor.  So I'm going to start

08:57  18  here with what Your Honor asked us to do, which is a

08:58  19  supplemental brief on claim construction.

08:58  20      So if we can have the next slide.

08:58  21      Okay.  So a year ago there was a Markman hearing.  I

08:58  22  wasn't here, actually, because my daughter was born a few

08:58  23  months before.  So I didn't get a chance to argue at that

08:58  24  hearing.  Mr. Hand did an excellent job.

08:58  25      And at that hearing, at the end of the hearing, Mr. Black

08:58  1    argued about the middle boundary between high and low.  And

08:58  2    Your Honor decided that the claims were definite and that plain

08:58  3    meaning would apply.  So that was the law of the case.  That's

08:59  4    what we had and that's what we did.

08:59  5         The claim terms do have a plain meaning to a person of

08:59  6    ordinary skill.  Professor Larson applied that meaning.  His

08:59  7    understanding is consistent with everyone else on our side of

08:59  8    the case, and it's consistent with their expert when he's

08:59  9    talking about invalidity.

08:59  10         And the Court has already decided that these terms are

08:59  11   definite.  But we're here on a rehearing of that and multiple

08:59  12   briefs from them about indefiniteness.  They haven't engaged on

08:59  13   the construction issue.

08:59  14         But let's just talk about the plain meaning, because

08:59  15   that's what we understood Your Honor to be asking about in the

08:59  16   last hearing.

08:59  17         So in the next slide, a person of ordinary skill would

08:59  18   understand the claims.  Now, this is Dr. Kiaei, Samsung's

08:59  19   expert.  He did both infringement and invalidity.  And he cited

08:59  20   a textbook in his background of his invalidity section, and

08:59  21   that textbook's from 1998, so before these patents.  And in

09:00  22   there we find a description of the very situation that's in

09:00  23   Dr. Tsividis' patents.  Just the -- you know -- and it's

09:00  24   exactly the same way.

09:00  25         So the point here is that Dr. Tsividis, Professor

09:00 1    Tsividis, teaches this material in the way that's shown on the

09:00 2    right in the patent.  He shows the signals, the signal levels,

09:00 3    relative to the noise 4N, relative to the signal maximum.

09:00 4        Dr. Razavi, in this other textbook, teaches it the same

09:00 5    way, high interferes -- "a weak signal accompanied by two

09:00 6    strong interferers" that then you would experience third-order

09:00 7    non-linearity, could corrupt the desired component.

09:00 8        So the point here is that this is how the stuff is taught

09:00 9    in the industry.  This is how it is explained.

09:00 10       On the next slide, another reference that's in Dr. Kiaei's

09:00 11   report showing the same way, talking about it in the same way,

09:00 12   strong desired signals, weak desired signals and interferers, a

09:01 13   diagram that looks very familiar.

09:01 14       Again, this is how things are talked about and shown in

09:01 15   this industry by persons of ordinary skill.  This is how

09:01 16   they're taught in the textbooks and in the papers that they

09:01 17   read.

09:01 18   ████████████████████████████████████████████████████████

09:01 19   ████████████████████████████████████████████████████████████

09:01 20   ██████████████████████████████████████████████████

09:01 21       That figure would look familiar; but if it doesn't, there

09:01 22   it is on the right from the patent.

09:01 23       And on the bottom, here's a paper he published in 2003 in

09:01 24   an IEEE publication talking about the desired signal being

09:01 25   strong and no strong blocker being present, talking about a low

09:01  1  noise floor.

09:01  2       This is how people talk about this stuff in the industry.

09:01  3  This is how a person of ordinary skill understands this kind of

09:01  4  material.  They understand what high signals mean in their

09:01  5  particular application.  They understand what low signals mean

09:02  6  in their particular application, depending on what standard

09:02  7  they're using.  Whether it's LTE, whether it's 802.11 WiFi,

09:02  8  this patent applies to all of those.

09:02  9       Each of those has different standards.  Each of those

09:02  10  standards has different signal maximums that are specified.  So

09:02  11  if you know you're doing LTE, you know there's a rough sense

09:02  12  that gives you the low number, you know what's high, and you

09:02  13  can figure all of this out.  That's what we've been saying all

09:02  14  along.

09:02  15       On the next slide, you know, this is just a reminder from

09:02  16  the tutorial.  This is how we were talking about it back then.

09:02  17  There's a lot of talk in their briefs about us changing our

09:02  18  position.  We have not done that.  This has been the consistent

09:02  19  position all along.

09:02  20       You start from a condition where you have a signal maximum

09:02  21  and a noise floor, and this is what's described on the right.

09:02  22  On the left here is what's described in the patents as the

09:02  23  worst case -- or a worst case, the worst case with the high

09:03  24  interferers and the low signal strength.

09:03  25       It teaches that when you're in that situation, you can

09:03  1   adjust the bias and lower the signal maximum.  When you lower

09:03  2   the signal maximum, you've changed the operating point of the

09:03  3   circuit.  So now it has a new high and a new low.  It has a

09:03  4   different dynamic range.  So then from that point forward,

09:03  5   you're now operating with a different low and a different high.

09:03  6       We use the example in our brief of someone climbing a

09:03  7   mountain.  You know, they can start from the bottom and they're

09:03  8   going to get all the way to the top, but part way up they're

09:03  9   going to set an anchor, and then they're going to climb some

09:03  10  more from there.

09:03  11      The worst case for them is when they are way above their

09:03  12  anchor point, then they set a new anchor and now they have a

09:03  13  new floor and they're going to climb up towards the new

09:03  14  ceiling.

09:03  15      It's the same -- this is basically how you understand the

09:03  16  chart that Mr. Black showed.  He showed the entire range and

09:04  17  suggested that low could only be down at the bottom, high could

09:04  18  only be at the top.

09:04  19      Within that range, there's an operating range that has a

09:04  20  floor and a ceiling.  That's what defines what's high and low,

09:04  21  and it changes over time in the course of operating as

09:04  22  described in the patents.

09:04  23      On the next slide is the same thing.  The impedance

09:04  24  changing, which raises the floor.  It's showing a new range.

09:04  25  In the right here, it shows the power dissipation, but that's

23

09:04  1    the dynamic range of the circuit.

09:04  2         So this is how the patent teaches this stuff to a person

09:04  3    of ordinary skill, and that's how they understand it.

09:04  4         And it is objective.  Objective doesn't have to mean

09:04  5    numbers are applied.  Objective means you can figure it out.  A

09:04  6    person of ordinary skill can figure it out.

09:04  7         On the next slide, it's taught the same way in the patent.

09:05  8    He talks about a worst-case input signal where you've got the

09:05  9    low -- this will be 2B on the right -- the low desired signal,

09:05  10   the high interferers, and talks about the circuit impedances

09:05  11   and currents that are being set such that the noise floor is

09:05  12   sufficiently low for acceptable bit-error rate.  So if you get

09:05  13   too low, you get errors and it doesn't work.  That's how you

09:05  14   know you're too low.

09:05  15        And then you set it for -- the bias currents are set

09:05  16   sufficiently high for a required signal maximum.  So you have

09:05  17   to have your maximum above the strongest signal you're going to

09:05  18   receive so that you don't get clipping and interference.

09:05  19        This is all taught in the patent.  Person of ordinary

09:05  20   skill understands this.  They know that their circuit has a

09:05  21   floor and it has a ceiling, and they know that that ceiling and

09:05  22   floor move when they change the parameters.

09:05  23        Okay.  Next slide.

09:05  24        Just more diagrams showing the same thing.  Reducing

09:05  25   the -- sorry.  Yeah.  You can go on to Slide 11.

09:06  1       So there is, you know, many, many teachings in the patent

09:06  2  of how this works. ████████████████████████

09:06  3  ████████████████████████████████████████████

09:06  4  ████████████████████████  It's consistent with

09:06  5  textbooks and references that their own invalidity expert

09:06  6  relied on.

09:06  7       So -- and here it's showing that the worst-case signal

09:06  8  condition with reference to the figures is where the desired

09:06  9  signal is lower than the interferers.  That's the worst case

09:06 10  because the interferers when you -- if you have a low desired

09:06 11  signal and you're attempting to amplify it in order to be able

09:06 12  to receive it, you're also amplifying the interferers.  So this

09:06 13  causes problems.  It requires a very wide, dynamic range.  It's

09:06 14  hard to do in the circuit.  So he's teaching that to a person

09:06 15  of ordinary skill.

09:06 16       Now, on the next slide, here's where we applied this.

09:07 17  Dr. Larson in his report applied this to the actual devices,

09:07 18  the actual chips and the phones, you know.  The -- here he's

09:07 19  using the datasheet for one of the transceivers in the phone.

09:07 20       MR. BLACK:  Your Honor, I'm sorry to interrupt.  This is

09:07 21  highly confidential material, which some people in the

09:07 22  courtroom may not be entitled to see.  I just want to make sure

09:07 23  we don't have anyone.

09:07 24       THE COURT:  You know what?  You can -- I understand

09:07 25  your -- the point you're making.  You can take it off the

09:07  1    screen.

09:07  2         MR. JOHANNINGMEIER:  Okay.

09:07  3         THE COURT:  And Mr. Black?

09:07  4         MR. JOHANNINGMEIER:  That's a good reason.  I'll give you

09:07  5    the paper copies.

09:07  6         THE COURT:  Mr. Black, are you okay with him discussing

09:07  7    this in -- on the open record if he doesn't use that?

09:07  8         MR. BLACK:  Yes, Your Honor.  As long as we have an

09:07  9    opportunity later to redact anything of the public record, I

09:07  10   think that should be fine for this.

09:07  11        MR. JOHANNINGMEIER:  Okay.

09:08  12        THE COURT:  If you'll just get me to the page that you're

09:08  13   on.

09:08  14        MR. JOHANNINGMEIER:  Yes.  So Page 12, and I'll try to

09:08  15   remember to call out the page numbers.

09:08  16        THE COURT:  Is it 13?  It looks like 13.

09:08  17        MR. JOHANNINGMEIER:  Well, there's two.  So the -- Page

09:08  18   12.  ██████████████████████████████████████████████

09:08  19   ████████████████████████████████████████████████████

09:08  20   ██████████████████████████████████████████████████████

09:08  21   ████████████████████████████    It's discussed in the textbook

09:08  22   that we mentioned.  It's in our brief, you can see the

09:08  23   discussion in the Razavi textbook that their expert relies on.

09:08  24        ██████████████████████████████████████████████████████

09:08  25   ████████████████████████████████████████████████████

09:09   1   ████████████████████████████████████████████

09:09   2   ██████████████████████████████████

09:09   3   ████████████████████████████████████████

09:09   4   ████████████████████████████████████████████

09:09   5   ████████████████████████████████████

09:09   6        So Dr. Larson says in his report this here, at least,

09:09   7   meets the worst-case conditions.  You've got a low desired

09:09   8   signal.  You've got a jammer signal that's 1,000 times larger

09:09   9   than that.  And so that would be a worst-case condition.

09:09   10       ████████████████████████████████████████

09:09   11  █████████████████████████████████████

09:09   12  ████████████████████████████████████████

09:10   13  ████████████████████████████████████████

09:10   14  ██████████████████████████████████████

09:10   15  ████████████████████████████████████████████

09:10   16  ██████████████████████████████████████

09:10   17  ██████████████████████████████████████

09:10   18  ████████     So he makes that point to start in his analysis.

09:10   19       The next thing he does relative to these particular terms

09:10   20  is on Page 14 there are gain -- there are diagrams showing the

09:10   21  various gain states and showing the map of the signal

09:10   22  conditions.  ████████████████████████████████

09:10   23  ███████████████████████████████████

09:10   24  ████████████████████████████████

09:10   25       ████████████████████████████████████████

09:10  1  ███████████████████████████████████████████

09:11  2  ████████████████████████████████████████████████

09:11  3  ████████████████████████████████ And, you know, of

09:11  4  course, in his report he describes all of the code and the

09:11  5  documents behind this, why this is working this way.

09:11  6       And there's no disagreement from them with how this works.

09:11  7  So there's not -- we're not going to have a dispute about how

09:11  8  the actual products are working here, right?

09:11  9       And then on the right it shows the noise figures, which

09:11  10  add up to basically the total noise floor, changing.  It shows

09:11  11  the signal-to-noise ratio changing.  So the signal-to-noise

09:11  12  ratio is the signal to the noise floor that's changing along

09:11  13  with the gain state.

09:11  14       So this is showing basically in action with real numbers,

09:11  15  for this particular transceiver how the thing is stepping

09:11  16  through those different signal figures like we showed in the

09:12  17  patent, with the noise floor and the signal maximum changing as

09:12  18  the gain states change, which is done based on the input

09:12  19  signals.

09:12  20           ██████████████████████████████████

09:12  21  ████████████████████████████████████

09:12  22  ██████████████████████████████████████████████

09:12  23  ██████████████████████████████████████████████

09:12  24  █████████████████████████████████ This is -- that aspect

09:12  25  of it is not disputed here.

28

09:12  1      So this is how he applied -- you know, obviously there's

09:12  2  more to his report about the other claim steps, but this is how

09:12  3  he applied the plain meaning as taught in the teachings of the

09:12  4  patent.  You know, there's -- what does plain meaning mean?  It

09:12  5  means:  What would people understand when they read the patent?

09:12  6      That's the definition from Phillips, right, that plain

09:12  7  meaning is what a person of ordinary skill understands from

09:12  8  reading the patent.  They would read this, they would

09:13  9  understand how it works, and then they would try to apply that

09:13  10  to these chips.  They would look at the testing numbers and

09:13  11  they can -- you know, if you want objective numbers, here they

09:13  12  are.

09:13  13      But this is showing how this works.  The algorithm is in

09:13  14  the code that he looked at.  Counsel mentioned an algorithm.  I

09:13  15  heard a few times that the code is performing this algorithm to

09:13  16  make these adjustments in this particular environment.  I

09:13  17  believe this is LTE signals, but, you know, the -- because

09:13  18  that's one of the things that these devices cover.

09:13  19      So Your Honor asked us to show you this, so we put this in

09:13  20  our brief and here it is in the slides.

09:13  21      Your Honor also suggested that, you know, there may be a

09:13  22  need to do construction.  And part of the goal of the

09:13  23  supplemental briefing was to do that now rather than during the

09:13  24  trial, which is a laudable goal, if it's necessary.  So we

09:14  25  proposed constructions.

09:14  1      Now, we clarified, we don't think this requires

09:14  2  construction.  What's actually happened in this case is we've

09:14  3  construed plain and ordinary meaning.  ███████████████

09:14  4  ███████████████████████████████████████████

09:14  5  ████████████████████████████████████████████████

09:14  6  ███████████████████████████████████████████████

09:14  7  ███████████████████████████████████

09:14  8      And that's true, there are.  In other gain states at the

09:14  9  very end of the range, you can have one that's only up at -12.

09:14  10  But within the subset of the range that you're operating in,

09:14  11  which is between the noise floor and the maximum, this is a

09:14  12  worst-case condition.

09:14  13      So he wants to go to the end points and say, you know, the

09:14  14  lowest possible signal and the highest possible signal; and if

09:14  15  you're less than the highest possible, that's not infringing.

09:14  16  He's got that in his report at Paragraph 309.  That's just a

09:15  17  claim interpretation.  That's a misapplication of plain and

09:15  18  ordinary meaning.

09:15  19      They don't want to look at that.  They didn't address

09:15  20  that, when we brought it up in our brief, in their response.

09:15  21  Their expert is misapplying this stuff.  That's the issue.

09:15  22      And then they're just doggedly saying indefinite,

09:15  23  indefinite, indefinite.  They don't want to talk about what

09:15  24  their expert did on either invalidity, where he understood the

09:15  25  claims the same way, or on infringement, where he's basically

09:15   1   making claim reinterpretations.

09:15   2       So that's the situation we're in.  We proposed

09:15   3   constructions because we wanted to offer something that would

09:15   4   be consistent with our -- what we've done in our report, if

09:15   5   Your Honor feels it's necessary to construe these claims in

09:15   6   order to give clarity to the jury; because that's ultimately

09:15   7   what we're trying to do here, is not confuse the jury about how

09:15   8   this works.  That's the purpose of claim construction.

09:15   9       So we made a proposal and initially suggested that we

09:15   10  could put in the noise floor and the signal maximum.  They

09:16   11  complained about that, said they didn't like it.  So we pointed

09:16   12  out, you could do it without those as well.

09:16   13      Either of those proposals is consistent with what

09:16   14  Dr. Larson did.  Of course, we wouldn't have proposed it if it

09:16   15  were otherwise, right?  I mean, these are constructions that,

09:16   16  again, we're offering in order to clarify things for the jury.

09:16   17      Mr. Black suggested he didn't have any the opportunity to

09:16   18  respond.  They've had plenty of briefing on this.  They had a

09:16   19  responsive brief.  They didn't choose to address it rather than

09:16   20  just continue to go back to where they were at the beginning on

09:16   21  Slide 16.

09:16   22      This is from last year.  There's no standard here, Your

09:16   23  Honor, for low end of high or the high end of low.  That's

09:16   24  where they were at the end of the Markman argument, and then

09:16   25  you told them that everyone agreed that a person of skill in

09:16   1   the art would understand what this means, doesn't need to be

09:16   2   construed, and it will have plain and ordinary meaning.

09:16   3        So that's what we did.  That's what Dr. Larson did.  He

09:17   4   applied that, found infringement, which they don't dispute the

09:17   5   facts of.  They came back with some interpretive

09:17   6   noninfringement arguments that we don't think are appropriate.

09:17   7   And they also filed a -- you know, they spent most of discovery

09:17   8   quizzing all of our deponents on what would happen if you were

09:17   9   in the middle between high and low, right?

09:17   10       There's hours of testimony of various forms of questioning

09:17   11  about the middle boundary between high and low.  And in some of

09:17   12  that testimony Dr. Larson, being a helpful person, said, well,

09:17   13  you know, if he was looking at that, maybe 10 dBm, an order of

09:17   14  magnitude would be sufficient to say, okay, there's enough of a

09:17   15  difference to matter here.

09:17   16       This isn't a construction that he applied in his report.

09:17   17  They say it's not in his report.  Of course it's not in his

09:17   18  report.  This is his response to being deposed on this middle

09:18   19  boundary.  And he suggested that.  But so did Dr. Smith, our

09:18   20  other expert.  And even -- there's even some testimony from

09:18   21  Professor Tsividis about a 10 dB difference that we've got in

09:18   22  our briefs.

09:18   23       This is not a construction.  This is not an order of -- he

09:18   24  called it an order of magnitude construction.  That's not the

09:18   25  construction here.  It was never applied that way.  It is a

09:18   1   response to a deposition question about what would a person of

09:18   2   ordinary skill do in this middle boundary?

09:18   3       And Dr. Larson clearly said, well, they would look at at

09:18   4   least 10 dB.  An order of magnitude would be a significant

09:18   5   thing, and that he's basing that on his experience in the

09:18   6   industry as a inventor and as a teacher.  He's been teaching

09:18   7   this for many, many years.  Not as many as Dr. Tsividis, but

09:18   8   he, you know, offered that as an example.

09:18   9       But it's not a construction.  It's not what we're going

09:19   10  with.  It's not a, you know, new thing that we tried to

09:19   11  surprise them with.  It's a response to questioning on the

09:19   12  issue that Your Honor decided last year.  And so you know,

09:19   13  that's the reason it's not in the reports.  It is what a person

09:19   14  of ordinary skill would understand according to Dr. Larson and

09:19   15  Dr. Smith and Dr. Tsividis.

09:19   16      And, you know, these numbers that I showed here on Slide

09:19   17  12 meet that.  They're three orders of magnitude apart.  So it

09:19   18  meets its construction.  It's consistent with his analysis to

09:19   19  say that that's a minimum point.  But it isn't a construction

09:19   20  or a rule that we're applying.  It is not the construction, it

09:19   21  is not necessarily even the plain meaning.

09:19   22      But, you know, if asked, how would you tell?  Dr. Larson

09:19   23  would say, well, I would find at least 10 dB to be something

09:19   24  that was significant, that or more.

09:20   25      But as we pointed out in our briefs, there's no claim

33

09:20  1   element that goes to this middle boundary.  There is no, you

09:20  2   know, medium-medium that -- you know, there are other claims in

09:20  3   other parts of the patent family that talk about medium.  But

09:20  4   there is no -- these claims do not talk about medium signal

09:20  5   strength.  They talk about unambiguously high, which Dr. Larson

09:20  6   said there are, you know, discernable and unambiguously low.

09:20  7   And when you get in that situation, they tell you what to do to

09:20  8   change your floor, to change your ceiling, to get into a new

09:20  9   operating point where you can save power.

09:20  10      And then once you're in that new operating point with that

09:20  11  new floor and that new ceiling, you can find a worst-case

09:20  12  condition again and do the same adjustment again.  It's

09:20  13  dynamic, biasing.  It's changing the operating conditions of

09:20  14  the circuit in order to save power over time.  And that's

09:20  15  what's taught in the patents.

09:20  16      Now, I have a number of slides here about all of our

09:21  17  witnesses talking about the -- you know, consistently with

09:21  18  this.  These slides were, I think, handed up in the last

09:21  19  hearing as well.  And I'm happy to go through them if Your

09:21  20  Honor wants, but I think the point here is that the main thing

09:21  21  to take away from this is that their own invalidity expert

09:21  22  understands this patent in the same way that we do and cites to

09:21  23  materials that talk about low and high and weak and strong

09:21  24  signals that show the same diagrams that Dr. Tsividis is using

09:21  25  to teach this stuff.

34

09:21  1        Their own expert gets it when he wants to do invalidity.

09:21  2  Their own expert doesn't apply any objective standard to find

09:21  3  numbers for high and low in his invalidity report.  He just

09:21  4  applies the claims the same way here.

09:21  5        So there's no surprise for them.  There's no -- you know,

09:21  6  they've understood this all along.  They just want a ruling

09:22  7  that because there's not numbers in this patent, that it is

09:22  8  somehow indefinite.  But that isn't the law.

09:22  9        I will put that up just briefly.  Hold on one second.

09:22  10        The other thing about their expert report is that he

09:22  11  didn't talk about indefiniteness.  He didn't, you know, suggest

09:22  12  that these claims were unresolvable, especially when he was

09:22  13  trying to find them invalid.  But he doesn't say that.  He

09:22  14  doesn't have an indefiniteness opinion.  He says the claims are

09:22  15  invalid.  He says they're not infringed because he interprets

09:22  16  high and low differently.

09:22  17        So in the Nautilus case, the standard is reasonable

09:23  18  certainty to a person of ordinary skill.  And Nautilus cited

09:23  19  another older case called Eibel about the paper-printing

09:23  20  machines that had the term "high" in it.  And the Supreme Court

09:23  21  said, well, people of skill in this art know these machines and

09:23  22  they would know what high is.

09:23  23        And that's the same -- here it is on this slide.  Thank

09:23  24  you, Aaron.

09:23  25        Slide 34.  All the way back in 1923, the Supreme Court

35

09:23  1  said this.  Now, Nautilus didn't overturn this.  Nautilus cited

09:23  2  this.  So here's an example of the Supreme Court saying that

09:23  3  when the evidence discloses that a person of skill has no

09:23  4  difficulty in fixing the place that's high, then it's fine.

09:23  5      And of course there's also, on the following slides, a

09:23  6  bunch of district court cases.

09:23  7      Next one, then.  36, I guess.

09:23  8      Eibel.  Input/Output in the Eastern District, "low

09:23  9  frequency forces."

09:24  10      Now, some of these results are because there was examples

09:24  11  in the spec, and some of these results are because a person of

09:24  12  ordinary skill would understand this.

09:24  13      There's multiple ways to meet the objective standard, not

09:24  14  just numbers, not just a formula.  What we have in this patent

09:24  15  is a description of how to dynamically change things so that

09:24  16  they will save power over time.  So the Freeny case is one in

09:24  17  the Eastern District.  The Corning Optical case, low-frequency

09:24  18  control signals.  Freeny was low-power communication signals.

09:24  19  I believe Your Honor might have been in that case, so you might

09:24  20  actually remember that one.

09:24  21      The low profile, you know, again, there's plenty of

09:24  22  examples.  It's a case-by-case thing of course, so there's

09:24  23  examples going the other way.  But if the -- I think the core

09:24  24  thing to look at here is what was done in the Eibel case and

09:25  25  how that wasn't changed by Nautilus.  If a person of ordinary

36

09:25  1   skill can figure this out and apply it objectively, then it's

09:25  2   not indefinite.

09:25  3        So I won't -- I will save some time in case there's some

09:25  4   rebuttal.  Or if Your Honor has any questions, I'm happy to...

09:25  5        THE COURT:  Okay.  I'll hear from Mr. Black.

09:25  6        MR. JOHANNINGMEIER:  Okay.

09:25  7        MR. BLACK:  Thank you, Your Honor.

09:25  8        So we are a couple days before trial.  We have had two

09:25  9   rounds of argument, 37 pages of briefing from Theta after you

09:25  10  requested a short brief on the topic and something like 50

09:25  11  slides.

09:25  12       And we have yet to see anything that remotely approaches a

09:25  13  construction from Dr. Larson.

09:26  14       When I started doing arguments, in particular appellate

09:26  15  work, the one thing the older folks told me was when the judge

09:26  16  asks a question, you got to answer it.  You can go on and say

09:26  17  other things that you'd prefer to talk about, but you got to

09:26  18  answer the question.

09:26  19       And Your Honor asked the right question at the hearing two

09:26  20  weeks ago.  What was the plain meaning construction that

09:26  21  Dr. Larson used?  This was the moment of truth if there was

09:26  22  ever going to be one, and I didn't hear it.

09:26  23       We have slides here that Theta has provided to the Court

09:26  24  and Slide 11 references Dr. Larson's report, but just quotes

09:26  25  from the '825 patent.  It doesn't even say the words "high" and

09:26  1   "low" in it.  Slide 12 is a picture of a document.  It doesn't

09:26  2   mention high or low either.  It's three lines from Dr. Larson's

09:27  3   report.  The rest are documents that counsel spoke to, but

09:27  4   there's nothing from Dr. Larson's report explaining how he

09:27  5   reached his conclusion.  That's the sum total of the record in

09:27  6   this case as to how Dr. Larson applied plain meaning.

09:27  7       I think I heard counsel say that he did use the order of

09:27  8   magnitude test.  Well, if so, then we have all the problems

09:27  9   that are evident on my chart here.  Because if all you need to

09:27  10  do is to show that they're 10 dB apart, then -30 dBm could be a

09:27  11  low signal and -100 could be a high signal.  And in that case

09:27  12  we're entitled to judgment of noninfringement, because if

09:27  13  that's the construction he used, it's not plain meaning and

09:27  14  it's not right.

09:27  15      He talked about the worst case.  And I think -- you know,

09:28  16  I don't want to be too cute here, but this is the worst of the

09:28  17  worst in a way when it comes to claim construction because they

09:28  18  proposed a construction for worst-case condition, which they

09:28  19  represent is in '825, Claims 3 and 8.  That's not even what the

09:28  20  patent says.

09:28  21      The claim term is "worst-case power dissipation condition

09:28  22  from the battery."  This patent is about an observation that

09:28  23  Dr. Tsividis made that when the signal strength is low and

09:28  24  there's a lot of interference, that the battery -- the power

09:28  25  consumption will be high.  That's what his observation was.

09:28  1      And so the worst case in the claim is the worst-case power

09:28  2  dissipation condition.  That means the state in which it's

09:28  3  consuming the most power, and the patent is about ways to

09:28  4  reduce the amount of power consumed.

09:28  5      They've got a construction here that worst-case

09:28  6  condition -- that's not even a claim term -- when a low desired

09:28  7  signal occurs with a high interferer signal.  That's not a

09:29  8  construction of a claim term, and it's not a construction of

09:29  9  power dissipation condition.

09:29  10      They're trying to make these claims into a ball of mush so

09:29  11 they can get up in front of the jury and just say, oh, believe

09:29  12 me.  The expert's going to put his finger up in the air and

09:29  13 say, here's which way the wind's blowing, we win.

09:29  14      I mean, I was depressed when I read one of their briefs,

09:29  15 not because of the condition of our case but depressed for the

09:29  16 condition of the law, because they actually wrote in their

09:29  17 brief -- when you asked them to explain what their expert had

09:29  18 done, they sent you a brief, the first couple of pages of which

09:29  19 were a -- where we're talking about Dr. Tsividis' resume and

09:29  20 what a wonderful professor he was and some presentation he gave

09:29  21 to Qualcomm, which has no relevance to anything at all in this

09:29  22 case.

09:29  23      And they laid out in their brief for the Court, when they

09:29  24 were supposed to be talking about what their expert did, what

09:29  25 they intend to do in front of this jury.  They're going to put

09:29  1   the inventor up there and say he's a nice, esteemed man, give

09:29  2   him some money.

09:29  3        But that's not how we try patent cases.  There are claims

09:30  4   that were issued by the Patent Office.  These are narrow

09:30  5   claims.  The broad claims they wanted, they couldn't get.

09:30  6        These claims have claim terms, "high," "low," "worst-case

09:30  7   power dissipation condition."  Those have meaning.  But the

09:30  8   meaning is indefinite for high and low because they have yet to

09:30  9   come up with an algorithm from which a skilled in the art -- a

09:30  10  member of skill in the art could take the numbers that are spit

09:30  11  out by that circuit and determine whether they are high or low.

09:30  12       And more importantly, even if they had come up with that,

09:30  13  they haven't disclosed it to us yet.  So whatever case they're

09:30  14  going to put on is not what's in their expert reports, and

09:30  15  it's -- they did not use a plain meaning construction.

09:30  16       Now, we have had a highly prejudicial procedure going on

09:30  17  here.  You asked them to give a short brief on plain meaning,

09:30  18  and they have tried to turn this into a claim construction

09:30  19  process where we have not had an opportunity to respond.  We

09:30  20  have not had an opportunity to provide extrinsic evidence to go

09:31  21  through the file history.  That was not what Your Honor

09:31  22  ordered.

09:31  23       We were just chided for not engaging in a supplemental

09:31  24  claim construction process that Your Honor did not order.  And

09:31  25  it is not possible, if we're going to do something like that,

09:31  1  to get that done in the next couple of days for the following

09:31  2  reasons:

09:31  3  First, we need time to -- we'd need time to go through the

09:31  4  record.  We'd need time to get expert reports together on this

09:31  5  point, but they've put a lot of extrinsic evidence in these

09:31  6  briefs we haven't had an opportunity to respond to.

09:31  7  They don't have an -- whatever construction Your Honor

09:31  8  would come up with is not going to be one that their experts

09:31  9  use, so it'd mean their infringement report would have to be

09:31  10  redone.  Same for the invalidity reports.

09:31  11  The damages part -- the damages theory that they have is

09:31  12  tied to an argument that there's a specific amount of savings

09:31  13  and battery life that the phones would get by using the

09:31  14  invention.  But if the claim construction changes, the

09:32  15  infringement's going to change.  The amount of infringement's

09:32  16  going to change.  Their damages numbers are going to go down.

09:32  17  We basically have to redo the whole case.

09:32  18  They shouldn't be allowed to do that.  They asked for

09:32  19  plain meaning.  Plaintiffs do that.  I've been a plaintiff,

09:32  20  I've done it.  But when you do that, you take on the burden of

09:32  21  plain meaning.  And you can't come and play games at the end of

09:32  22  the case just before trial and say, oh, never mind, my expert

09:32  23  actually gave a report.  We did get a construction there, but

09:32  24  now I'd like this construction so I can try to fix things two

09:32  25  days before trial over the holidays.  It's not right.  It's not

09:32   1   fair.  And it violated your order on plain meaning.

09:32   2          Thank you, Your Honor.

09:32   3          MR. JOHANNINGMEIER:  May I briefly respond?

09:32   4          THE COURT:  Sure.

09:32   5          MR. JOHANNINGMEIER:  Just to address the point on needing

09:32   6   time.  He mentioned extrinsic evidence that we cited.  We got

09:33   7   that extrinsic evidence from their invalidity report and

09:33   8   textbooks that were cited in their invalidity report.  ████████

09:33   9   ████████████████████████████████████████████████

09:33   10  ████████████████████████████████████████████████████

09:33   11  ██████████████  So it's -- you know, it's basically support for

09:33   12  what we've been saying all along.  There's nothing new in our

09:33   13  briefs that wasn't added by their expert.

09:33   14         Now, on the construction, again, as we said, we think that

09:33   15  this could be done without a construction simply by precluding

09:33   16  their expert from misusing plain meaning.  But to the extent

09:33   17  that Your Honor wants to give something definite to the jury

09:33   18  that will make that concrete, we offered proposals that are, of

09:33   19  course, consistent with the analysis that we gave.  The

09:34   20  proposals are consistent with what Dr. Larson did.

09:34   21         Nothing has to change in his report.  The input signal

09:34   22  spectrum, being a low, combining with a signal that's high

09:34   23  relative to the desired signal strength gets the concept that

09:34   24  these things are relative into their -- the worst-case

09:34   25  construction gets that these things are -- the worst case is

09:34  1    when a low signal is (interruption) with a high signal.  It's

09:34  2    not the maximum ends of the range, right?

09:34  3        These are designed to give authority (interruption) to the

09:34  4    jury without breaking the case.  You know, as if we were doing

09:34  5    this during the trial which sometimes happens.  Now we're doing

09:34  6    it right before trial to the extent that we want to make sure

09:34  7    that the jury isn't hearing competing definitions of plain

09:34  8    meaning.

09:34  9        One way to do that is by precluding them from saying some

09:34  10   of the things they've said, either now or as it comes up in

09:35  11   trial.  Another way to do that is to give a construction that

09:35  12   would rule out shenanigans.  So that's why we've offered this.

09:35  13   There's nothing inconsistent.  We aren't going to have to redo

09:35  14   our power calculation number.  They could have come back with a

09:35  15   kind of proposal.  They chose instead to just argue for

09:35  16   reconsideration of Your Honor's ruling last year that these are

09:35  17   definite.

09:35  18       So the prejudice here would be, if Your Honor was to agree

09:35  19   with them, we would have spent a year doing a case on plain

09:35  20   meaning based on Your Honor's order, putting up all of these

09:35  21   experts' reports, everything else.  Everything we've been doing

09:35  22   would basically be overturned because they didn't like the

09:35  23   result a year minus two days ago.

09:35  24       That result should stand.  These claims are definite.

09:35  25       And that's all I have.  Thanks.

09:36  1        (Off-the-record bench conference.)

09:39  2        THE COURT:  The Court is going to overrule the motion for

09:39  3  summary judgment and maintain the construction of plain and

09:39  4  ordinary meaning.

09:39  5        The next issue to take up is Samsung's summary judgment of

09:40  6  noninfringement.  Who will be arguing that?

09:40  7        MR. CORDELL:  I will, Your Honor.

09:40  8        THE COURT:  Mr. Cordell?

09:40  9        MR. CORDELL:  Thank you.

09:40  10       May I proceed, Your Honor?

09:40  11       THE COURT:  Yes, sir.

09:40  12       MR. CORDELL:  Ruffin Cordell for Samsung.

09:40  13       Your Honor, we're here this morning to talk about our

09:40  14  motion for summary judgment for noninfringement, and I'm going

09:40  15  to focus on three principal grounds.  And it's a little bit

09:40  16  complicated in this case because we've got an array of claims

09:41  17  and we have to make successive arguments in order to reach each

09:41  18  of the asserted claims.

09:41  19       But essentially, the arguments are spread across the claim

09:41  20  pattern.  Your Honor's very familiar with these patents.

09:41  21  They're very repetitive.  We see the same claim terms, same

09:41  22  claim elements appearing in multiple patents.  And so the

09:41  23  arguments are grouped as follows:

09:41  24       There's the no worst-case condition, when the interferer

09:41  25  is high.  And you've already had a fair amount of argument

44

09:41  1  about worst case this morning, but I'm going to continue that;

09:41  2      That there's no required bias adjustments to compensate

09:41  3  for as the system departs from that worst-case condition, which

09:41  4  is a key element of these patents, the idea that when we are in

09:41  5  a worst-case condition and we exit that worst-case condition

09:41  6  there is a prescribed bias adjustment;

09:41  7      And then, finally, you heard some argument this morning

09:41  8  about this notion that you have a desired signal and an

09:42  9  interferer signal and that there must be a comparison.  That

09:42  10  some of the claims require a direct comparison between the two.

09:42  11  And it's simply just not done in the accused systems, and

09:42  12  there's no evidence of it in this case.

09:42  13      And essentially what we're talking about here is a

09:42  14  no-evidence summary judgment.  The plaintiff took us to task

09:42  15  and said that our motion papers were terse and we were -- you

09:42  16  know, weren't verbose, which I normally appreciate.  I'm not

09:42  17  ashamed of that.  But these are no-evidence motions.  The point

09:42  18  is that we've challenged them to put in the evidence necessary

09:42  19  to survive summary judgment, and they just didn't do it.

09:42  20      So let's start with the first argument about the no

09:42  21  worst-case condition.  It applies to the '825 and '202 patents,

09:42  22  Claims 3, 8, 7 and 13.

09:42  23      And the notion is this:  And I've got examples from each

09:42  24  of the patents, the '825, Claim 3, for example, wherein a

09:42  25  worst-case power dissipation condition from the battery results

09:42  1    when the signal strength of the desired signal is low and the

09:43  2    signal strength of the interferer signal is high.

09:43  3         Now, we just had a debate about what low and high mean.

09:43  4    And we understand the plain meaning construction that the Court

09:43  5    has prescribed.  But the worst case is a little bit different,

09:43  6    and it's important.  It's important because these claims have

09:43  7    to mean something, right?  We have to know -- we have to be

09:43  8    able to stand in front of this jury and, you know, I'm feeling

09:43  9    for these folks.  They're going to be asked to make these

09:43  10   complicated technical decisions based on, you know, what

09:43  11   appears to me, at least, to be a fair number of different

09:43  12   statements from the plaintiff about what this means.

09:43  13        Well, what the patent tells us, what the patent tells us

09:43  14   over and over again is that interferer high and desired signal

09:43  15   low is that worst case.  It's a thing.  It's not a moving

09:43  16   target.  It's not something that changes on Tuesday versus

09:43  17   Thursday.  It is a thing.

09:44  18        And when we start from that perspective, the patents

09:44  19   actually begin to make some sense.  The idea is that in the

09:44  20   past we had a situation where the -- all of the receivers had

09:44  21   to be tuned for that worst case.  You had to be able to recover

09:44  22   that really soft signal against a very loud noise.  And so you

09:44  23   cranked up the power.  That's the way they worked.  And the

09:44  24   whole notion of these patents is that you needed to have that

09:44  25   power there so you could recover that low desired signal.

09:44  1          You start from that point over and over and over again.

09:44  2     And what these patents talk about and Dr. Tsividis' entire

09:44  3     contribution was, was to point out, well, sometimes that

09:44  4     interferer signal comes down and you could turn the power down

09:44  5     a little bit.  That's the basic notion.  But we have to have

09:44  6     that starting point.  We have to have the worst case or none of

09:44  7     this makes sense.  And they just haven't been able to show that

09:44  8     in the accused devices.

09:44  9          So what do they do?  They look at the accused devices --

09:45  10    and I'll describe this generally, Your Honor.  ▬▬▬▬▬▬▬▬



09:45  22         So what Dr. Larson says is the worst case, the highest

09:45  23    power consumption, this Gain State 0, actually corresponds to

09:45  24    when the desired signal and the interferer signal are at their

09:46  25    lowest.  We don't have this high interferer/low desired signal

47

09:46   1   characteristic.  It's completely different because the accused

09:46   2   systems work by measuring the amount of power and then trying

09:46   3   to keep the output constant.

09:46   4       So if the input signals are low, the interferer and the

09:46   5   received signals are low, they crank up the power a little bit

09:46   6   because they want the output to be at a determined level.  If

09:46   7   they're high, they crank the power down.  They do exactly the

09:46   8   opposite of what the patent tells us.

09:46   9       But here's Dr. Larson's problem and Theta's problem.  They

09:46   10  say, okay.  Gain State 0 is the worst case.  That's the one

09:46   11  where the power is maximum.  That's the one where you're going

09:46   12  to have all your losses.  But then he also has to admit that in

09:46   13  Gain State 0 that interferer is very low.  We don't have a high

09:46   14  signal here.  We have two low signals.

09:46   15      And he points out that Gain State 0 is the worst case.  He

09:47   16  admits that in his expert report.  He talks about it.  I have

09:47   17  it here in Paragraph 137.  He also talks about the Gain State 0

09:47   18  being the worst case in Paragraph 143.  He says:  The lowest

09:47   19  worst-case gain state, e.g., G0.

09:47   20      He didn't give us any other e.g.s.  Only G0, Gain State 0,

09:47   21  was the one that he pointed to.  He said:  It's the highest

09:47   22  power dissipation in all the components.  It's the worst-case

09:47   23  gain state.  It is exactly what the patent describes.

09:47   24      But then when we turn to the infringement side of the

09:47   25  coin, he can't make it out.  He can't make it out because he

48

09:47  1    has to admit that in Gain State 0, then it's a very small

09:47  2    received signal power, both desired and interferer.

09:47  3         We don't have that worst case.  We don't have the high

09:47  4    interferer and the low desired under any definition, frankly,

09:48  5    because he readily admits that it's a very small received

09:48  6    signal power for both signals.

09:48  7         So they simply just don't have the worst case.  They can't

09:48  8    meet the basic threshold of these patents and particularly in

09:48  9    these claims.

09:48  10        Now, you know, they've -- in response, they said, well,

09:48  11   there could be multiple worst cases.  Well, there's really not.

09:48  12   You know, there's a -- these patents talk about the worst case,

09:48  13   and they talk about it specifically.  They talk about it over

09:48  14   and over again.

09:48  15        If what they wanted to do was to nibble around the edges

09:48  16   and say for a particular device it might be different because

09:48  17   of the way the system is set up, that might be one thing.  But

09:48  18   what they're suggesting is that in the same device you could

09:48  19   have a different worst case from moment to moment to moment,

09:48  20   and that's simply not the way these patents are constructed.

09:48  21        They -- in their expert report, Dr. Larson, you know, made

09:48  22   it very clear that G0 is the gain state that he -- he's

09:48  23   pointing to.  They have to be held to their representations at

09:48  24   some point.  We have to be able to try this case on a rational

09:49  25   and fair basis.

49

09:49  1      And if they're now going to throw that out the window and

09:49  2  go hunting and pecking for some other set of facts, number one,

09:49  3  that's not in his expert report, so it shouldn't be permitted;

09:49  4  but number two, it's just not allowed.

09:49  5      And the summary judgment process is really designed to

09:49  6  make sure that that doesn't happen, right?  They should have

09:49  7  come forward with evidence that they had previously put in, not

09:49  8  attempt to supplement the record at this late stage.

09:49  9      And so the -- the reality is, the patents talk about high

09:49  10  interference/low signal.  And when that happens, you

09:49  11  dynamically -- you dynamically change the bias current so that

09:49  12  you can ultimately achieve these power savings, and they just

09:49  13  don't have it.

09:49  14      I show the '202 patent, Claim 7 and 13, that have the same

09:49  15  worst-case characteristic.

09:49  16      So at the end of the day, Your Honor, they just don't have

09:50  17  the worst case.  They simply don't.  What they pointed to was

09:50  18  G0.  G0 does not fit any definition of worst case that we've

09:50  19  heard.  It doesn't have the high interferer.  It perhaps has a

09:50  20  low signal, but you got to have both in order to have the worst

09:50  21  case.  And they just can't make it out.

09:50  22      So they can't leave here and go forward on those claims

09:50  23  without demonstrating to you that in G0 that interferer signal

09:50  24  or the jammers, or whatever they want to call them, come in

09:50  25  high.  And if they can't do that, then they can't survive

09:50  1    summary judgment.  It's just that simple.

09:50  2        Let's talk about bias adjustments.  So this is in the '202

09:50  3    patent, Claim 13, and the '962 patent, Claim 1.

09:50  4        Now, what are the bias adjustments?

09:50  5        So I've got Claim 1 of the '962, and there are really two

09:50  6    flavors of this.  One is, it starts again at the worst case,

09:50  7    when the signal strength of the interferer signal is high and

09:50  8    the signal strength of desired signal is low, then the bias

09:50  9    current is increased.

09:50  10        So that's our worst case.  That's the streaming that

09:51  11   these -- that these patents, you know, talk about.  Making sure

09:51  12   that power's cranked way up so that whatever little desired

09:51  13   signal is there gets passed on down the line and can be

09:51  14   recovered.  That is the fundamental first step of every single

09:51  15   one of these claims.

09:51  16        It then goes on in little Roman iii and tells us that when

09:51  17   we -- so remember, we start at the worst case.  And then it

09:51  18   says:  When the signal strength of the interferer is low and

09:51  19   the signal strength of the desired signal is low, the bias

09:51  20   current of the circuit in the receiver signal path of wireless

09:51  21   transceiver is reduced.

09:51  22        So when we started at the worst case and when the

09:51  23   interferer comes down, the entirety of these inventions talk

09:51  24   about -- or alleged inventions I should say -- talk about

09:51  25   turning down the power.  You save some power when that

09:51  1   interferer signal comes down.  But you got to have a starting

09:51  2   point.  If you don't have a starting point, this all becomes

09:52  3   meaningless.

09:52  4        What we've seen from Theta in the summary judgment process

09:52  5   is an effort to essentially be divorced from any

09:52  6   cause-and-effect relationship whatsoever.  They look for any

09:52  7   modification of the bias current, and they say, aha, there's

09:52  8   been a modification of the bias current and that's all that

09:52  9   matters.

09:52  10       But that's not what this says.  This says a condition when

09:52  11  the signal strength of the interferer falls, you've got to

09:52  12  reduce the bias current.  You start at that worst case, when it

09:52  13  falls, you reduce the bias current.  Otherwise these claims

09:52  14  really have no meaning.  That ball of mush that Mr. Black

09:52  15  talked about, you know, becomes manifest.  They have to meet

09:52  16  these precise claim elements.

09:52  17       So, you know, Dr. Larson points out that, you know, if you

09:52  18  are increasing interference, that the bias current has to go

09:53  19  up.  That's his fundamental tenet, that's the fundamental under

09:53  20  current of the patent case.

09:53  21  ████████████████████████████████████████████████████████

09:53  22  ██████████████████████████████████████████████████

09:53  23  █████████████████████████████████████████████████████

09:53  24  ████████████████████████████████████████████████████████

09:53  25  ███████████████████████████████████



09:53   1        So it's a little bit like, you know, when I got ahold of

09:53   2   my sister's stereo set when I was a kid, her Harman Kardon that

09:53   3   she really loved, and all I could do was screw it up.  And I,

09:53   4   of course, would crank it up all the time.  And she would yell

09:53   5   at me because I was going to blow out our speakers.

09:53   6   ████████████████████████████████████████████████████████

09:53   7   ████████████████████████████████████████████████

09:53   8   ████████████████████████████████████████████

09:53   9   ████████████████████████████████████████████████████████

09:53   10  ████████████████████████████████████████████████████████

09:53   11  ████████████████████████████████████████████████████████

09:54   12  ████████████████████████████████████████████████████████

09:54   13  ██████████████████████████████████████████

09:54   14       So they have a fundamental problem.  ██████████████████

09:54   15  ██████████████████████████████████████████████

09:54   16  ████████████████████████████████████████████████████████████

09:54   17  ████████████████████████████████████████████████

09:54   18  ████████████████████████████████████████████████████████

09:54   19  ████████████████████████████████████████████████

09:54   20  █████████████████████████

09:54   21       That's what these -- the accused systems actually do as

09:54   22  opposed to all of the stuff that we've seen in the patent.  So

09:54   23  what do they do?  ██████████████████████████

09:54   24  ████████████████████████████████████████████████████████████

09:54   25  ████████████████████████████████████████████████████████



09:54  1

09:54  2

09:54  3

09:55  4

09:55  5

09:55  6

09:55  7      So Theta, you know, seems to acknowledge there's been a

09:55  8   little bit of a dispute about whether bias current and gain are

09:55  9   coincident, but I don't think that there really is a dispute

09:55 10   about that.  I think everybody understands that when you reduce

09:55 11   the bias current, you reduce gain; when you increase the bias

09:55 12   current, you increase gain.  So I don't need to spend much time

09:55 13   on that.

09:55 14      So again, Your Honor, fundamentally, they've got a

09:55 15   problem.  Theta's patents tell us, as the interference goes up,

09:55 16   you increase the bias current, crank up the juice.  And in the

09:55 17   accused products, it's just the opposite.  And they've got a

09:55 18   problem that they can't deal with.

09:55 19      So what do they say?

09:55 20      They say, well, we're going to come up -- in summary

09:55 21   judgment, we're going to give you two new theories.  The first

09:55 22   one is the starting point theory, and then the second is the

09:55 23   components theory.  And I'll take them each in turn.

09:55 24      So with the starting point theory, what they're basically

09:56 25   saying is, look.  You can't be distracted by those claim

09:56   1    elements.  You can't be distracted by the idea that you're

09:56   2    supposed to start from a worst case and then you come down from

09:56   3    that.

09:56   4         What they're saying is that, look.  If there's any time

09:56   5    you're making adjustments to the bias current and the gain,

09:56   6    then that's good enough.  We don't need to worry about those

09:56   7    pesky worst-case recitations in the claims.

09:56   8         But that's not what the claims say.  The claims -- and in

09:56   9    their opposition, they talk about the idea that, you know,

09:56   10   every time you make an adjustment, you're doing it in response

09:56   11   to some signal changing.  This is from their opposition where

09:56   12   they tell us that the measured signal strengths transition are

09:56   13   sometimes at a high level.

09:56   14        Now, this is a bit of a misnomer.  They say high

09:56   15   desired/high interferer.  Well, the part has no knowledge of

09:56   16   this.  I used to work with a guy that would say that all the

09:56   17   time.  Because the Samsung devices just don't know.  They don't

09:57   18   know whether it's a high interferer and a high desired signal.

09:57   19   All they know is that it's -- we're getting a high amount of

09:57   20   power in the receiver from whatever source.

09:57   21        And so what they're doing here is they're saying, well,

09:57   22   look.  If you have that, that could be a worst case; and then

09:57   23   when you transition down from that, then perhaps you'll be, you

09:57   24   know, moving into a low -- a lower signal level.

09:57   25        But, Your Honor, the reality here is when that happens,

09:57  1    you get an increase in bias current, not a decrease.  And they

09:57  2    actually tell us that at the end of this particular paragraph.

09:57  3         So imagine that we're going to allow them to shift around

09:57  4    and make their worst case a -- you know, a high-high and then

09:57  5    go to a low, which is nowhere in these patents, but it results

09:57  6    in an increase in bias current, not a decrease.  So we're not

09:57  7    saving power, we're actually wasting power.

09:58  8         And the claim elements are pretty specific here.  We can't

09:58  9    simply ignore that.  We know that there are two separate,

09:58  10   distinct requirements.

09:58  11        And so we can't just pick and choose any one case and say,

09:58  12   well, you know, for Claim Element, you know, i, we're going to

09:58  13   look at the system on Tuesday; and for iii, we're going to look

09:58  14   at it on Thursday.

09:58  15        The system is the system, and the conditions that are set

09:58  16   forth have to be satisfied.  You've got to satisfy each and

09:58  17   every one of them.

09:58  18        And it tells us that when the signal strength of the

09:58  19   interferer is low and the signal strength of the desired signal

09:58  20   is low, the bias current is reduced.  So we can stop right

09:58  21   there for Claim 1 of the '962 patent, because whatever

09:58  22   definition change they give it, the interferer signal is low

09:58  23   and the desired signal is low.

09:58  24

09:58  25



09:58   1

09:59   2

09:59   3

09:59   4          And on Slide 23, I've reproduced part of what they're --

09:59   5   they're pointing to the chart again.

09:59   6

09:59   7

09:59   8

09:59   9

09:59   10

09:59   11

09:59   12

09:59   13

09:59   14          So now they moved to a different argument.  They say,

09:59   15   well, it could be components.  You could have different parts

09:59   16   along the signal pathway.  Where in one of them you might have

09:59   17   a bias current increased or decreased.  Well, that's a

09:59   18   completely new position.  And you know that because what they

09:59   19   reproduced in their brief was a bunch of annotations that the

09:59   20   lawyers have added, not what their expert talked about.  And

10:00   21   that of course is not the way we try cases.

10:00   22          I think that theory is completely wrong.  I think there's

10:00   23   no evidence of this.  I think they're just guessing at the

10:00   24   different components along the pathway.  But what we absolutely

10:00   25   can't do is let them supplement their expert's report with

10:00  1   attorney annotations on a document.

10:00  2        And, you know, perhaps most importantly, when we asked

10:00  3   Dr. Larson about this, he was pretty candid that he didn't do

10:00  4   that analysis.  He didn't do this component-by-component

10:00  5   analysis.  And he's pretty -- was pretty candid with us that

10:00  6   it's not in this report.  And as you know, if it's not in a

10:00  7   report, it's not in the trial.  And that's really where that

10:00  8   should stop.

10:00  9        There's one other point on the components argument that I

10:00  10  should raise, which is the only analysis they've done was of

10:00  11  the Beamer version of the products.  But there are six or seven

10:00  12  other versions.  So if the only evidence they have is for the

10:01  13  Beamer design documents, then that's deficient.  That leaves

10:01  14  out a large swath of the products.

10:01  15       So with that, there just is no required adjustments.  The

10:01  16  fundamental tenet of these patents is when you go from high to

10:01  17  low, you turn down the power.  It's exactly the opposite in the

10:01  18  accused devices, and they need to explain that to you if they

10:01  19  want to proceed.

10:01  20       So finally, the comparing to the desired interferer.

10:01  21  We've heard over and over again this morning how important the

10:01  22  high interferer and low signal is, low desired signal.  And

10:01  23  that comparison is manifest in the '202 patent in Claim 7 and

10:01  24  13.

10:01  25       And you see it on Slide 28, the claim elements actually

58

10:01  1    require that you do a comparison.  You have to compare the

10:01  2    strength.  You got to ascertain the strength of the desired

10:01  3    signal relative to the strength of interferer signal.  That

10:01  4    means you got to measure them or know what they are in some

10:01  5    fashion and you got to compare one to the other.

10:01  6          There might be different ways to do that.  I have, you

10:01  7    know, three children and I can compare their heights.  I can

10:02  8    put them back to back.  I can measure them and look at numbers.

10:02  9    There are a lot of different ways I could do that, but you got

10:02  10   to make the comparison.  I've got to know how tall they are and

10:02  11   I've got to compare them in order to satisfy that element.  The

10:02  12   same is true with these signals.

10:02  13         In Dr. Larson's report we were very keen to look for

10:02  14   these.  We were very keen to try to find where he was going to

10:02  15   do this, because we don't see the comparison anywhere.  So we

10:02  16   studied long and hard.  And it's funny, he talks about it, and

10:02  17   he says, oh, it's in there.  It's like the pasta sauce.  It's

10:02  18   in there somewhere.

10:02  19   ████████████████████████████████████████████████████████

10:02  20   ██████████████████████████████████████████████

10:02  21   ████████████████████████████████████████████

10:02  22   █████████████████████████████████████████████████████

10:02  23   ██████████████████████████████████████████████████████

10:03  24   ███████████████████████████████████

10:03  25         But he doesn't do that.  He doesn't show us where they're

10:03   1   doing any comparison.  He doesn't tell us where they're doing

10:03   2   any measurement.  And in order for me to know whether my one

10:03   3   kid is taller than the other, I got to do the measurement.  If

10:03   4   I don't do the measurement and then I don't do the comparison,

10:03   5   I obviously haven't accomplished the process.

10:03   6        And that's it.  What we show on Slide 29 is the sum total

10:03   7   of his analysis of these comparison elements.  And it's a

10:03   8   problem, right?  We're supposed to try this case.  We're

10:03   9   supposed to determine whether or not these parts do these

10:03  10   claims, and we just can't do it.

10:03  11        So we asked him in deposition.  You know, Dr. Larson,

10:03  12   where is it?  You know, with those same paragraphs, where is it

10:03  13   that you show us, that you're ascertaining those signals and

10:03  14   then you're doing a comparison?  And he said, well, I haven't

10:03  15   explicitly shown that.

10:03  16        And when he says that the adjacent channel signal to the

10:03  17   desired signal, the adjacent channel is really another way of

10:04  18   saying the noise, you know, the non-desired signals.  I haven't

10:04  19   shown that.  He was pretty candid.

10:04  20        So how are we supposed to try this case, Your Honor?  How

10:04  21   am I supposed to cross-examine him and show the jury that he

10:04  22   didn't do this?  Because what I'm going to get is what I got in

10:04  23   their summary judgment motion.  What I got in their summary

10:04  24   judgment opposition was a citation to a bunch of impenetrable

10:04  25   source code.  A bunch of signal pathways and symbols that are,

10:04  1   you know, 18 characters long, each and every one of them.  And

10:04  2   they don't show any such comparison.  I got two and a half

10:04  3   pages of attorney argument.

10:04  4        And you can see it at Pages 17 and 18 of their brief.  I

10:04  5   wish I'd blown this up a little better, but you can see some of

10:04  6   the source code that they cite.

10:04  7        So what they've got is they've got their lawyer standing

10:04  8   up and saying, well, we can find the comparison.  We're going

10:04  9   to show this jury a bunch of impenetrable technical documents

10:04  10  that make no sense to real people and never say the word

10:04  11  "comparison."  There's not a real-world cue that they can pick

10:05  12  up from these.

10:05  13       And so what we're left with is their expert saying, at a

10:05  14  very high level, it's in there.  And that's as far as they'll

10:05  15  go.  And it's just not fair at the end of the day.

10:05  16       So it's -- you know, the orderly process of these cases is

10:05  17  supposed to be that we get the evidence.  When we file a

10:05  18  no-evidence summary judgment motion, they come forward with

10:05  19  something we can actually point to or they can point to, and

10:05  20  that just didn't happen here.

10:05  21       So at the end of the day, Your Honor, there is no evidence

10:05  22  of this comparer, and Claims 7 and 13 should be adjudicated

10:05  23  now.

10:05  24       And with that, unless there are any questions, I'll pass

10:05  25  the podium.

61

10:05  1          THE COURT:  Very good.

10:05  2          MR. CORDELL:  Thank you.

10:05  3          THE COURT:  If it doesn't screw you up too much to do it

10:05  4     this way, if you could address the comparison issue to start

10:05  5     off with --

10:05  6          MR. JOHANNINGMEIER:  Yes.  Sure, Your Honor.

10:05  7          THE COURT:  -- since it's the freshest in my mind.

10:05  8          MR. JOHANNINGMEIER:  Yes.  And actually, let's see.  For

10:06  9     that one maybe we should go with the paper slides --

10:06 10          THE COURT:  Okay.

10:06 11          MR. JOHANNINGMEIER:  -- because I've got code on them.

10:06 12          (Off-the-record discussion.)

10:06 13          MR. JOHANNINGMEIER:  So let's go with -- it's starting at

10:06 14     Slide 45.

10:06 15          MS. DE MORY:  Can I ask just a clarified question?  Does

10:06 16     this screen -- is this shown publicly?

10:06 17          THE COURT:  I don't think so.

10:06 18          MS. DE MORY:  Yeah.  And I don't think there's anyone in

10:06 19     the courtroom who can't see it, and I think Mr. Cordell put

10:06 20     some source code in the confidential documents on the screen as

10:06 21     well.

10:06 22          MR. CORDELL:  I tried not to.  Not anything extensive,

10:06 23     other than just a gain state document.

10:07 24          MR. JOHANNINGMEIER:  Well, I don't want to mess anyone up.

10:07 25     I mean, I'm happy to use the paper.  I mean, I just...

                                                                      62

10:07  1      MR. CORDELL:  One of the issues we're going to have to

10:07  2  confront sooner or later, Your Honor, is unfortunately

10:07  3  Mr. Kahng from Samsung is here, and Samsung and Qualcomm are

10:07  4  competitors.

10:07  5      So when we show Qualcomm's source code, they get very

10:07  6  agitated about showing that to Qualcomm (sic).  So we're going

10:07  7  to -- one of the things we're going to have to deal with in

10:07  8  trial is, I'm going to have to excuse our client

10:07  9  representatives whenever we go into that.

10:07  10      THE COURT:  Understood.  Let's move forward.  And if the

10:07  11  Samsung counsel believes you're showing anything that needs to

10:07  12  be taken down, just take it down and I'll --

10:07  13      MR. JOHANNINGMEIER:  Okay.

10:07  14      THE COURT:  Yeah.  I don't think there will be any harm

10:07  15  done --

10:07  16      MR. CORDELL:  So for example, Your Honor, this algorithm,

10:07  17  I think, is part of the Qualcomm --

10:07  18      THE COURT:  Got it.  And so Qualcomm might have a concern.

10:07  19      MR. JOHANNINGMEIER:  Let's take this slide off.

10:07  20      THE COURT:  Okay.

10:07  21      MR. JOHANNINGMEIER:  Okay.  So address the comparison one

10:07  22  first as to the '202 patent.

10:08  23      Mr. Cordell's description of what happened isn't exactly

10:08  24  accurate.  Dr. Larson didn't say he hadn't shown this.  He got

10:08  25  a lot of questioning.  The form of the questioning was sort of,

10:08  1  where is it in this paragraph?  He has a long report.  His

10:08  2  report cross-references -- they were looking at particular

10:08  3  paragraphs and saying where was it?

10:08  4      And, you know, to be completely honest, he didn't remember

10:08  5  at the time the source code citations that are elsewhere.  But

10:08  6  it's in his report.  It's clearly in his report.  And you can

10:08  7  see on this slide we cited it from his report.

10:08  8      So this is a no-evidence summary judgment motion.  We put

10:08  9  the evidence in the brief, his testimony, right?  His

10:08 10  testimony's very clear.  He thinks the comparison is done.

10:08 11  He's got examples of it.  It's lengthy.  I won't belabor it or

10:08 12  go through it all.

10:08 13  ████████████████████████████████████████████

10:08 14  ████████████████████████████████████████████████

10:09 15  ████████████████████████████████████████████████

10:09 16  ██████████████████████████████████████████████████

10:09 17  ███████████████████████████████████  And

10:09 18  Dr. Larson says that is a comparison, right?  I mean, you're

10:09 19  taking a difference between two numbers and then comparing the

10:09 20  second one to a threshold.  He says that meets it.

10:09 21      On summary judgment the Court can't decide he's wrong.

10:09 22  This is a -- this is evidence that's in the case that we can

10:09 23  present.  Now, counsel can call it impenetrable.  He can accuse

10:09 24  it of being attorney argument.  It's not attorney argument, it

10:09 25  is the evidence in the case.

64

10:09  1          So there is a subtraction --

10:09  2          THE COURT:  And maybe I just had a senior moment.  I was

10:09  3   reading something from one of my clerks.  But the information

10:09  4   that is in -- that Mr. Cordell referenced that was in the

10:09  5   lawyer documents, is all that information -- was that all

10:09  6   disclosed in the expert's report as well?

10:10  7          MR. JOHANNINGMEIER:  Yes.  So he cites to this code.  He

10:10  8   cites to these documents.

10:10  9          THE COURT:  Okay.  I'm just saying, maybe I misunderstood

10:10 10   what Mr. Cordell said, that you all had -- I got the sense that

10:10 11   you all had supplemented what had been done in what was filed.

10:10 12   And I just -- what I'm trying to figure out is what you used

10:10 13   for supplementation, was it already in the expert's report?

10:10 14   Did he rely on it?

10:10 15          MR. JOHANNINGMEIER:  It's cited.  So this one here in

10:10 16   particular, just to use an example, is from documents that he

10:10 17   cited, and so -- and code that he cited.

10:10 18          Now, we looked at thousands and thousands of code files.

10:10 19   I think there's 5,000 pages of printed source code.  So he

10:10 20   didn't go line by line and put it all in there, but he cited

10:10 21   to -- he did actually cite to this particular code file in his

10:10 22   report and these particular lines that we've put here.

10:10 23          Now, it's not in the paragraph, that 212 that he

10:10 24   mentioned.  It's in another paragraph in another section that

10:11 25   he cross-references.  He says, as in, you know, element

10:11   1   whatever, I described this in conjunction with this algorithm.

10:11   2   And then he mentions this flowchart and he cites this document.

10:11   3   He doesn't reproduce the flowchart in his report.  We put it

10:11   4   here, but he does cite to it.  So it's disclosed to the other

10:11   5   side.  I mean, they can try to penetrate the source code.  I

10:11   6   mean, I realize it's complicated stuff, but we've pointed out

10:11   7   what we were relying on in the report for this stuff.

10:11   8       So this is, you know, just one example and then there's

10:11   9   testimony in our brief on these as well.  There's another

10:11   10  example, the second one on here is this deficit bias

10:11   11  calculation.

10:11   12      Now, again, he cites to this file.  He doesn't

10:11   13  specifically discuss this calculation, but these are all

10:11   14  documents that are in his report.  I actually did some of this

10:11   15  code with Dr. Kiaei, their expert, and he talked about it as

10:12   16  well and gave some admissions on it that, you know, as we say

10:12   17  in our brief, are also sufficient to defeat summary judgment.

10:12   18      So there is, we think, ample evidence in the case of

10:12   19  multiple places where this comparison stuff is done.

10:12   20      Now, they may disagree with Dr. Larson's interpretation

10:12   21  about whether or not a subtraction followed by a threshold

10:12   22  comparison is equal to the claims, but that's just, you know,

10:12   23  for the jury to hear.  It's not summary judgment.  There is a

10:12   24  genuine issue here about whether comparison was done.

10:12   25      So if Your Honor doesn't have any more questions on that,

66



10:12  1    I can switch to the other one.

10:12  2        THE COURT:  Sure.

10:12  3        MR. JOHANNINGMEIER:  Okay.  So they did worst case first,

10:12  4    so let's talk about that one.  And then we can put this one up

10:12  5    on the screen -- this is Slide 44 -- or you can look at it.

10:12  6        So the bottom line on this is that Dr. Larson did find the

10:13  7    worst case in Gain State 0.  They suggested he did not.  He

10:13  8    did.

10:13  9        Their belief that he did not is based on the argument I

10:13 10    mentioned a little bit earlier about how their expert says,

10:13 11    well, a -45 dBm jammer can't be high because there's other

10:13 12    states where there's higher jammers.

10:13 13

10:13 14

10:13 15

10:13 16

10:13 17

10:13 18

10:13 19

10:13 20

10:13 21

10:14 22

10:14 23

10:14 24                                                        Those are

10:14 25    in there as well.

67

10:14   1        The -- this worst case isn't only limited to Gain 0.

10:14   2   That's their interpretation of this, but it's not.  But he did

10:14   3   find it in Gain 0, so their summary judgment motion has to be

10:14   4   denied just based on that point.

10:14   5        He found it in other places.  I think it was -- that's

10:14   6   actually on the earlier slides.  In 12 and 13, you can see it

10:14   7   in the -- on Slide 13, you can see the same worst-case scenario

10:14   8   with the low interferer and the high jammer in other gain

10:14   9   states, Gain State 1, Gain State 2.

10:14   10  ████████████████████████████████████████████████████████

10:14   11  ███████████████████████████████████████████████████████████

10:14   12  ███████████████████████████████████████████████████████████

10:15   13  ████████████████████████████████  And he found that in each one of

10:15   14  those, which is why, when asked in deposition, he testified

10:15   15  that there could be multiple worst cases at different points in

10:15   16  the overall range of the device.

10:15   17       They're suggesting that that's not right, that you can

10:15   18  have only, you know, the very lowest of the low and the very

10:15   19  highest of the high.  That's just not the plain meaning of this

10:15   20  term.  So we're kind of back to the same argument here.

10:15   21       But at bottom, he did find it in Gain State 0.  He

10:15   22  described how the chip reacts to that, what it does.  It does

10:15   23  do the required adjustment from that point.  When the -- when

10:15   24  it's in the worst case and the signal goes up, it does the

10:15   25  required adjustment to the bias that's in the claims.  And

68

10:15  1    that's clearly in his report.

10:15  2        So this is just another one where the evidence is there.

10:15  3    We put it in our brief.  Their one page on this no-evidence

10:15  4    summary judgment motion should be denied.

10:16  5        And then, finally, on the bias adjustment one, you can

10:16  6    look at Slide 40 and 41.

10:16  7        Now, Claim 1 of the '962 and Claim 13 of the '202 have a

10:16  8    clause that requires a decrease in response to a particular

10:16  9    change.  The other claims have a different requirement where

10:16  10   the bias current would be increased in similar situations.

10:16  11   Those aren't at issue for this.

10:16  12       So the claims at issue here, Claim 1, they filed a motion

10:16  13   saying we hadn't shown this anywhere.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:16  14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:16  15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:16  16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:16  17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:16  18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:17  19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:17  20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:17  21       Now, he also said that has to be in Gain 0.  The only

10:17  22   place this could happen is Gain 0.  Well, that's just nonsense,

10:17  23   that's not what the claim requires.  That's something that

10:17  24   they've attempted to impose on this.  That -- it's just -- it

10:17  25   doesn't come from anywhere.

10:17  1        So he showed this.  Now, these annotations in red are

10:17  2  stuff that we put on to explain it, but these charts are in his

10:17  3  report.  And he explained it in his deposition, as is in our

10:17  4  brief.

10:17  5        Now, we heard -- I heard Mr. Cordell talk about the total

10:17  6  power.  Well, let me be clear here.  There is a total power,

10:17  7  the RSSI, but in their own brief at Page 4 they admit that that

10:17  8  is a combination of the desired strength and the interferer

10:17  9  strength.  ████████████████████████████████████████████████

10:18  10 ████████████████████████████████████████████████████████████

10:18  11 ██████████████████████████████████

10:18  12      ████████████████████████████████████████████████████████

10:18  13 ████████████████████████████████████████████████████████████

10:18  14 ████████████████████████████████████████████████████████████

10:18  15 ██████████████████████████████

10:18  16      ███████████████████████████████████████████████████

10:18  17 ████████████████████████████████  And so it meets the claim

10:18  18 elements.  And when it does -- when the code reacts to an

10:18  19 increase by decreasing, as we see here, then it meets these

10:18  20 particular elements of the claims.  So this is evidence of

10:18  21 those elements being met in those gain state transitions for

10:18  22 these two products.

10:18  23      ███████████████████████████████████████████████████████

10:18  24 ████████████████████████████████████  And this is one

10:19  25 where actually Dr. Larson mentioned this in his depo.  It's in

10:19  1    his report. ████████████████████████████████████

10:19  2    ████████████████████████████████████████████████

10:19  3    ████████████████████████████████████████████████

10:19  4    ███████████████████████████    So it's an example of infringement

10:19  5    of these particular claims.  So this is the evidence for their

10:19  6    no-evidence summary judgment motion.  The motion should be

10:19  7    denied.

10:19  8         Again, I heard Mr. Cordell say that Larson -- Dr. Larson

10:19  9    didn't do the analysis and didn't do it.  It's not in his

10:19 10    report.  He didn't say that.  He did the analysis.  It's in his

10:19 11    report.  These are the examples.

10:19 12         They want to say that these little -- that these

10:19 13    individual transitions don't matter, but they do.  These

10:19 14    individual transitions infringe when that happens in the

10:19 15    circuit.  And then the overall -- the overall gain may go one

10:19 16    way but the individual component gains go another way.  That

10:19 17    infringes the claims, and Dr. Larson has shown how that's done.

10:20 18         So unless Your Honor has any questions, that's it for me.

10:20 19         THE COURT:  I'm good.

10:20 20         MR. JOHANNINGMEIER:  Thank you.

10:20 21         THE COURT:  Mr. Cordell?

10:20 22         MR. CORDELL:  So if I could begin with the comparing.  And

10:20 23    actually, could I keep the plaintiff's slides and could you go

10:20 24    to Slide 44, please?

10:20 25         I can do it on the ELMO.  44?  Oh, sorry.  Would you

71

10:20  1    believe 45?

10:20  2         Looks like my slides have a different numbering than --

10:20  3    actually, could I just have the ELMO?

10:21  4         Okay.  So counsel showed you two slides that -- mine's 45,

10:21  5    but I think his -- well, I'm not sure what it was.  But you'll

10:21  6    recall the algorithm, Your Honor, which I hopefully am just

10:21  7    publishing to Your Honor and the well.  And the citation they

10:21  8    give us is to Dr. Larson's report at Paragraph 134.

10:21  9         So I pulled out Paragraph 134.  And this is part of the

10:22  10   source code analysis, but this is the entirety of Paragraph 134

10:22  11   from Dr. Larson's report.  And there are a couple of important

10:22  12   points here.

10:22  13        Number one, this relates to the '825 patent which does not

10:22  14   have the comparing limitation in it at all, right?  So the

10:22  15   claims that I'm analyzing here are the one -- are the comparing

10:22  16   claims, not the '825 at all.

10:22  17        So when we're talking about the '202, and it's -- just to

10:22  18   make sure I have the claim numbers correct -- it's Claim 7 and

10:22  19   13.  Those are the ones that have the comparing limitations in

10:22  20   them.  So we start from that proposition, that they're

10:22  21   expecting us to go to a different patent on a different issue.

10:22  22        Number two, this Paragraph 134 is analyzing the preamble

10:22  23   of the '825 patent claims.  So it's not even -- it's not even

10:23  24   beyond the substance -- or into the substance other than

10:23  25   they're supposed to show some power savings.

10:23    1          So somehow we're supposed to divine from this citation,

10:23    2     which I won't read into the record because it's highly

10:23    3     confidential, but it goes on for, I don't know, 20 characters

10:23    4     lots of underscores and slashes.  And yet, I'm supposed to know

10:23    5     that that's where to find the comparing evidence.

10:23    6          Counsel also showed you Slide, what for me is 46, which,

10:23    7     again, has some source code on it.  Again, impenetrable source

10:23    8     code.  Source code that doesn't -- to normal people would never

10:23    9     tell us that this is -- that this is the comparing limitation.

10:23   10          And here we cite -- they cite Paragraph 728 of

10:23   11     Dr. Larson's report.  And, again, with a very long source code

10:23   12     citation.  Counsel's correct, there are thousands of source

10:23   13     code files.  But my clairvoyant powers aren't good enough to

10:24   14     know that, oh, I should have been looking at this for the

10:24   15     comparing limitation.

10:24   16          So you go to Paragraph 728.  And there, again, we're

10:24   17     talking about the '825 patent.  We're not talking about the

10:24   18     '202 patent at all.  And all it tells us is that there are --

10:24   19     there is firmware that is using certain functions.  And that's

10:24   20     it, and that's what I got.

10:24   21          So the reality is there is no evidence here.  And counsel

10:24   22     did a valiant -- you know, made a valiant attempt at trying to

10:24   23     point us to where it might be somewhere in the evidentiary

10:24   24     record.  That doesn't mean that it's part of the evidentiary

10:24   25     record at trial.  So the fact that Dr. Larson relied on a chunk

10:24 1    of source code for some purpose doesn't mean he can rely on it

10:24 2    for this purpose.  So there simply is no evidence of that

10:24 3    comparing limitation.

10:24 4        With respect to the worst-case conditions argument, the

10:24 5    reality is they point to G0.  They point to G0 over and over

10:24 6    again, that's the gain state they're stuck with.  And it's

10:25 7    undisputed that in Gain State 0 you have low desired signal and

10:25 8    low interferer.

10:25 9        Counsel said a couple of times that somehow -- somehow

10:25 10   Samsung determines the value of the interferers and determines

10:25 11   the value of the desired signal.  There's no evidence of that

10:25 12   at all.  In fact, the evidence shows they just take whatever

10:25 13   comes in and they test to see how much power it carries, and

10:25 14   that's it.

10:25 15       They deal with the noise, they deal with the desired

10:25 16   signal downstream someplace.  And that's a result of the

10:25 17   progress of technology.  Way back when, maybe they had to do it

10:25 18   the way the patents talk about, but today they just don't.  So

10:25 19   there's no evidence of that.

10:25 20       And they can't show you anything where in Gain State 0

10:25 21   you've got a high noise signal interferer, jammer, whatever you

10:25 22   want to call it.  And unless they can, they can't survive the

10:25 23   worst-case conditions.

10:25 24       And with respect to the adjusting the bias argument, you

10:26 25   know, again, counsel did a valiant job of trying to go in and

10:26  1    find components where the bias currents are adjusted.  But his

10:26  2    expert didn't do it.  He didn't do it.  And, you know, with

10:26  3    this level of complexity, it's simply not fair for him to stand

10:26  4    in front of a jury and walk them through source code and say,

10:26  5    ha, you know, Element 47 in the path has a bias adjustment,

10:26  6    therefore that somehow qualifies.  That's just not the way the

10:26  7    process works.

10:26  8         And even if he could, what he can't show is that coming

10:26  9    off of that worst-case condition where the interferer is high

10:26  10   and the desired signal is low, somehow the bias currents are

10:26  11   decreased.  Because it's just the opposite.  When we come off

10:26  12   of that high interferer signal, bias current are increased.

10:26  13        And I have to make one comment about the -- an argument

10:26  14   that I heard this morning.  Because when we're looking at the

10:26  15   worst case, I heard something new today.  But it's indicative

10:26  16   of the problems we're going to have in trial.

10:27  17        You know, the third order intercept.  I actually wrote it

10:27  18   down to make sure I got it right.  We're going to be looking

10:27  19   for the third order intercept of a signal to know whether it's

10:27  20   low.

10:27  21        And, Your Honor, that's the kind of thing that we just

10:27  22   can't burden the good people of Waco with.  I mean, that's

10:27  23   just -- you know, can you imagine what they'll throw at us if

10:27  24   we expect them to make those decisions?

10:27  25        So with that, Your Honor, I'll pass the podium unless

10:27  1  there are any questions.

10:27  2      THE COURT:  Counsel, if you would, as directly as

10:27  3  possible, address Mr. Cordell's argument about the fact that

10:27  4  the bias current is actually increased.

10:27  5      And then also if you'll address his concern that the

10:27  6  section of the expert report that you're relying on applied to

10:27  7  a different patent.  Both those issues I'd like to --

10:27  8      MR. JOHANNINGMEIER:  That one's easy, Your Honor.

10:28  9      I mean, basically the paragraphs that he cites refers --

10:28  10  so he -- Dr. Larson goes through the claims of the '825 patent

10:28  11  first.  So he analyzes Claim 3 in extreme depth with going into

10:28  12  all the code.  And then when he gets down to the other claims,

10:28  13  in multiple places he says "as I talked about in -- with

10:28  14  respect to Element 3[c] or with Element 3[a]," so it's -- you

10:28  15  know, because it is the same functionality for both patents.

10:28  16      And so when the same element appears, he basically refers

10:28  17  back.  So the reference does cross the boundary into his

10:28  18  analysis of the previous patent.  But as far as the code and

10:28  19  the chips go, it's the same chips and the same code that he's

10:28  20  analyzing.  So it's just a, you know, cross-reference that --

10:28  21  you know, but it's there and it's clear and they can follow it.

10:28  22      There's a lot in his report and there's a lot of documents

10:28  23  and code cited, but we try to make it as clear as possible of

10:28  24  what he was relying on.

10:28  25      The other thing I would point out, with respect to some of

10:28  1   that comparing code, their expert went through it as well.  He

10:29  2   went through in-depth, right?  And actually, interestingly,

10:29  3   with respect to this comparison stuff, he mentioned the deficit

10:29  4   bias thing that was shown in my Slide 46.

10:29  5         But if you look at his code analysis, he walks through

10:29  6   that same code file, and then he stops talking about it at

10:29  7   Line 1966.  But the code that we cited here is like four lines

10:29  8   later.  It's -- he literally just walks all the way through the

10:29  9   code until he gets to that part that he doesn't like because

10:29  10  it's got a comparison in it and stops talking about the code.

10:29  11        They had the code.  They looked at the code.  Their expert

10:29  12  looked at the code.  There's no -- you know, Mr. Cordell's

10:29  13  concern with whether or not we can explain this to the good

10:29  14  people of Waco is -- you know, it's on us to do.  We're going

10:29  15  to bring in professors and explain this to them in our best

10:29  16  possible way, but this is a summary judgment motion and the

10:29  17  evidence is there.

10:29  18        So now, you asked about the increased bias point for the

10:30  19  '962, Claim 1, I believe.  Because I heard him talking about

10:30  20  the -- I'm trying to make sure which one we're talking about,

10:30  21  but with respect to the increased bias for the -- the '962, I

10:30  22  mean, there's examples in there, as I showed you, of that

10:30  23  occurring.  The overall -- there's cases where the overall gain

10:30  24  increases but the component gain drops, decreases.  So that's

10:30  25  clearly shown.

10:30   1   ████████████████████████████████████████

10:30   2   █████████████████████████████████████████████

10:30   3   █████████████████████████████████████████████

10:30   4   ████████████████████████████████ It's in the report,

10:30   5   it's in the code.

10:30   6   █████████████████████████████████████████████

10:30   7   ███████████████████████████████████████

10:30   8   ████████████████████████████████████████████

10:31   9   ████████████████████████████████████████████

10:31   10  ███████████████████

10:31   11  ███████████████████████████████████

10:31   12  █████████████████████████████████████████████

10:31   13  █████████████████████████████████████████████

10:31   14  ███████████████████████████████████████████

10:31   15  ██████████

10:31   16         Thanks, Your Honor.

10:31   17         THE COURT:  Mr. Cordell, anything else?

10:31   18         MR. CORDELL:  Only this, Your Honor.  The '825 patent

10:31   19  doesn't have the comparing limitation in it at all.  So

10:31   20  there's -- the citations back to the '825 patent don't do us

10:31   21  any good.  It's just not there.

10:31   22         THE COURT:  A response to that?

10:31   23         MR. JOHANNINGMEIER:  Well, the citations are to the

10:31   24  analysis of the device that he did for the other patents.  So

10:32   25  he analyzes the device and says, okay, well, this functionality

10:32   1   of the device does X, Y and Z.  And then when he gets down to

10:32   2   the comparing step, he refers back.  So the analysis is not --

10:32   3   you know, the claim terms are very similar.  There is no

10:32   4   comparing step, right?  But he does call back to the previous

10:32   5   analysis and the previous code.

10:32   6        So, I mean, that's the citation that he makes.  And if you

10:32   7   follow the chain of his citations, you get to these files, you

10:32   8   get to this code.  Their expert was able to do it.  And this

10:32   9   is, again, a summary judgment motion.  So if the question is,

10:32   10  is the evidence weak or hard to follow, that's maybe something

10:32   11  for Mr. Cordell to, you know, cross Dr. Larson on.  But there

10:32   12  is a genuine issue in the report about the evidence here.

10:32   13       THE COURT:  Mr. Cordell?

10:32   14       MR. CORDELL:  Well, what we're talking about here are

10:32   15  broad citations to code.  And the question becomes when -- and

10:33   16  I showed you the two paragraphs he relies on.  You know, those

10:33   17  broad citations to source code that has, you know, thousands of

10:33   18  lines in it.  Analysis for the '825 patent doesn't mention

10:33   19  comparing, so there was no reason for us to then have decided

10:33   20  to look into those files.  He seems to suggest that because we

10:33   21  could perhaps figure out the answer, doesn't answer the

10:33   22  fundamental question which is whether or not they put the

10:33   23  evidence in the record.  And they didn't.  And because they

10:33   24  didn't, they can't survive summary judgment.

10:33   25       THE COURT:  Counsel?

10:33   1         MR. JOHANNINGMEIER:  What he put in his report was a

10:33   2   citation to the other part of his report where he did the

10:33   3   analysis of the device.  So he gave them the citation to

10:33   4   follow.  The fact that it's in a different section is

10:33   5   irrelevant.  If you go to the paragraphs that he cites, you

10:33   6   find the discussion of the padding algorithm, for instance, and

10:33   7   the citation to the flowchart, and the comparison is there.  So

10:33   8   that's what's in his report.

10:34   9         MR. CORDELL:  Just to be clear, Your Honor, this, you

10:34  10   know, flowchart is not in his report.  That's not the -- that's

10:34  11   an exhibit.  That's a document that we would have had to have

10:34  12   dug out in order to have found what they're now telling us is

10:34  13   where the comparison step takes place.  There's just no reason

10:34  14   for us to have done that.  It's a different patent, it doesn't

10:34  15   have the comparing limitation in it.  And the fact that he

10:34  16   cited a chunk of source code somewhere in his report doesn't

10:34  17   answer the question.

10:34  18         MR. JOHANNINGMEIER:  Well, Your Honor, I don't want to

10:34  19   keep popping up here, but, I mean, the issue with the report is

10:34  20   that, you know, we have a lot of code.  We have a lot of

10:34  21   documents.  We cited to them.  He can't put all the code in his

10:34  22   report, for one thing.  He put in the citations.  He put in the

10:35  23   cross-reference.

10:35  24         The issue on summary judgment isn't whether or not they

10:35  25   did or did not follow the citations or whether they chose to

10:35   1    just cross-examine him on Paragraph 212 and say, where is this

10:35   2    in Paragraph 212?  Which is what they actually did.

10:35   3          When their expert was looking at this code, he found the

10:35   4    file, he analyzed the file.  He went through.  He stopped a few

10:35   5    lines before the part where there's a comparison.  I think

10:35   6    that -- he clearly did the analysis.  He was in the right

10:35   7    files, he could have seen it, he could have responded to it.

10:35   8    He chose not to.  When I asked him about it in deposition, he

10:35   9    got pretty cagey.  I think we put the answers in the brief.

10:35   10          But this is a case where they were able to figure out how

10:35   11   this works.  They didn't like the result, so they tried to do a

10:35   12   where-is-it-in-your-report game in deposition.  We've now shown

10:35   13   where the stuff is, and I guess that's the best we can do, Your

10:35   14   Honor.  Thanks.

10:35   15          MR. CORDELL:  Again, I -- now I'm belaboring it, Your

10:36   16   Honor.  The process is supposed to be rational.  We're supposed

10:36   17   to have the disclosure.  They didn't make the disclosure.  I

10:36   18   think I just heard counsel, you know -- I admire his candor.

10:36   19   He said that the expert stopped a few lines before.  Well,

10:36   20   okay, he stopped.  And the reality is that if the evidence

10:36   21   isn't in there, it's not in there.

10:36   22          MR. JOHANNINGMEIER:  Just to clarify, their expert stopped

10:36   23   a few lines before the code.  Not ours.  Their expert, in his

10:36   24   analysis, stopped right before the code we cited.

10:36   25          I don't have anything else.

81

10:36    1        MR. CORDELL:  Nothing further.

10:36    2        THE COURT:  Well, why don't we take a ten-minute recess?

10:36    3   We'll come back and I'll give you my ruling.  And then we'll

10:36    4   move on to the next issue.

10:36    5        THE BAILIFF:  All rise.

10:36    6        (Recess taken from 10:36 to 10:44.)

10:44    7        THE BAILIFF:  All rise.

10:44    8        THE COURT:  Thank you.  You may be seated.

10:44    9        The Court is going to overrule Samsung's motion of

10:45   10   noninfringement -- motion for summary judgment of

10:45   11   noninfringement.

10:45   12        The next issue up is -- has to do with 102(g) art.  I'll

10:45   13   hear from plaintiff.

10:45   14        MR. JOHANNINGMEIER:  You've seen a lot of me early in this

10:45   15   one.  Get to hear from some other people later.

10:46   16        All right.  We'll start on Slide No. 48.

10:46   17        THE COURT:  You can -- I'm pretty familiar with 102(g).

10:46   18   You can skip over --

10:46   19        MR. JOHANNINGMEIER:  Yeah.  Well, I've only got -- it's

10:46   20   actually really short.

10:46   21        So, Your Honor, as you know, 102(g) is a special category

10:46   22   of art.  You have to show invention by another.  So in order to

10:46   23   show it, you have to show conception, reduction to practice,

10:46   24   lack of concealment.

10:46   25        Dr. Kiaei's report, on Slide 49, actually recited the

10:46  1   constructive reduction to practice standard, and said that you

10:46  2   had to describe the invention with sufficient detail to enable

10:47  3   a person of skill in the art to practice.  That's what you have

10:47  4   to do to show constructive reduction to practice in this

10:47  5   context, and there it is in his report.  And the problem is, he

10:47  6   didn't do the analysis.

10:47  7       So on the next slide we just have the deposition

10:47  8   testimony.  He didn't do it.  He didn't analyze the thing from

10:47  9   the point of view of enablement or conception.  But we'll just

10:47  10  focus on this one, because this is the clearest failure.

10:47  11      "I do not have specific analysis of that," he says.  "I

10:47  12  may not have explicit, direct analysis of that."  And then he

10:47  13  attempts to say that it's in these paragraphs, but on the next

10:47  14  slide, on 52, if you look at it, it's not in those paragraphs.

10:47  15      All that he does in his analysis is he basically

10:47  16  identifies the inventors of some Qualcomm patents and says that

10:47  17  the filing of those patents was constructive reduction to

10:48  18  practice, but he never analyzed those patents for whether or

10:48  19  not they showed conception.  He never analyzed those patents

10:48  20  for whether or not they showed enabling disclosure to a person

10:48  21  of ordinary skill in the art.

10:48  22      He just basically relied on his invalidity analysis and

10:48  23  said, well, it discloses -- you know, it basically -- it's --

10:48  24  it makes the invention obvious; therefore, it somehow shows

10:48  25  reduction to practice.  But obviousness doesn't that.  You have

10:48  1   show every element.  You have to show it in the mind of the

10:48  2   inventor.  You have to show it enabled for constructive

10:48  3   reduction to practice.

10:48  4       And then on concealment, he basically just pointed to the

10:48  5   same thing, pointed to those patents, not all of which have the

10:48  6   disclosure.  In fact, you know, he doesn't -- for certain

10:48  7   claims, he doesn't even say that those patents disclose all the

10:48  8   elements.  So he doesn't have lack of concealment either for

10:48  9   those claims.  Because the '430 patent, you know, if you -- if

10:48  10  he can't even say it anticipates, then how can he say it

10:49  11  discloses the invention, much less anything else?

10:49  12      So this is all they've got in their brief.  I won't

10:49  13  belabor the point because it's fairly simple.  He didn't do the

10:49  14  analysis that's required to qualify this as prior art;

10:49  15  therefore, it's not prior art.

10:49  16      They can run the '430 patent at trial if they want.

10:49  17  That's a separate patent.  But this ███████ project chip

10:49  18  is not qualified as prior art in this case.

10:49  19      And I'll turn it over to counsel.

10:49  20      MR. CORDELL:  Your Honor, Mr. Song will be presenting our

10:49  21  argument.

10:49  22      THE COURT:  Okay.  I think this is the first time I've had

10:49  23  you in my court, isn't it?

10:49  24      MR. SONG:  Yes, Your Honor.

10:49  25      THE COURT:  Welcome.

10:49  1        MR. SONG:  Thank you very much.

10:49  2        Good morning, Your Honor.  So Theta, while acknowledging

10:50  3   that the 102(g) art can be used for obviousness, they argue

10:50  4   that it can't qualify as 102(g) art unless it's anticipatory.

10:50  5   This contradicts itself, and it just makes no sense.

10:50  6        This -- let's look at Theta's arguments here.  This is

10:50  7   from the reply brief.  First, they say:  Once qualified as

10:50  8   prior art, Section 102(g) references can be used in obviousness

10:50  9   analysis.

10:50  10       So they acknowledge that the reference itself does not

10:50  11  have to disclose each element of the claim.  They say it can be

10:50  12  used in obviousness analysis.

10:50  13       But then they go on to say, okay.  What does it take to

10:50  14  qualify?

10:50  15       Qualification as 102(g) art requires a showing of

10:50  16  conception and constructive reduction to practice.  Okay.

10:50  17       Then they say:  But the conception cannot be corroborated

10:50  18  and constructive reduction to practice cannot be shown in a

10:51  19  reference that only renders certain elements obvious.

10:51  20       So now they say the reference must show every element.  It

10:51  21  must be anticipatory.  So this is self-contradictory.

10:51  22       According to Theta, any reference to be used for

10:51  23  obviousness, which they acknowledge that it can be used for

10:51  24  obviousness, must also anticipate the claims.  That just makes

10:51  25  no sense, Your Honor.

85

| | | |
|---|---|---|
| 10:51 | 1 | First of all, I want to -- well, so -- and the -- just |
| 10:51 | 2 | wanted to make sure that the entirety of Theta's argument boils |
| 10:51 | 3 | down to that issue.  They incorrectly argue that the |
| 10:51 | 4 | ██████████ project used in the obvious analysis for certain |
| 10:51 | 5 | claims cannot qualify as 102(g) art because it does not |
| 10:51 | 6 | anticipate.  This makes no sense, and Theta is incorrect on the |
| 10:51 | 7 | law. |
| 10:51 | 8 | So before I get into the correct law, I wanted to point |
| 10:52 | 9 | out that Theta's argument applies to only a subset of the |
| 10:52 | 10 | asserted claims.  And those are Claim 8 of the '825 patent and |
| 10:52 | 11 | Claim 1 of the '962 patent. |
| 10:52 | 12 | With regard to the other claims, Dr. Kiaei opined that |
| 10:52 | 13 | they're anticipated by the ██████████ project.  So even under |
| 10:52 | 14 | Theta's wrong test, ██████████ is qualified as 102(g) art for |
| 10:52 | 15 | those other claims. |
| 10:52 | 16 | But, in fact, the ██████████ project is 102(g) art for |
| 10:52 | 17 | all claims because Theta is wrong on the law.  The Tyco case |
| 10:52 | 18 | from the Federal Circuit lays it out.  102(g) art need not |
| 10:52 | 19 | disclose all elements of the claims when used for obviousness. |
| 10:52 | 20 | In Tyco, the conception and reduction to practice analysis |
| 10:52 | 21 | of the Ethicon Prototype -- it was the 102(g) reference |
| 10:52 | 22 | there -- it did not include all the elements.  It was |
| 10:53 | 23 | considered under 103.  And because of that, ultimately the |
| 10:53 | 24 | Federal Circuit concluded:  The district court improperly held |
| 10:53 | 25 | that the Ethicon Prototype could not be considered prior art |

10:53  1   under 103, and erred in finding that the Curved Blade Claims

10:53  2   and Dual Claims would not have been obvious.

10:53  3        So, obviously, the prototype did not include the curve --

10:53  4   all the elements for the Curved Blade Claims or the Dual

10:53  5   Claims.

10:53  6        Theta does not address this clear standard laid out in the

10:53  7   Tyco case.  And, in fact, Theta cites no case requiring an

10:53  8   anticipation analysis when a 102(g)(2) reference is used for

10:53  9   obviousness under 103.

10:53  10        Samsung, on the other hand, has cited numerous cases, such

10:53  11   as two seminal Federal Circuit cases, Tyco and Sandt, stating

10:53  12   no special all elements disclosure is required for 102(g) art

10:54  13   to be used for obviousness.

10:54  14        The cases that Theta relies on for this, you know, special

10:54  15   requirement that it must be anticipatory, they all involve two

10:54  16   parties determining the priority of invention.

10:54  17        Who was the first to invent?

10:54  18        So of course an inventor seeking to show priority must

10:54  19   show conception of every element.  Similarly, an inventor

10:54  20   swearing back of antedating prior art must also show conception

10:54  21   of all elements.

10:54  22        So these are the examples that Theta cites for their

10:54  23   incorrect assertion that 102(g) art must be anticipatory.

10:54  24        And Section 102(g) itself has two distinct sections

10:54  25   addressing these concepts.  102(g)(1) talks about -- it

—87—

10:54  1   addresses an interference proceeding and the priority of

10:54  2   invention; 102(g)(2) is the use of -- use of a reference as a

10:54  3   source of prior art whether for anticipation or obviousness

10:55  4   under Section 103.

10:55  5        So here the --

10:55  6        (Off-the-record discussion.)

10:55  7        MR. SONG:  Okay.  So here are the cases, Your Honor, that

10:55  8   the -- both parties -- both parties cite.  On the left are

10:55  9   those cases where you're addressing the priority of invention.

10:55  10  Theta cites, for example, the Frazer case, right?  That was an

10:55  11  interference proceeding.  And of course both parties are trying

10:55  12  to show priority of inventorship and all elements or of each

10:55  13  "count," as Theta puts it.

10:55  14       Theta also cites the Burroughs case, where they were

10:56  15  trying to determine whether all the listed inventors did, in

10:56  16  fact, conceive of the invention.  So of course they were trying

10:56  17  to determine whether the listed inventors conceived of the

10:56  18  entire invention.

10:56  19       Theta also cites the Round Rock case.  So there, they're

10:56  20  trying to antedate -- the inventor was trying to antedate a

10:56  21  prior art reference.  Of course he's trying to show all

10:56  22  elements were conceived.

10:56  23       Our case is spelled out in Tyco and Sandt, which is 102(g)

10:56  24  art used for obviousness and prior invention.  And in that

10:56  25  instance, that can be combined with other references or a

10:56   1    POSITA's knowledge.

10:56   2       Here are the two cases again.

10:56   3       Tyco:  It would have been obvious to one of ordinary skill

10:56   4    to replace a straight blade of the Ethicon Prototype with a

10:56   5    curved blade.

10:56   6       In Sandt:  The district court correctly concluded that the

10:56   7    use of threaded studs would have been an obvious substitution

10:56   8    for welding...

10:57   9       The Federal Circuit cases that are actually on point talk

10:57  10    about 102(g) art need not disclose all elements when used under

10:57  11    103.

10:57  12       Now, Theta also complains that Samsung did not prove

10:57  13    evidence on conception and reduction to practice.  And, again,

10:57  14    their analysis is incorrect in that they're saying Samsung must

10:57  15    show proof on evidence of conception and reduction to practice

10:57  16    on every element.  But 102 -- but Samsung is using -- with

10:57  17    regard to certain claims Samsung is using the 102(g) art to

10:57  18    show obviousness.

10:57  19       And with regard to showing obviousness, Dr. Kiaei provided

10:57  20    11 pages on the background of a Qualcomm ██████ project.

10:57  21    He identifies the timeline all based on documents long before

10:58  22    the priority date of the Theta patents.  The technology and the

10:58  23    personnel involved, including numerous individuals that

10:58  24    overlapped between the Qualcomm project and the Qualcomm

10:58  25    patents.  He has 92 pages of element-by-element analysis for

10:58  1   the Qualcomm ███████ project which shows conception,

10:58  2   anticipation and obviousness.

10:58  3        And he has further 114 pages element-by-element analysis

10:58  4   of the '430 patent which shows the reduction to practice.

10:58  5   Samsung submits that the '430 patent and '602 patent and the

10:58  6   '279 Qualcomm patents show reduction to practice of the

10:58  7   Qualcomm ███████ project.  Dr. Kiaei's report is more than

10:58  8   sufficient to show conception and reduction to practice.

10:58  9        And it doesn't seem like plaintiffs are really focusing on

10:59  10  abandonment, suppression to conceal.  But I won't get into

10:59  11  these slides, Your Honor, but of course Qualcomm disclosed this

10:59  12  invention and they did not abandon, suppress or conceal.

10:59  13       With that I'll pass it to plaintiff.

10:59  14       MR. JOHANNINGMEIER:  Just briefly, Your Honor.

10:59  15       So counsel cited a bunch of cases about whether or not --

10:59  16  and there are a bunch of cases about whether or not 102(g) art

10:59  17  could be used for obviousness in the ultimate liability

10:59  18  analysis.  And we actually don't disagree on that.  Those cases

10:59  19  say that it can.

10:59  20       But even the Tyco case, and we pointed this out in our

10:59  21  reply brief at Page 3.  In that case the reference was

10:59  22  qualified through a prior showing of -- or a showing of prior

11:00  23  conception and later diligent reduction to practice.

11:00  24       There's a threshold issue with 102(g).  You don't get to

11:00  25  use it for anticipation or obviousness if you don't show the

11:00  1   statutory requirements of 102(g) of invention, conception and

11:00  2   reduction to practice.  So that's what we are saying is not met

11:00  3   here.

11:00  4        We're not saying that ███████ couldn't be used.  The

11:00  5   issue with 102(g) is that it's secret art, right?  So no one

11:00  6   knows about it, and that's why the statute has these additional

11:00  7   requirements of conception, reduction to practice and lack of

11:00  8   concealment.  And so they haven't done that analysis, most

11:00  9   obviously, with respect to reduction to practice.  Because as

11:00  10  counsel said, he never mentioned an enablement analysis.  There

11:00  11  is no enablement analysis in the briefs.  It's just not there.

11:00  12  And their expert admits it's not there.

11:00  13       So they cannot show, just by saying, well, look, here's a

11:00  14  patent that has, you know, its own invention in it.  They can't

11:00  15  show conception and reduction to practice of Dr. Tsividis'

11:00  16  invention by those inventors before in that patent.  They

11:01  17  haven't done it.

11:01  18       And so that's the whole beginning and end of this issue.

11:01  19  This art isn't qualified as prior art, so whether or not it can

11:01  20  be used is -- well, it can't be used because it's not qualified

11:01  21  under 102(g).

11:01  22       So thank you, Your Honor.

11:01  23       THE COURT:  Court's going to overrule the motion.

11:01  24       I think this would be a good time also -- I may have told

11:01  25  you all this, I can't remember who I have and who I haven't,

11:01  1   but if I haven't explained to you when you're at trial how I

11:01  2   expect you all to put on your experts.

11:01  3          Let's say that, to pick on Mr. Cordell, he has a witness

11:01  4   on the stand, an expert -- this is just experts -- and he draws

11:01  5   an objection that there's something that he's asking that is

11:01  6   outside of the expert report.

11:01  7          I expect in Mr. Cordell's outline for him to have already

11:01  8   put down wherever it is in the report that that is tethered to.

11:01  9   And so I expect the lawyer who's on direct to say, Judge, it

11:02  10  is.  It's on Page 32 in Paragraph X.

11:02  11         Now, it doesn't, you know, verbatim.  I'm just saying, you

11:02  12  have to be able to persuade me that you have disclosed to the

11:02  13  other side what you're asking in the report or it was clear

11:02  14  from the report that's what he was going to be asked.

11:02  15         The only problem we get into is, you all are really good

11:02  16  lawyers, which means on cross you're going to do a good job on

11:02  17  cross, which means occasionally there's something an expert has

11:02  18  to get into on redirect that may or may not be in his direct to

11:02  19  deal with something that was unanticipated that was brought up

11:02  20  on cross.

11:02  21         I'm more flexible on what an expert says on redirect if I

11:02  22  am persuaded by a lawyer that it was something that the expert

11:02  23  is responding to rather than giving an affirmative opinion to.

11:03  24         And so that's, generally speaking, the way I handle when

11:03  25  experts are on the witness stand, is I want the person who

11:03  1   asked the questions to very quickly be able to tell me in good

11:03  2   faith where it is in the report so we can keep going quickly.

11:03  3        And also, it -- after one or two times, it discourages the

11:03  4   other side from making those objections.

11:03  5        The next issue we have up is the motions.  I think we can

11:03  6   take up both no direct infringement and no willfulness at the

11:03  7   same time, or we can do them one at a time, whichever Samsung's

11:03  8   counsel think -- I think I can follow both arguments.  But if

11:03  9   you'd rather do them one at a time, that's fine too.

11:03  10        MR. CORDELL:  And, Your Honor, these are arguments that

11:03  11   Dr. Albert is handling.  He's our remote lawyer.

11:03  12        THE COURT:  Is he available remotely?

11:03  13        MR. ALBERT:  I am, Your Honor.

11:03  14        THE COURT:  I'm happy to hear -- let me just -- if you'll

11:03  15   introduce yourself, I just want to make sure my court reporter

11:04  16   can hear you and we can make sure we can transcribe.

11:04  17        So if you'd introduce yourself, let me make sure Kristie

11:04  18   can hear you and then you can go ahead and proceed with your

11:04  19   argument.

11:04  20        MR. ALBERT:  Good morning.

11:04  21        (Off-the-record discussion.)

11:04  22        THE COURT:  So let's do this.  We can hopefully get that

11:04  23   addressed at lunch.  Why don't we skip over this issue, we'll

11:04  24   get it -- we're going to do what we can to get this fixed over

11:04  25   lunch so that Kristie can hear it better.  And so let's move on

| | | |
|---|---|---|
| 11:04 | 1 | then to -- we have an hour. |
| 11:04 | 2 | So let's take up the issue of the certificate of |
| 11:04 | 3 | correction. |
| 11:04 | 4 | MR. CORDELL:  And for us that'll be Mr. Song again. |
| 11:04 | 5 | THE COURT:  Okay.  Very good. |
| 11:06 | 6 | I'm -- we're -- I've been pretty fully briefed on this.  I |
| 11:06 | 7 | think I can jump to the plaintiff first and have -- I |
| 11:06 | 8 | understand your argument, and I'm certainly going to give you a |
| 11:07 | 9 | chance to respond after I hear them, but I have a pretty good |
| 11:07 | 10 | idea of what you're going to say.  And to save a little time, |
| 11:07 | 11 | let me start with the plaintiff and do it that way. |
| 11:07 | 12 | MR. SONG:  Very well, Your Honor. |
| 11:07 | 13 | THE COURT:  Thank you. |
| 11:07 | 14 | MR. JOHANNINGMEIER:  You skipped the one that wasn't me. |
| 11:07 | 15 | So it's me again. |
| 11:07 | 16 | THE COURT:  Well, not to put too fine a point on this, but |
| 11:07 | 17 | it's probably not a great thing for you that I'm asking you to |
| 11:07 | 18 | go first. |
| 11:07 | 19 | MR. JOHANNINGMEIER:  I understand.  I understand. |
| 11:07 | 20 | THE COURT:  And I want to take up -- I don't want to take |
| 11:07 | 21 | up the damage.  I want to take up whether or not the -- it was |
| 11:07 | 22 | the -- it was correctable, and then what happens with the |
| 11:08 | 23 | damages will flow from that.  I don't want to hear about the |
| 11:08 | 24 | damages first. |
| 11:08 | 25 | MR. JOHANNINGMEIER:  Right.  Right.  Yes, Your Honor. |

94

11:08   1       So the question here is -- can we just go to the next

11:08   2   slide?

11:08   3       So we have the brief on no damages.  We have our brief on

11:08   4   judicial correction, which would moot theirs by making it

11:08   5   retroactive.  The question is:  The Court, you know, can

11:08   6   correct this if it's evident from the face of the patent, but

11:08   7   that's ultimately the question on both the -- you know, the

11:08   8   propriety of the correction and the judicial correction.

11:08   9       So the unamended claim contradicts itself and the

11:08   10  specification.  In the specification, in every discussion, in

11:08   11  all of these figures it talks about the bias current being

11:08   12  lowered and reduced, and the uncorrected claim said that it was

11:08   13  increased.

11:08   14      So simply looking -- a person of ordinary skill looking at

11:09   15  that thing would say, you know, would the testimony reveal --

11:09   16  it wouldn't be consistent on the terms of the claim itself

11:09   17  because it doesn't make sense.  It says that you want to -- it

11:09   18  basically describes a situation where you want to reduce the

11:09   19  bias current, but the claim said to increase it.  Basically it

11:09   20  said use more power when you're in the best -- in the good

11:09   21  condition.

11:09   22      And that doesn't make any sense to a person of ordinary

11:09   23  skill reading this, as the testimony from everybody suggested.

11:09   24  But then if that person of ordinary skill was to read the

11:09   25  specification, they would find all of the references to mean

11:09  1   that it was lowered.  So they would understand that the

11:09  2   claim -- the patent actually was teaching that it should be

11:09  3   lowered in that circumstance.

11:09  4       Now, there's a lot of discussion in the briefing about

11:09  5   whether or not this kind of thing is correctable.  And we have

11:10  6   a case showing minor corrections that are correctable.  We've

11:10  7   had -- put in cases showing things where the -- where stuff was

11:10  8   corrected from the opposite to itself.

11:10  9       And the bottom line is that the cases say that if the --

11:10  10  well, they say that if it was evident from the face of the

11:10  11  patent, the Court can correct it.  But in terms of correction,

11:10  12  the cases say that when you're conforming -- when you're making

11:10  13  a correction that simply conforms the claim to what the

11:10  14  specification says that that's not a broadening correction.

11:10  15  And those -- you know, there's multiple examples of that in our

11:10  16  brief, including ones that are about minor corrections.

11:10  17      So the --

11:10  18      THE COURT:  Help me out.  I didn't understand this -- the

11:10  19  argument that this was broadening.  I think the defendant's

11:10  20  concern is that this would be rewriting the patent.  I don't --

11:11  21  am I wrong about that from Samsung's perspective?

11:11  22      MR. SONG:  Yes, Your Honor.  I mean, they are essentially

11:11  23  rewriting the patent.  Case law says broaden.  But any change

11:11  24  that covers things that didn't cover before, that, by

11:11  25  definition, is broadening.

96

11:11  1        THE COURT:  Got it.  In that sense, but, yeah.  We're

11:11  2   saying the same thing.  I got it.

11:11  3        MR. JOHANNINGMEIER:  Well, but we -- I mean, we disagree

11:11  4   with that -- with what Mr. Song just said, that any change that

11:11  5   changes the scope would be broadening.  That -- if that was the

11:11  6   rule, there could never be a correction.  Someone would argue

11:11  7   that it changes the scope.

11:11  8        So the cases we laid out in our brief show changes that --

11:11  9   changing things from plus or minus in a formula, things like

11:11 10   that that do change the scope.  And yet they're valid

11:11 11   corrections, right?  And the cases say, well, that's because

11:11 12   the -- you're conforming -- you're not changing the scope.

11:11 13   You're conforming the scope to what was intended, to what's

11:11 14   disclosed, to what a person of ordinary skill would understand.

11:12 15        So in the situation where a person of ordinary skill would

11:12 16   look at this and say, whoa, that can't be right, and look at

11:12 17   the patent and say, that's not right.  Then you are not

11:12 18   changing the scope of the claim from what a person of ordinary

11:12 19   skill would understand.  You're just conforming it to what they

11:12 20   would understand.

11:12 21        And there's multiple cases that say that, including ones

11:12 22   after the -- that they rely on.  I believe the -- well, if I

11:12 23   can pull up -- I don't have the brief in front of me, but

11:12 24   they're all in our brief.

11:12 25        So that fundamentally is the dispute, is whether or not

97

11:12  1   you can make a change that corrects the patent to what a person

11:12  2   of ordinary skill would understand.  And then, you know, is

11:12  3   that changing the scope?  Well, no, because -- it's not

11:12  4   changing the scope.  Because the scope is what a person of

11:12  5   ordinary skill would understand.  If they understand it's

11:12  6   broken, then you're not changing the scope by making the

11:12  7   correction.

11:12  8       And so there's multiple opinions laying that out,

11:13  9   including with respect to minor corrections as opposed to just

11:13  10  typos.  And then, you know, so those are in our brief and we

11:13  11  believe that this is proper based on that.

11:13  12      We think this is a perfect example of one where, you know,

11:13  13  the claim says save power by increasing the power.  It doesn't

11:13  14  make sense.  So a person reading that would be like --

11:13  15  would look to the spec and see lowered, reduced, reduced.  They

11:13  16  would understand that what was taught in the specification

11:13  17  wasn't captured in the claims.  And they would understand that

11:13  18  this was what was intended.

11:13  19      And in that situation there's plenty of authority for

11:13  20  corrections being proper.  And if Your Honor believes that the

11:13  21  error is -- would be evident, then there's also authority for

11:13  22  correcting -- judicially correcting the claims to just make

11:13  23  that -- basically do what the PTO did.  I mean, the PTO looked

11:13  24  at this.  They issued a correction.  Corrections are presumed

11:14  25  valid.  All of that we have in our briefs as well.

11:14   1       What we're asking the Court to do is to correct the claim

11:14   2   consistent with what the PTO did.  And the reason for that is

11:14   3   very obvious from the brief, because it makes the damages

11:14   4   retroactive.

11:14   5       But the important thing here is that there are cases that

11:14   6   lay it out.  You can correct this when you're just conforming

11:14   7   the claim to what's disclosed to a person of ordinary skill and

11:14   8   what a person of ordinary skill would understand.

11:14   9       So I think that's it in a nutshell, Your Honor.

11:14   10      THE COURT:  Got it.  Give me a second.

11:14   11      (Off-the-record bench conference.)

11:16   12      THE COURT:  So the Court finds that the certificate of

11:17   13  correction is invalid.  The Court is not going to judicially

11:17   14  correct it.  It's going to deny the motion for judicial

11:17   15  correction.

11:17   16      Now, what I don't know is what that does to the

11:17   17  plaintiff's case because the plaintiff has a patent that was

11:17   18  extant before the correction, but I'm assuming the plaintiff

11:17   19  would not be asserting that patent with that claim in it

11:17   20  against the defendant.  But I'm not sure.

11:17   21      So I know I sound ignorant, but I'm just -- I'm not sure

11:17   22  what -- I'm not sure what to do with that -- what we're going

11:17   23  to do with that patent in this trial, given what I've done with

11:17   24  regard to the certificate of correction and the issue of

11:17   25  correction.

11:17  1        MR. CORDELL:  So I don't think the plaintiff has asserted

11:17  2    the uncorrected version at all.

11:18  3        MR. SONG:  Your Honor, the uncorrected claim they've, in

11:18  4    fact, said that it's nonsensical.  It's against Ohm's law.

11:18  5    They have not asserted any opinions on it.  So there's nothing

11:18  6    in the record on the uncorrect one.

11:18  7        MR. JOHANNINGMEIER:  Your Honor, just briefly, the

11:18  8    situation is that if the damages -- we've basically conceded

11:18  9    that the damages would not be retroactive.  So it would be from

11:18  10   the point of view of the correction, which makes this no longer

11:18  11   the first patent in the case.

11:18  12       It is asserted forward from the correction, but we

11:18  13   obviously need to discuss and decide what we're going to do

11:18  14   with respect to whether or not we're going to run with it at

11:18  15   trial.

11:18  16       MR. CORDELL:  I believe, as a legal matter, Your Honor,

11:18  17   your finding that the correction is invalid invalidates the

11:18  18   patent.  So I don't think there is a take --

11:18  19       THE COURT:  That, I don't know.  But if that's true,

11:18  20   then -- I don't remember that in the briefing, that my finding

11:18  21   invalidates the patent, and I guess that's where I'm showing my

11:18  22   ignorance, is I know what I've done.  I understand what I've

11:19  23   done in terms of I don't believe the Patent Office was correct

11:19  24   and I don't believe it should have been corrected, but I don't

11:19  25   know the law on the impact on a patent that has improperly been

11:19  1  corrected.

11:19  2      MR. BLACK:  The answer is, Your Honor, the uncorrected

11:19  3  patent might have been assertable.  However --

11:19  4      THE COURT:  That was what makes sense to me.

11:19  5      MR. BLACK:  First of all, they did not present an

11:19  6  infringement case based on the uncorrected patent; and second

11:19  7  of all, they've stated repeatedly, as a matter of law, judicial

11:19  8  estoppel at this point actually, that there's no support in the

11:19  9  original specification for the uncorrected claim.  They went so

11:19  10 far as to say it violated Ohm's law.

11:19  11     So there can be nothing in this case from an infringement

11:19  12 perspective because they don't have a report on the uncorrected

11:19  13 analysis; and if they did, it would be invalid under

11:19  14 Section 112 because there's no support for the claims.

11:19  15     So the patent is out of the case.  It's not a matter of

11:19  16 whether or not the infringement date, the start date, the '962

11:20  17 is out, which will have other ramifications for the rest of the

11:20  18 day.

11:20  19     THE COURT:  That is what makes sense to me.

11:20  20     MS. DE MORY:  Yeah.  I don't think -- I mean, we didn't

11:20  21 assert the uncorrected patent, and I believe Your Honor is

11:20  22 finding the patent to be invalid essentially by the

11:20  23 correction --

11:20  24     THE COURT:  I'm finding the correction to be invalid.  But

11:20  25 not having dealt with this before, I don't know -- and I should

11:20  1   have thought of this before I came out here.  I just don't know

11:20  2   if that means that the patent is invalid and can't -- and I

11:20  3   understand what Mr. Black is saying, which -- and it makes

11:20  4   eminently good sense to me, especially given what the plaintiff

11:20  5   had to do to attempt to get it corrected, which is to say it

11:20  6   only makes sense -- it is -- the proof of it needing to be

11:20  7   corrected is what's in the specification doesn't...

11:20  8        So I'm going to invalidate the patent --

11:20  9        MR. BLACK:  Thank you, Your Honor.

11:20 10        THE COURT:  -- which I guess is the cleanest way to do it.

11:20 11   And then it's Samsung's problem if I'm wrong, but I think

11:21 12   that's -- I think it's the right thing to do, based on my

11:21 13   decision, is to formally -- not ask the plaintiff to withdraw

11:21 14   it and deal with a failure to do an expert report and all that

11:21 15   stuff.

11:21 16        I'm just going to find as a matter of law it's invalid

11:21 17   based on my decision with regard to the correction, and that's

11:21 18   what the plaintiff can take up if they think I'm wrong.

11:21 19        MR. CORDELL:  Thank you, Your Honor.

11:21 20        MS. DE MORY:  Thank you, Your Honor.

11:21 21        THE COURT:  Okay.  So next we have a Daubert regarding --

11:21 22   is it Dr. Steckel?

11:21 23        MR. HAND:  Yes, Your Honor.

11:21 24        THE COURT:  Okay.  I'm happy to take that up.

11:21 25        MR. CORDELL:  Your Honor, Mike McKeon will handle that for

11:21  1    Samsung.

11:21  2          MR. HAND:  Aaron Hand for the plaintiff, Your Honor.

11:21  3          THE COURT:  Yes, sir.

11:21  4          MR. HAND:  I will do my best to keep this brief.

11:21  5    Incredibly in this case, Dr. Steckel admitted in his deposition

11:22  6    that he had not deciphered the very analysis that he was hired

11:22  7    to rebut before the report bearing his name was tendered.  He

11:22  8    didn't figure out until Samsung's counsel told him on redirect

11:22  9    what had happened in the report that he himself was supposed to

11:22  10   have analyzed.  Therefore, the opinions that are expressed in

11:22  11   Dr. Steckel's report are not reliable, and there's no way they

11:22  12   can possibly be tied to the specific facts of this case.

11:22  13         This goes beyond something that's a mere cross point, this

11:22  14   is a methodological failure on the part of Dr. Steckel.

11:22  15   Because having not actually understood or analyzed or read or

11:22  16   deciphered the report that he was supposed to rebut, there's no

11:22  17   way that what the words that are in his rebuttal report are any

11:22  18   way tied to the facts of this case, the facts of Dr. Prince's

11:22  19   report, the facts that he was hired to rebut.

11:22  20         And it goes beyond that, because the report that he

11:23  21   tendered is really nothing more than a generic recitation of

11:23  22   articles that are not actually tied to what happened in this

11:23  23   case.  And he did nothing himself to go beyond generic to

11:23  24   actually look at any facts in this case.  He didn't talk to a

11:23  25   single Samsung person.  He didn't talk to a single one of

11:23  1  Samsung's other experts.  He didn't look at a single deposition

11:23  2  transcript.  He didn't look at any rog responses.  He didn't

11:23  3  interview anybody in the industry.  He didn't conduct any focus

11:23  4  groups.  He didn't review any production documents of his own.

11:23  5       And this is a list of things that one of his footnotes

11:23  6  says is all things that you should be doing if you're trying to

11:23  7  assess whether or not a survey is valid or whether or not a

11:23  8  survey looked at the right factors.

11:23  9       So exclusion under Daubert is warranted here.  There's

11:23 10  simply too great of an analytical gap between the data that he

11:24 11  didn't look at and he didn't analyze and the opinions that are

11:24 12  in his report.  And that comes from the GE versus Joyner case

11:24 13  from the Supreme Court.  I'll keep it simple.

11:24 14       THE COURT:  Mr. McKeon?  Welcome.  I haven't seen you in

11:24 15  over a decade.  Good to see you.

11:24 16       MR. MCKEON:  Good morning, Your Honor.  It's a pleasure to

11:24 17  appear before you.  It really is.

11:24 18       So if I can get the slides up here, please.  All right.

11:24 19       Well, so good morning, Your Honor.  So the issue here is

11:24 20  Dr. Steckel, really the basis of his opinions, of course, are

11:24 21  in his report.  And what we know about Dr. Steckel is that he

11:24 22  really is a premier expert on the issue of surveys and conjoint

11:24 23  analysis.  And, in fact, he has over 40 years of survey

11:24 24  experience and conjoint analysis.  And that's the primary

11:25 25  opinion he offers in his report, is critiquing the conjoint

11:25  1    survey that their expert, Dr. Prince, put on.

11:25  2          And the basis, really, of their motion papers and the

11:25  3    argument I heard this morning really is, there was an issue

11:25  4    about his experience related to economics.  Because what you're

11:25  5    going to hear with respect to Dr. Prince's challenge that we

11:25  6    have in our motion papers is that he takes the survey and then

11:25  7    he does a second step and does a microeconomic analysis.  And

11:25  8    we have a big problem with his two-step process.

11:25  9          The bulk of the report that Dr. Steckel put in related to

11:25  10   the survey.  And he also, as part of that analysis, made some

11:25  11   observations about the microeconomic analysis.  But that was

11:25  12   secondary to his main focus which is survey.  And certainly he

11:25  13   has experience in survey and they don't really, I think, in any

11:26  14   meaningful way, counter that.

11:26  15         And even with respect to economics, he has a degree from

11:26  16   Wharton School, an M.B.A., that deals with economics as well.

11:26  17   So his experience is there.

11:26  18         But let me talk about the deposition testimony that they

11:26  19   cited, and that seems to be the focus of their argument this

11:26  20   morning.

11:26  21         During the report -- in the report process, we have on the

11:26  22   right an excerpt from his report.  He commented on an excerpt

11:26  23   from Dr. Prince's report.

11:26  24         And this is, on the left, is from Dr. Prince.  And

11:26  25   Dr. Prince makes his observation that based on this willingness

11:26 1  to pay, which is the result of the survey, consumers are going

11:26 2  to pay $4.74 more per unit.  And then he takes that and tries

11:26 3  to create a -- he calls it an equilibrium price, which is

11:26 4  market price that a consumer would pay for this additional

11:26 5  20 minutes of battery life on an already existing 13-hour

11:27 6  battery.  And he says that price is going to be $2.37.

11:27 7       Then he goes on and does this micro -- further

11:27 8  microeconomic analysis and concludes that the profit that

11:27 9  Samsung would make per unit, based on the $2.37 additional

11:27 10  price, is $4.72.

11:27 11       And that's the head-scratcher.  Because, well, wait a

11:27 12  minute.  The price is only going up -- the same phone,

11:27 13  nothing's changed, and the price is only going up $2.37, but

11:27 14  yet Samsung's going to have the profit go up to $4.72.

11:27 15       And in his report, that's all he mentions, you know, on

11:27 16  the right.  He goes, well, that's kind of a head-scratcher,

11:27 17  doesn't make sense to me.

11:27 18       And that was the point he made.  And then in deposition,

11:27 19  they went on further about, well, what about Prince's analysis

11:27 20  and the $4.72, do you know how he would calculated it?

11:27 21       That wasn't the focus of his critique.  He was just making

11:27 22  the high-level point that it doesn't make sense where you're

11:28 23  going to have -- the costs are the same, the same product and

11:28 24  also your profits are almost going to double for the $2.37

11:28 25  price increase.

11:28  1      That was the point he was making in his report.  And in

11:28  2  the deposition, they went off on, what's the basis for

11:28  3  Dr. Prince's analysis?  He wasn't going into that, and that was

11:28  4  the excerpt and the confusion in the deposition.

11:28  5      But what he did do -- and it's the core of his report and

11:28  6  what he -- he's going to testify at trial, will be his trial

11:28  7  testimony is the problems with the survey.

11:28  8      And Dr. Prince's survey is really problematic, Your Honor.

11:28  9  And I won't go into the details of his numbers, but there's two

11:28  10  ways to look internal validity of a survey and a conjoint

11:28  11  survey.

11:28  12      And, you know, hit rate is how well the model of the

11:28  13  survey, how well that predicts a given respondent's result.

11:29  14  And the literature says, oh, you've got to be 70, 80 percent.

11:29  15  At the time, it should predict it.  And the hit rate here that

11:29  16  was calculated by Dr. Steckel was 44 percent.

11:29  17      And U-Squared is how well that the data fits the model.

11:29  18  One is random -- I'm sorry.  Zero's random.  One is perfect

11:29  19  fit.

11:29  20      This survey by Dr. Prince is close to random.  And this

11:29  21  analysis is laid out in the report.  That is the bulk of his

11:29  22  opinion that's going to be at trial?  And this is Steckel's

11:29  23  bailiwick.  This is his area.  And this is the basis of his

11:29  24  opinion.

11:29  25      And there's other things they didn't mention this morning,

11:29  1    so I won't go into it, Your Honor.  But in their briefing they

11:29  2    go off about some of the survey issues.  We've got responses to

11:29  3    all those.  I'm not going to go through it this morning.  But

11:29  4    just to say that when it comes to the conjoint survey,

11:29  5    Dr. Steckel is, you know, is a conjoint survey stud, if I may,

11:29  6    and the microeconomic analysis that he's done in responding to

11:30  7    Dr. Prince, very narrow and certainly consistent with the case

11:30  8    law.

11:30  9          And the Fifth Circuit that says, areas adjacent -- and we

11:30 10    cite the case here from the Fifth Circuit on Slide 2 -- areas

11:30 11    adjacent to the core expertise of an expert are fine.  And we

11:30 12    have the Abbott case from Delaware we cite that even actually,

11:30 13    ironically, quotes, an expert in the area of marketing, they're

11:30 14    certainly able to testify related areas such as economics.

11:30 15          And that's from Judge Jordan who was on the bench at the

11:30 16    time in Delaware.

11:30 17          So unless there's any questions, Your Honor, that's the

11:30 18    only response I have.

11:30 19          THE COURT:  A response?

11:30 20          MR. MCKEON:  Thank you.

11:30 21          THE COURT:  You're welcome.

11:30 22          MR. HAND:  Yes.  Briefly, Your Honor.

11:30 23          We're talking about an expert that was hired exactly two

11:30 24    weeks before he tendered his report.  And although counsel

11:31 25    wants to say that this was just some sort of observatory

11:31   1   remark, that something didn't seem to make sense that you had a

11:31   2   $2 number, that how could that possibly -- how could you have a

11:31   3   $4 number higher than this $2 number?

11:31   4       The problem is that Dr. Steckel, in that concluding

11:31   5   paragraph, demonstrates that he really didn't understand the

11:31   6   analysis that Prince did.  And what's even more problematic,

11:31   7   Your Honor, is he didn't understand the whole purpose for which

11:31   8   the survey was being used.

11:31   9       He didn't understand -- Dr. Steckel did not take the time

11:31   10  or didn't understand that the survey was being used and

11:31   11  designed for an intended purpose.  And that intended purpose

11:31   12  was being fed into this economic model, and that there was an

11:31   13  analysis that came around it.  He didn't understand any of

11:31   14  that.

11:31   15      Whether it's because he didn't have the understanding or

11:31   16  the background or whether it's because he didn't take the time

11:31   17  to do it, his report and the deposition demonstrate that he did

11:32   18  not do the work that was necessary to be done in order to tie

11:32   19  his opinions to this case and render an opinion that is in line

11:32   20  with Rule 702.  And his opinion should be excluded.

11:32   21      Thank you, Your Honor.

11:32   22      THE COURT:  You're welcome.  I'm going to overrule the

11:32   23  Daubert motion.

11:32   24      The next motion we have up is Samsung's Daubert to

11:32   25  exclude -- is it Dr. Prince?

11:32  1        MR. MCKEON:  All right.  Well, let's -- if I can get the

11:32  2   slides up here.  Okay.  Well, let me just start, Your Honor, as

11:33  3   I -- while the slides are being pulled up here.

11:33  4        As I indicated earlier, Dr. Prince, the analysis that he

11:33  5   undertook was a two-step analysis.  Do the survey, his conjoint

11:33  6   survey.  And the goal of the survey -- it's got one goal -- is

11:33  7   to get what's referred to as a willingness to pay.  What are

11:33  8   consumers willing to pay, based on the survey, for an

11:33  9   additional 20 minutes of battery life over the 13 hours already

11:33  10  in the battery?  And he does the survey and he gets to $4.74.

11:33  11       Then he takes the second step.  And he refers to it as the

11:33  12  microeconomic analysis.  And the goal here -- he needs to do

11:33  13  this because he needs to get an actual market price driven by

11:33  14  supply/demand concepts.  And what he does is he gets to $2.37.

11:34  15  And from there gets a profit, an equilibrium profit of $4.72.

11:34  16       So what's the problem here?  The problem is, Your Honor,

11:34  17  under Daubert, as we all know Daubert is very precise what you

11:34  18  need to do here.  First of all you're going to offer a theory

11:34  19  and present it to a jury, it's got to be generally accepted in

11:34  20  the scientific community.  We all know that.

11:34  21       And then moreover, you've got to demonstrate that it's

11:34  22  peer-reviewed, this theory, and there's publications.  If it's

11:34  23  some kind of new far-flung theory, we better demonstrate that

11:34  24  others out there in your community have written about it,

11:34  25  peer-reviewed about it and approve of it.

11:34  1      And, finally, if there's any potential error rate or an

11:34  2  error rate that you can demonstrate in the analysis that's

11:34  3  unacceptable, then that needs to be considered in your job as a

11:34  4  gatekeeper here.  And he just utterly fails at this.  And why

11:35  5  is this?

11:35  6      It's because there's nothing out there in the scientific

11:35  7  community, Your Honor, where you combine the conjoint survey

11:35  8  and then take the additional step of doing a microeconomic

11:35  9  analysis to get at what he refers to as an equilibrium price,

11:35  10  and that's the fundamental problem.

11:35  11      And let me just comment quickly on the survey.  This is an

11:35  12  example, Your Honor, of one of the questions that a respondent

11:35  13  is asked.  It's on the slide here.  You pick four potential

11:35  14  phones, and these are all random phones with the brand for

11:35  15  Samsung, LG, Apple, Motorola; a selection in the battery life,

11:35  16  which is notable, it's 6 hours, 12 hours, 24 hours, 18 hours.

11:35  17      And remember, Your Honor, we're talking about willingness

11:35  18  to pay for 20 minutes, and yet he has these really unrelated

11:35  19  segments of hours.

11:35  20      And then really for this motion fundamentally the problem

11:36  21  is, there is no choice of none of the above.  So the

11:36  22  respondents have to pick one of these four.  You can't --

11:36  23  there's no choice just to opt out of this.  You've got to pick

11:36  24  one.  And that's a problem.

11:36  25      And then let's talk about the microeconomic analysis.  He

11:36   1   takes that and goes into the microeconomic analysis we see here

11:36   2   in which he creates a demand curve, a demand curve, and he

11:36   3   adjusts it down based on willing to pay values and he generates

11:36   4   the numbers that we've talked about.

11:36   5        And there's nothing in the literature, Your Honor.  We

11:36   6   asked them to identify it.  In their motion papers, they simply

11:36   7   don't do it.  The best they come to is the Allenby, which we

11:36   8   have here on the slide in the left, and the Allenby paper is

11:36   9   very specific.

11:36   10       I'll quote from it:  While demand parameters can, in

11:36   11  principle, be measured from a conjoint study conducted without

11:37   12  the outside option -- "outside option" here means without the

11:37   13  none of the above -- valid equilibrium calculations do require

11:37   14  an outside alternative.

11:37   15       What does that mean?

11:37   16       Equilibrium price.  If your goal is to do this analysis --

11:37   17  to use a conjoint survey to get to the equilibrium price, you

11:37   18  have to have the outside alternative, which is the none of the

11:37   19  above.  So even the best they do is the Allenby paper.  That

11:37   20  paper itself demonstrates, if you're going to do this, you've

11:37   21  got to have none of the above.

11:37   22       And, Your Honor, it's really intuitive.  Because if I have

11:37   23  a phone -- and we have an example in our brief that they

11:37   24  criticize, but I think it demonstrates the point.  If I have a

11:37   25  phone that's, you know, $1 million for 6 hours of battery life

11:37  1   and $2 million for 12 hours of battery life, well -- and I

11:38  2   can't -- the survey says the respondent can't say none, well,

11:38  3   any result I get from that survey is garbage on its face

11:38  4   because of course no one's going to buy that.  And that's

11:38  5   really the point here.

11:38  6       And we went through the brief, Your Honor.  And as far as

11:38  7   we can tell, the sources they cite for this proposition that I

11:38  8   can combine the conjoint survey and the microeconomic analysis

11:38  9   to get to the equilibrium price -- we have it on the slide --

11:38  10  the paper we cite -- that they cite deals with market shares,

11:38  11  not equilibrium price.  They cite testimony from Professor

11:38  12  Hauser from the Apple/Samsung case.  You know, query whether

11:38  13  that's a valid, you know, consideration in Daubert.  But

11:38  14  nevertheless, it didn't deal with equilibrium price changes

11:38  15  which is really the key here.

11:38  16      And the other sources are from Dr. -- from Dr. Prince, the

11:38  17  focus group, of course, you know, is not a signal of generally

11:38  18  accepted principles and not a peer-reviewed publication.  And

11:39  19  they did offer the Apple/Qualcomm, though he didn't really give

11:39  20  us any evidence in what he was saying there.

11:39  21      And then finally, Your Honor, so that's the problem -- the

11:39  22  Daubert problem with not generally accepted in the scientific

11:39  23  community, not peer-reviewed.  Hopefully when they come up

11:39  24  here, they can show you, but we haven't seen it yet.

11:39  25      Then the third problem is the error rate.  And I touched

11:39   1    upon this earlier and I won't belabor the point, but the error

11:39   2    rates that are in evidence in this case in terms of what we're

11:39   3    going to present to the jury if this goes forward, right here,

11:39   4    a 44 percent hit rate, that's -- you're batting, that's an F.

11:39   5    Because you got to get 70 to 80 percent, the literature tells

11:39   6    you, 55 percent of the time the survey is predicting in the

11:39   7    wrong result.  And the data -- the U-squared tells you it's

11:40   8    close to random.

11:40   9        And this is an internal validity study.  Now, there was

11:40   10   the survey itself from an internal design is problematic.  Now,

11:40   11   in the brief they go off about external design, and we have a

11:40   12   problem with what Dr. Prince did there.  But external design is

11:40   13   basically saying can I use the results of the survey and apply

11:40   14   it to the broader population that I'm looking at?  And okay.

11:40   15   That's -- you got to have external validity.

11:40   16       But if you don't have internal validity, in other words,

11:40   17   my survey's garbage, whether you have external validity is

11:40   18   irrelevant.  And that's the point we're making.  And so

11:40   19   external validity is really beside the point.  They don't have

11:40   20   internal validity.

11:40   21       And when we asked Dr. Prince in his deposition about, do

11:40   22   you have any response to this?  He did not.  With respect to

11:41   23   the error rates that we've cited, Dr. Prince has no response to

11:41   24   that.  And so this is all we have on this, is that we have a

11:41   25   study where the error rates are an F.  They just don't pass

| | | |
|---|---|---|
| 11:41 | 1 | muster.  And we don't believe that they pass Daubert, Your |
| 11:41 | 2 | Honor. |
| 11:41 | 3 | And with that, Your Honor, we believe that you should |
| 11:41 | 4 | grant our Daubert motion.  If there's any questions -- |
| 11:41 | 5 | THE COURT:  No, sir. |
| 11:41 | 6 | Response? |
| 11:41 | 7 | MS. DE MORY:  Good morning, Your Honor. |
| 11:41 | 8 | THE COURT:  Good morning. |
| 11:41 | 9 | MS. DE MORY:  Denise De Mory for plaintiff Theta IP. |
| 11:41 | 10 | If you can switch to the next slide. |
| 11:41 | 11 | So this Daubert motion is a classic non-Daubert motion. |
| 11:42 | 12 | This is a -- |
| 11:42 | 13 | Can I get the next slide? |
| 11:42 | 14 | Disagreement is not a basis for a Daubert.  So we just |
| 11:42 | 15 | heard a number of things about the "none of the above" option |
| 11:42 | 16 | and how it must be an option.  Otherwise, this study does not |
| 11:42 | 17 | qualify as you cannot do the second step which is the economic |
| 11:42 | 18 | analysis. |
| 11:42 | 19 | And initially I want to start with that, which is this |
| 11:42 | 20 | notion that there is no ability to do both the survey and the |
| 11:42 | 21 | economic analysis.  Really what normally happens is, because |
| 11:42 | 22 | Dr. Steckel is not an economic expert, which is why he didn't |
| 11:42 | 23 | understand the economic analysis.  Normally he does the |
| 11:42 | 24 | conjoint survey and he passes it to, for example, Dr. Ugone, |
| 11:42 | 25 | who does the economic analysis. |

11:42  1          But in this case Theta hired Dr. Prince who just stepped

11:42  2     down as the chief economist of the FCC.  He is a Ph.D.

11:43  3     economics expert.  He is also a survey expert.  And so we just

11:43  4     happened to have the same person in one person.  One expert.

11:43  5     And to suggest that there's no peer-reviewed authority for him

11:43  6     doing the microeconomic analysis that he did, this -- I happen

11:43  7     to have the ninth edition of his textbook here, but it's --

11:43  8     he's on the tenth.  And the microeconomic analysis that he did,

11:43  9     the pictures which we're going to look at later in the Bergman

11:43  10    report for damages.  But you'll see this slide later.  The

11:43  11    analysis is in his textbook which is now in the tenth edition.

11:43  12         So that notion is just wrong from the perspective that you

11:43  13    can't do this two-part analysis, that it is nowhere supported.

11:43  14    It is just normally not found.  These two skills are normally

11:43  15    not found in the same expert.

11:43  16         Now, in terms of the "none of the above" option, I just

11:44  17    heard opposing counsel talk about how there's nothing in our

11:44  18    papers or in the Prince report, other than this Allenby

11:44  19    article.  Now, the first thing is the Allenby article itself

11:44  20    is -- doesn't -- says something beyond what counsel quoted on

11:44  21    his slide.  And it says, whether or not the outside option is

11:44  22    included depends on the ultimate use of the conjoint survey.

11:44  23    Clearly it's possible to measure how respondents trade off

11:44  24    different product attributes against each other without

11:44  25    inclusion of an outside example -- outside option.  For

11:44  1   example, it is possible to estimate price coefficient in a

11:44  2   conjoint survey which does not include the outside option.

11:44  3        In addition to that, we go on -- and that's a 2014

11:44  4   paper -- we go on and discuss, and Dr. Prince cites in his

11:44  5   report, a 2019 paper which discusses all the reasons why it is

11:45  6   not appropriate to make a reasoned decision by the person who's

11:45  7   conducting the study of whether or not you should include a

11:45  8   "none of the above" option.

11:45  9        And it gives a number -- three reasons why you should and

11:45  10  should not include it.  And it goes on to say, you know, it may

11:45  11  actually bias the results in a way that you don't want them to

11:45  12  bias them.

11:45  13       So you do an analysis, which Dr. Prince did, and you make

11:45  14  a reasoned decision about whether or not the "none of the

11:45  15  above" option should be there.  And so there are, in fact, not

11:45  16  just one but two peer-reviewed papers that are cited in the

11:45  17  Prince report and are cited in our opposition.  And this is

11:45  18  really a classic disagreement between experts as to whether or

11:45  19  not the conjoint survey that was conducted should have included

11:45  20  a "none of the above" option.

11:45  21       So that is the "none of the above" option.

11:45  22       And then in terms of the internal and external validity --

11:45  23       We can go to the next slide.

11:45  24       -- it's the same debate.  So I recall when we were talking

11:46  25  about the Steckel Daubert a minute ago, counsel actually said

11:46   1   there are actually two different ways to validate a survey.

11:46   2   One is external, and one is internal.

11:46   3        And that's the way he started the discussion with regard

11:46   4   to Steckel, and then he said Steckel criticizes this internal

11:46   5   validity.

11:46   6        There is no hard and fast rule that both forms of checks

11:46   7   need to be performed.  In our papers and in Dr. Prince's

11:46   8   report, he cites peer-reviewed articles and -- that say that

11:46   9   both external and validity don't have to be assessed.  There's

11:46   10  no dispute that Dr. Prince did an external validity test.

11:46   11       And the papers that we cite, in fact, say -- including

11:46   12  some of the ones that Dr. Steckel cites himself, say that the

11:46   13  external validity is the more rigid test for validating the

11:46   14  expert report and even say that the internal validity test is

11:46   15  only for a limited reason, which is to predict the -- a

11:47   16  consumer's, like, purchase decision as opposed to what

11:47   17  Dr. Prince was doing, which was applying it exactly as counsel

11:47   18  said, to the broader population and determining a willingness

11:47   19  to pay.

11:47   20       And so what Dr. Prince actually did is he put a control in

11:47   21  his survey, which was storage in a phone.  And he actually

11:47   22  said -- he surveyed and he said, okay.  So let me look at how

11:47   23  the survey respondents responded to how much more they would

11:47   24  pay for storage, and then he compared that to what actually

11:47   25  happens in the market.  And he validated that the survey

11:47  1   actually predicted the external -- how much somebody would pay

11:47  2   for a feature, and that is an external validity.

11:47  3       And so we've cited a number of sources.  This is a classic

11:47  4   dispute between the experts as to how the survey should be

11:47  5   formulated and how it should be validated, and it is something

11:47  6   that is not inappropriate for Daubert and it should be denied.

11:48  7       MR. MCKEON:  Your Honor, if I may make a couple quick

11:48  8   points?

11:48  9       THE COURT:  Whatever you care to.

11:48 10       MR. MCKEON:  I think the -- leave aside the peer-reviewed

11:48 11   and general-acceptability point, I'm going to focus on the

11:48 12   error rates.

11:48 13       It's clear, Your Honor, and I think the literature is

11:48 14   clear on this, that -- and sort of the logic is clear, that

11:48 15   you've got to have internal validity and you have to have

11:48 16   external validity.  Both tests are important.

11:48 17       But if you don't have internal validity, how are you going

11:48 18   to apply your survey results to a broader population?

11:48 19       There's no logical sense there, Your Honor, but the error

11:48 20   rates -- I want to focus on error rates.  What counsel said

11:48 21   here, that Dr. Prince did this external validity analysis --

11:49 22   and he did, he -- the internal validity, there's no response to

11:49 23   that.  But he did do an external validity analysis.

11:49 24       And what he did was, he compared actual memory -- the

11:49 25   prices of memory, which was one of the features in the survey.

11:49  1   And when he went to calculate the willingness to pay and

11:49  2   compared it to the actual market price to what happens in the

11:49  3   survey, he -- what he determined was that he had it -- it was

11:49  4   wrong.

11:49  5       So he had a lower -- he lowered it by 33 percent that he

11:49  6   was getting the -- it wasn't matching, that there was no

11:49  7   validity, and so he lowered it by 33 percent.

11:49  8       So even his analysis with respect to the external validity

11:49  9   was problematic.

11:49  10      But I just go back to the basic point, Your Honor, on the

11:49  11  errors.  If you don't have internal validity, it's -- I mean,

11:50  12  it's -- basically, it's a random survey with a hit rate less

11:50  13  than 50 percent, then we don't believe it should go to the

11:50  14  jury, Your Honor.

11:50  15      With that I will sit down.  Thank you.

11:50  16      THE COURT:  Anything else?

11:50  17      MS. DE MORY:  Very briefly, Your Honor.  It is the case

11:50  18  that it is disputed whether or not you have to do internal

11:50  19  validity check for the purpose for which this survey was used.

11:50  20  And there are peer-reviewed papers and Prince's report in our

11:50  21  opposition on that point.  So that's it.

11:50  22      (Off-the-record bench conference.)

11:51  23      THE COURT:  Court is going to deny the motion.

11:51  24      We are going to take our lunch recess.  Why don't we plan

11:51  25  on getting started at 1:15?  I think that will give everyone

| | | |
|---|---|---|
| 11:51 | 1 | enough time.  For those of you who are not from Waco, there's a |
| 11:51 | 2 | big food court right next door.  And then there are restaurants |
| 11:51 | 3 | within a couple of blocks.  So I'll see you. |
| 11:51 | 4 | THE BAILIFF:  All rise. |
| 11:51 | 5 | (Recess taken from 11:51 to 1:19.) |
| 01:19 | 6 | THE BAILIFF:  All rise. |
| 01:19 | 7 | THE COURT:  Thank you.  You may be seated. |
| 01:19 | 8 | Ladies and gentlemen, over the break I talked to my law |
| 01:19 | 9 | clerks, and I think I erred earlier when I said I was |
| 01:19 | 10 | invalidating the patent.  I don't remember the patent number. |
| 01:19 | 11 | But what I'm going to do is I'm going to dismiss the patent |
| 01:19 | 12 | from the case. |
| 01:19 | 13 | In my opinion, it may have been in the complaint, but as I |
| 01:19 | 14 | understand it, and the plaintiff can correct me, there are |
| 01:19 | 15 | never any infringement contentions of the uncorrected patent |
| 01:19 | 16 | provided or anything done in the case. |
| 01:20 | 17 | So I'm dismissing it without prejudice.  If the plaintiff |
| 01:20 | 18 | wants to reassert it in the uncorrected form, that's up to you. |
| 01:20 | 19 | But I'm dismissing the -- I'm not invalidating it.  I'm not |
| 01:20 | 20 | going to invalidate, but I am going to dismiss it without |
| 01:20 | 21 | prejudice from the case, in that you have not prosecuted that |
| 01:20 | 22 | patent in this case. |
| 01:20 | 23 | MS. DE MORY:  Thank you. |
| 01:20 | 24 | THE COURT:  So let me turn, then, to -- Jeff just |
| 01:20 | 25 | suggested to me that we go back, because the -- my |

01:21  1   understanding is the lawyer is now -- well, he always was

01:21  2   available, but my understanding is that we can now

01:21  3   technically -- oh, is not right?

01:21  4       Kristie's shaking her head.

01:21  5       MR. CORDELL:  We came close, Your Honor.  We were able to

01:21  6   get him in on everything except for your microphone.  And we

01:21  7   were a little worried that you might be the person we should

01:21  8   actually involve.  So we decided to have Mr. Black just pick up

01:21  9   the arguments.

01:21  10      THE COURT:  Okay.  Very good.  Mr. Black?

01:21  11      MR. BLACK:  Thank you, Your Honor.

01:21  12      So the good news is I've only had ten minutes to prepare

01:21  13  and therefore this will be relatively brief.  I know we're on

01:21  14  limited time, and I'll try not to speak --

01:21  15      THE COURT:  I had a trial once where everyone settled that

01:21  16  morning, and Judge Davis told me he would give me an extra

01:21  17  15 minutes to get ready for the opening argument.

01:21  18      MR. BLACK:  Okay.  This is nothing like that.  I will try

01:21  19  not to talk too fast.  I've been told I'm up against the

01:21  20  transcription limit, so I will try to keep the comments smooth.

01:21  21      Okay, Your Honor.  So we have two motions here that are

01:21  22  joined together, motion for partial summary judgment of no

01:21  23  indirect infringement and motion for partial summary judgment

01:22  24  of no willfulness.

01:22  25      They really turn on the same set of facts, whether or not

01:22  1   there is sufficient scienter to justify putting to the jury the

01:22  2   question of induced infringement or willfulness.  We have the

01:22  3   legal standards here.  Your Honor knows them well.  Your Honor

01:22  4   applies them frequently in evaluating complaints.

01:22  5        Now, the interesting thing about this case is we have

01:22  6   three patents -- or we did have three patents.  Each of which

01:22  7   would require independent proof of indirect infringement and

01:22  8   willfulness evidence.  The plaintiff is proceeding rather

01:22  9   unusually on a willful blindness path.  And what that means is

01:22  10  they have to show under the law that the -- there's evidence

01:22  11  that -- of conduct that is not negligent, not reckless, but

01:22  12  more than reckless conduct is what's at stake here.

01:22  13       And they do not have any evidence that would support that

01:22  14  kind of an inference.  And it is their burden.  They can't meet

01:23  15  that burden by arguing about Samsung's privileged objections or

01:23  16  whatever.  They have to show that there's going to be evidence

01:23  17  that they're going to produce at trial.

01:23  18       And we've filed a Rule 56 motion.  It's their time to come

01:23  19  forward and show us what the evidence is.  And the problem is

01:23  20  they don't have any evidence.

01:23  21       On Count 3 of the complaint for the '202 patent, that

01:23  22  patent was filed long after the original settlement in the

01:23  23  case.  And there's no evidence that Samsung was aware of it.

01:23  24  And therefore, as a matter of law, we're entitled to judgment

01:23  25  of no indirect liability and no willfulness with respect to the

01:23  1    '202.

01:23  2        On Count 2 of the complaint, the '825 patent, the

01:23  3    application for that patent was known to Samsung at the time of

01:23  4    the original settlement.  However, however, the claims that

01:23  5    were pending at the time of the settlement were all cancelled,

01:23  6    every single one of them.  They stood rejected at the time of

01:23  7    the settlement and then they were cancelled six months later,

01:24  8    and they were replaced with new claims which eventually issued

01:24  9    into the claims that are involved in this case.

01:24  10        So their argument with respect to those claims is that

01:24  11   Samsung was willfully blind because it failed to follow the

01:24  12   prosecution of their patent applications through the Patent

01:24  13   Office.  Even though they obviously made decisions along the

01:24  14   way to not give us notice when the '962 issued, not give us

01:24  15   notice when the '825 issued, not give us notice when the '202

01:24  16   issued.

01:24  17        Those were conscious litigation-driven decisions, and they

01:24  18   have to live with the consequences of them.  They can't push

01:24  19   our lack of knowledge back on us, saying we had some

01:24  20   affirmative obligation.

01:24  21        There's no case law supporting what they're doing here.

01:24  22   And the law is pretty clear.  Willful blindness doesn't mean

01:24  23   negligence, it doesn't mean reckless.  It means more than

01:24  24   reckless conduct, and the only evidence they have and the only

01:24  25   fact they have is that we were aware of rejected, ultimately

01:24  1  not issued claims in the '825 patent, and they have no evidence

01:25  2  on the '202.

01:25  3      The '962, Count 1, that's now out of the case.  So what's

01:25  4  their evidence?  Here's the time to show it at summary

01:25  5  judgment.  Where's the positive evidence?

01:25  6      They don't have any.

01:25  7      That's our submission, Your Honor.

01:25  8      MR. BUNSOW:  Good afternoon, Your Honor.

01:25  9      THE COURT:  Good afternoon.

01:25  10     MR. BUNSOW:  Henry Bunsow for Theta IP.

01:25  11     THE COURT:  I think this is the first time I've had you in

01:25  12 my court, isn't it?

01:25  13     MR. BUNSOW:  Your Honor, this is the first time, and I

01:25  14 have to confess that I've been spending the last decade in the

01:25  15 Eastern District of Texas.

01:25  16     THE COURT:  That's okay.  I spent a lot of time in the

01:25  17 Eastern District of Texas.

01:25  18     MR. BUNSOW:  I'll tell you, I like the drive here from

01:25  19 Dallas a lot better.

01:25  20     THE COURT:  Well, it's -- let's see.  It's shorter, I

01:25  21 guess, for sure shorter than Tyler, isn't it?

01:25  22     MR. BUNSOW:  Oh, and way shorter than Marshall.

01:25  23     THE COURT:  Way shorter than Marshall, for sure.

01:25  24     MR. BUNSOW:  For sure.  And I'd say better scenery too.

01:25  25     So there are two motions here, the one on willfulness and

01:26  1   the one on induced infringement allowing us to go back in time,

01:26  2   pre-filing, for damages, and both of those are supported by the

01:26  3   case law on a willful blindness showing and also because the

01:26  4   jury can infer, based on the evidence that will be presented,

01:26  5   that Samsung knew or should have known.

01:26  6        And remember, that's the test, knew or should have known,

01:26  7   very similar to the test in statute of limitations.

01:26  8        What counsel failed to mention is that in 2017, when the

01:26  9   prior case was resolved, there was a covenant not to sue.  And

01:26 10   during those negotiations, Samsung explicitly asked for the

01:26 11   covenant not to sue to extend to all patents in that family,

01:27 12   from the parent to all siblings.

01:27 13        At that time, there were two siblings pending, another

01:27 14   sibling came along later, but Samsung knew that those patents

01:27 15   could be a problem down the road and they tried to get

01:27 16   clearance.  Theta told them, no, that they would not grant them

01:27 17   licenses to those patents.

01:27 18        Now, Samsung is not a babe in the woods when it comes to

01:27 19   patent matters.  They're one of the most litigious patent

01:27 20   litigants in the country and have been for many, many years.

01:27 21        So when faced with the prospect that patents coming off

01:27 22   the parent that was previously litigated might be a problem, I

01:27 23   would submit to you that that alone meets the knew or should

01:28 24   have known test for them to be responsible for willful

01:28 25   blindness or for their knowledge to be implied.

01:28  1        But that's not all.  Up until the time of the covenant not

01:28  2   to sue, Samsung regularly tested its products and they tested

01:28  3   power consumption for differing signals, basically what we're

01:28  4   talking about in these patents at a high level.  They did that

01:28  5   testing through the end of that case, and they documented it

01:28  6   regularly.

01:28  7        After they asked for a license to the siblings of the

01:28  8   parent application, suddenly the documenting stopped, but

01:29  9   Samsung didn't stop the testing.  They continued doing the

01:29  10  testing.  They just stopped documenting it.  And the reason

01:29  11  they stopped documenting it is because they knew that they

01:29  12  could be facing a patent infringement claim down the line on

01:29  13  these patents that dealt with power modifications for varying

01:29  14  signals, and they didn't want a record showing that they

01:29  15  continued to test.

01:29  16        That alone shows their knowledge of the applications that

01:29  17  were pending and the prospect that they might be responsible.

01:29  18  They knew or should have known.

01:29  19        THE COURT:  Did you depose anyone at Samsung, 30(b)(6) or

01:29  20  otherwise, to inquire the reason the documentation stopped?

01:30  21        MR. BUNSOW:  We did.  There was a 30(b)(6) witness that we

01:30  22  deposed.  And he confirmed that the documenting stopped but the

01:30  23  testing continued.  And there was no reason given for that.

01:30  24        But there's more.  Because we went further in discovery on

01:30  25  this issue with their 30(b)(6) witnesses, with interrogatories

01:30  1    and with every type of discovery we could think of.  As you

01:30  2    know, this issue has been before the Court several times.

01:30  3        This is the subject matter of Motion in Limine No. 3.

01:30  4    Basically Samsung blocked, under claim of privilege, any effort

01:30  5    to ascertain their direct knowledge.  Not that direct knowledge

01:30  6    is necessary, but, nonetheless, to block our getting direct

01:30  7    knowledge.

01:30  8        They have no answer to the circumstantial evidence that

01:31  9    shows that they knew or should have known about these

01:31  10   applications and that they were in jeopardy.  They have no

01:31  11   response.  The only thing they have is an unverified

01:31  12   interrogatory answer where they say that having learned of the

01:31  13   applications, they did not follow them and did nothing else.

01:31  14   In other words, willful blindness.

01:31  15       But that unverified interrogatory answer is hearsay.  It's

01:31  16   not admissible into evidence.  And every witness we asked about

01:31  17   this was blocked on a privilege claim.  And you warned them

01:31  18   what would happen with those types of privilege objections and

01:31  19   they persisted anyway.

01:31  20       So here's the state of the record:  Samsung knew in 2017

01:31  21   that there were sibling applications coming off of the parent

01:32  22   that they had previously been sued under.  Samsung asked for a

01:32  23   license, clearance to those sibling applications and was

01:32  24   denied.  Samsung had been doing testing, and they knew that

01:32  25   their products practiced at least what was disclosed in the

—128—

01:32  1   specification of those patents.

01:32  2       This was a huge red flag, a red flag for a company that is

01:32  3   a sophisticated patent litigant, which they decided to ignore.

01:32  4   We have cited multiple cases on Pages 10 and 11 of our brief

01:32  5   that supports a finding of willful blindness in this case,

01:32  6   supports induced infringement and supports willfulness.

01:32  7       In the final analysis this may come down to a credibility

01:33  8   issue if they're allowed to put on any evidence.  They

01:33  9   shouldn't be, and we'll see what happens with Motion in Limine

01:33  10  No. 3.  But if they claim somehow that they had no knowledge,

01:33  11  that is simply incredible.  And we all know credibility is an

01:33  12  issue for the jury.  And I think I know how they would decide.

01:33  13      THE COURT:  Well, on the willfulness, that -- that's in

01:33  14  front of me.

01:33  15      MR. BUNSOW:  Correct.

01:33  16      THE COURT:  Okay.  Got it.

01:33  17      MR. BUNSOW:  That is correct.  The credibility issue on

01:33  18  the inducement would be for the jury.

01:33  19      THE COURT:  Got it.

01:33  20      MR. BUNSOW:  Thank you, Your Honor.  I appreciate, by the

01:33  21  way, all the time you've given us today.  It was very generous.

01:33  22      THE COURT:  You're more than welcome.  Well, I have the

01:33  23  best job in the world.  I get to have the best lawyers in the

01:33  24  world appear in front of me routinely.  So it's -- and there

01:33  25  are days I shouldn't even get paid for doing this, and this is

01:33  1   probably one of them.

01:33  2        MR. BUNSOW:  I'm not sure I'd put that on the record, but

01:34  3   thank you.

01:34  4        THE COURT:  Every time I have a hearing with lawyers this

01:34  5   good, I walk in and out of the courthouse feeling unbelievably

01:34  6   blessed.

01:34  7        MR. BUNSOW:  Thank you, Your Honor.

01:34  8        THE COURT:  Mr. Black?

01:34  9        MR. BLACK:  Certainly, Your Honor.

01:34  10       So everything we just heard about the law and about the

01:34  11  facts and about what's in their motion is wrong.  The standard

01:34  12  under current law, 2015, the Commil case, Supreme Court, is:

01:34  13  Like induced infringement, contributory infringement requires

01:34  14  knowledge of the patent-in-suit and knowledge of the patent

01:34  15  infringement.

01:34  16       Not if they knew or should have known standard.  This is

01:34  17  the Federal Circuit, 2021:  To establish willfulness, the

01:34  18  patentee must show the accused infringer had a specific intent

01:34  19  to infringe at the time of the challenged conduct.

01:35  20       Specific intent.  There must be knowledge of the patent

01:35  21  and knowledge that the activities in question are, in fact,

01:35  22  infringing.

01:35  23       I addressed the knowledge of the patent issue.  You heard

01:35  24  nothing at all about the '202 patent.  There's no evidence

01:35  25  whatsoever in the case that anyone from Samsung knew about the

01:35  1  '202 patent.  There's no evidence they knew about the '825

01:35  2  patent before they were sued.

01:35  3  There is deposition testimony on it.  It's in our brief.

01:35  4  Our witnesses said, unequivocally, we did not know about those

01:35  5  patents.  We were not monitoring prosecution.

01:35  6  There was no privilege claim made on that.  We provided an

01:35  7  interrogatory answer on it.  They don't like the answer.  The

01:35  8  answer was verified, and it was supported in the 30(b)(6)

01:35  9  deposition.

01:35  10  This business about power testing, well, I imagine Samsung

01:35  11  does testing of power control on some of its products, but what

01:36  12  does that have to do with showing that there is infringement in

01:36  13  this case?  What does that have to do with the patents?

01:36  14  That's not been shown.  There's no inference that because

01:36  15  Samsung does power testing or did or didn't document something

01:36  16  over a period of time that that is somehow evidence of willful

01:36  17  blindness, evidence of indirect infringement.

01:36  18  There's just no evidence in the case that they've produced

01:36  19  in their brief, other than the fact that we had a prior

01:36  20  litigation with them, which was dismissed.  The '825 patent

01:36  21  claims did not exist at the time of the case settlement.  The

01:36  22  '202 had not even been filed.

01:36  23  They know that under the law they can collect damages for

01:36  24  pre-suit infringement if they provide the notice that's

01:36  25  required, notice of infringement or marking if they made

01:36  1  products, which they don't.  But they decided not to do that.

01:36  2  That decision was on them.  And they cannot rely solely on the

01:37  3  argument that because Samsung asked for a broad covenant so

01:37  4  that they'd never have to hear from these people again, which

01:37  5  is what happened, they cannot rely on that to say that, oh, if

01:37  6  they ever do get any patents later, Samsung's now willfully

01:37  7  blind under the law and subject to willfulness and indirect

01:37  8  infringement.

01:37  9      Patentee bears some burden here.  And in this case they

01:37  10  bear the burden of telling the patentee, the alleged infringer,

01:37  11  about the infringement and the nature of the infringement.

01:37  12      It's particularly a problem here because what was accused

01:37  13  in the last case was a product called IntelliCeiver.  And

01:37  14  that's what they sued us on.  They sued us on IntelliCeiver,

01:37  15  and then only after this case got started did they learn that

01:37  16  we don't use it anymore.  And that therefore their entire

01:37  17  infringement theory had to be reworked.

01:37  18      But from a willful infringement inducement perspective, we

01:37  19  did not know about the patents.  We did not know about the

01:37  20  alleged infringement.  And there's clearly insufficient

01:37  21  evidence to support a finding under the appropriate legal

01:38  22  standard, which is that we would have to be more than reckless

01:38  23  in knowing that we were infringers, when even they did not know

01:38  24  when they filed this case that we had stopped using

01:38  25  IntelliCeiver.

01:38  1       But the bottom line, there's been no case that the Federal

01:38  2  Circuit has ever affirmed, and we're not aware of any district

01:38  3  court cases either, where someone's been allowed to go to trial

01:38  4  on an issue, or even get past a complaint on an issue where

01:38  5  they didn't even have knowledge of the patent like the '202.

01:38  6  Or where a patent was in prosecution and the claims were

01:38  7  completely changed.

01:38  8       They just haven't met their burden of production on

01:38  9  summary judgment and the issue should not be submitted to the

01:38 10  jury.

01:38 11       THE COURT:  Anything else, sir?

01:38 12       MR. BUNSOW:  Very briefly, Your Honor.  All of the cases

01:38 13  that we cite on Pages 10 and 11 were summary judgment cases

01:38 14  where the -- this exact motion, basically, was denied.  And

01:38 15  counsel talks about evidence that they did not know about the

01:39 16  patents.  We've provided, I think, ample evidence that they

01:39 17  knew or should have known or actually did know, from which a

01:39 18  jury could infer that they did know.

01:39 19       He points to an interrogatory response and a 30(b)(6)

01:39 20  statement from a witness with no personal knowledge who simply

01:39 21  read what counsel wrote for him so he could read it into the

01:39 22  record of a deposition, neither of which, I submit, are

01:39 23  introducible into evidence and will not be part of the record

01:39 24  of this case.

01:39 25       So what the jury will have is Samsung's knowledge that

01:39   1   applications were coming out of the parent application -- the

01:39   2   parent patent rather.  And that it sought a license to those

01:39   3   and was denied, that they related directly to the technology at

01:39   4   issue in this case.  And I submit that that alone is sufficient

01:40   5   from which a jury could infer their knowledge, and that it will

01:40   6   support inducement.

01:40   7       I agree with you that willfulness is for the Court, and I

01:40   8   think we should probably take that up after the evidence is in.

01:40   9   I think the record will support willfulness at that time as

01:40  10   well.

01:40  11       Thank you, Your Honor.

01:40  12       THE COURT:  Anything else?

01:40  13       MR. BLACK:  Yeah.  Just we have to separate out the

01:40  14   patents here, Your Honor.

01:40  15       At the time of the settlement, there were two applications

01:40  16   pending.  One was the '962 patent application, which is now out

01:40  17   of the case, so it's irrelevant.  The '825 application didn't

01:40  18   include the claims at issue here.  They had been rejected and

01:40  19   were all cancelled.

01:40  20       Are you willfully blind to infringing rejected claims in

01:40  21   the Patent Office?  Are you required to monitor all your

01:40  22   competitors' applications to see what they may do, or are the

01:40  23   competitors required to give you notice when they think there's

01:41  24   a problem?

01:41  25       That's what this is about.  All these claims were

01:41  1    rejected.  They filed new ones, which is what are at issue now.

01:41  2    And on the '202, there's no evidence whatsoever.

01:41  3        They have not produced a case from which you could

01:41  4    conclude -- any reasonable jury could conclude that Samsung had

01:41  5    knowledge or was beyond reckless.

01:41  6        In addition, they haven't address the fact that the key

01:41  7    infringement evidence in the case came from Qualcomm source

01:41  8    code, which is not available to Samsung.  And to the extent

01:41  9    they are going to put forward a case on inducement, they cannot

01:41  10   rely on that information because it was not within Samsung's

01:41  11   knowledge.

01:41  12       There was neither knowledge of the patent nor knowledge of

01:41  13   the nature of infringement before suit or, frankly, until they

01:41  14   gave us final infringement contentions in the middle of 2021.

01:41  15       Thank you.

01:41  16       MR. BUNSOW:  Two things, Your Honor.

01:41  17       Counsel himself stated that the request for a license

01:42  18   included the entire family coming off of the parent patent.

01:42  19   There's no reason to parse out one application over another.

01:42  20   It was the parent.  And as you know, all of these siblings are

01:42  21   tracked off the parent in the Patent Office records and they're

01:42  22   very easy to follow.

01:42  23       So if they followed one, they followed them all.  There's

01:42  24   no question about that.

01:42  25       The second thing is -- and I just want to do this by way

01:42   1   of an offer of proof if possible -- Samsung knows what's in the

01:42   2   Qualcomm code because they have the code, and they have the

01:42   3   code that relates to this particular functionality.

01:42   4       We have copies of that, both the Samsung and the Qualcomm

01:42   5   code.  It is identical line for line.  What Samsung has been

01:42   6   saying in this case about not knowing what's in the Qualcomm

01:43   7   code is absolutely false, and we will prove it.

01:43   8       Thank you.

01:43   9       MR. BLACK:  There was a request at the time of the

01:43   10  settlement, Your Honor, to be done with these people, we said,

01:43   11  we would like you to give us the license to all your patents,

01:43   12  they said no.

01:43   13      This happens every day in negotiations between companies.

01:43   14  You don't walk away with a licensed negotiation pregnant with a

01:43   15  requirement to monitor a counterparty's patent applications.

01:43   16      There's no evidence in the case on the '202.  On the '825,

01:43   17  the claims that were at issue at the time of the settlement

01:43   18  were -- had been rejected, were cancelled.  They amended those

01:43   19  claims.  That's why we're here.  There's been no knowledge of

01:43   20  the amended claims or the '202 patent.

01:43   21      Thank you.

01:43   22      THE COURT:  Anything else?

01:43   23      MR. BUNSOW:  I think we joined issue adequately, Your

01:43   24  Honor.

01:44   25      (Off-the-record bench conference.)

01:46   1        THE COURT:  With respect to the '202 patent, the Court is

01:46   2   going to grant the motion for summary judgment with respect to

01:47   3   any claim of willfulness.

01:47   4        With respect to both the '202 and the '825 patent, the

01:47   5   Court is going to deny the motion for summary judgment with

01:47   6   respect to claims of indirect infringement.

01:47   7        So let me find what the next motion is.  Give me one

01:47   8   second.

01:47   9        MS. DE MORY:  I'm sorry.

01:47  10        THE COURT:  Yes, ma'am.

01:47  11        MS. DE MORY:  So we have up next the objections to

01:47  12   witnesses that we filed, but we're actually going to take those

01:47  13   up with our motions in limine because they overlap

01:47  14   substantially.

01:47  15        THE COURT:  Have we done all the Dauberts?

01:48  16        MS. DE MORY:  Oh, okay.  Sorry.  I got up before somebody

01:48  17   else.

01:48  18        THE COURT:  If it -- yeah.  Okay.  If it wasn't clear, by

01:48  19   omission, my law clerk just reminded me, I granted the motion

01:48  20   for summary judgment with regard to the '202 patent and

01:48  21   willfulness.  I'm denying it with respect to the '825, if that

01:48  22   wasn't clear.  So I apologize if it wasn't.

01:48  23        And then with respect to indirect infringement, it's still

01:48  24   in the case for both the '202 and the '825.

01:48  25        MR. MCKEON:  I believe our next motion, Your Honor,

01:48  1   relates to Dr. Larson.  It's a Daubert.

01:48  2        THE COURT:  That's what I have.  Yes.  Thank you.

01:48  3        MR. MCKEON:  All right.  So with respect to this issue,

01:48  4   Your Honor, it's related.  Even though Dr. Larson's a technical

01:49  5   expert, this relates to the damages case.  And what Dr. Larson

01:49  6   did was did an analysis on an accused product, is try to

01:49  7   evaluate with respect to the patented feature, tried to

01:49  8   evaluate what battery savings would be achieved with the use of

01:49  9   the patented feature.

01:49  10       And in the end he comes out with a 20.9-minute battery --

01:49  11  extra battery life by using -- the allegation is by Samsung's

01:49  12  use of the patented feature they gain an extra 20.9 minutes of

01:49  13  battery life.  And it's a technical analysis that he undergoes.

01:49  14       But there's two, we believe, significant problems that

01:49  15  will prevent this from going to the jury.  One relates to

01:49  16  apportionment which is, you know, standard damages law.  But

01:49  17  it's important to consider this issue in the context of when

01:49  18  you're evaluating technical improvements.  And the other is a

01:49  19  speculation that Dr. Larson does in his analysis.

01:50  20       So let me just hit it quickly here on the first one, the

01:50  21  apportionment.  Your Honor knows the law well, but I want to

01:50  22  put a real fine point on the issue that we're talking about.

01:50  23  We know that in every case, in every case you got to have

01:50  24  apportionment from the profits and the damages with respect to

01:50  25  the patented feature and the unpatented feature.  So that's the

01:50  1    comparison that has to happen.  What the improvement is, the

01:50  2    patented feature, and what is out there unpatented in the prior

01:50  3    art.

01:50  4        More case law we have here on Slide 5, Your Honor.  The

01:50  5    Lucent case I know you're well aware of.  You have to show the

01:50  6    particular improvement that is added for the patented feature.

01:50  7    And then the AstraZeneca case that we cite here is a really, I

01:50  8    think, helpful case.  That you have to show the value created

01:50  9    beyond conventional elements.  So that's -- frames up what the

01:50 10    analysis needs to be.

01:50 11        And what happened here in this case, Your Honor, starting

01:51 12    in the prosecution history of the patents at issue, but even in

01:51 13    the Markman process, they're very clear here that in the prior

01:51 14    art, in the prior art the two current modes or two states with

01:51 15    respect to battery savings -- to achieve battery savings by

01:51 16    having these two states, that is in the prior art.

01:51 17        And they've said that to Your Honor in the briefing.

01:51 18    Dr. Tsividis, the inventor, is very clear on that, that

01:51 19    switching between two levels -- that you're trying to achieve

01:51 20    battery savings by switching between two levels, that's in the

01:51 21    prior art.  And their corporate representative, again, same

01:51 22    testimony in this case.

01:51 23        And what did Dr. Larson do in the technical part of his

01:51 24    analysis?

01:51 25        And here on the screen it shows you what he did, and it's

139

01:51   1    very simple.  What he did was, he analyzed it between two

01:51   2    states.  Two states was the analysis that he did to evaluate

01:51   3    the power savings to come up with this 20.9 minutes.  That's

01:52   4    precisely the prior art approach.

01:52   5         So all he has done here is evaluated -- to the extent you

01:52   6    can rely on his analysis, the only thing he's done, at best, is

01:52   7    evaluated what the improvement would be with doing the prior

01:52   8    art.

01:52   9         And we just think, Your Honor, that's just -- he's got to

01:52   10   do more than that.  He's got to isolate the patented feature.

01:52   11   It's admitted that the test that he performed here is the prior

01:52   12   art.  And we think, Your Honor, that's not good enough.  He's

01:52   13   got to do more than that under the case law.

01:52   14        And the second point, Your Honor, is the speculation.  And

01:52   15   what's going on there?

01:52   16        In this test, what Dr. Larson did was, he took a phone --

01:52   17   represented a phone and he used a Verizon test that Verizon

01:52   18   has.  It's called Verizon Idle Mode.  And when you want to test

01:52   19   battery life in a phone, you can use the Verizon Idle Mode.

01:52   20        But what is critical is, if you're going to use the

01:52   21   ███████████████████████████████████████████████████████

01:53   22   ██████████████████████████████████████████████████████

01:53   23   ███████████████████████████████████████████████████████████

01:53   24   you get vastly different results because they're different

01:53   25   power levels.

01:53  1        And he did the test, and what he used was the power state

01:53  2  cDRX.  This is what he says in his report and his deposition.

01:53  3        Well, not that this is -- matters, frankly, Your Honor,

01:53  4  ████████████████████████████████████████████████

01:53  5  ██████████████████████████████████████████████████  It

01:53  6  means you're connected to the network.

01:53  7        In the idle mode, you're not.  It's DRX.  That was the

01:53  8  mode that's relevant here.  And when we asked in his deposition

01:53  9  the difference between the cDRX and the DRX ████████████

01:53  10 █████████████████████████████████████, his testimony, Your

01:54  11 Honor:  I have no idea.

01:54  12       He doesn't know.

01:54  13       Now, again, our expert says it's DRX, but you don't even

01:54  14 need to get into that point.  He doesn't even know what the

01:54  15 right mode is.  And we know that it's different.  You get a

01:54  16 different result depending on which one you use.

01:54  17       And based on that, Your Honor, it's -- his result is

01:54  18 purely speculative.  So whether it's an apportionment problem

01:54  19 or the speculation problem, we think that this analysis

01:54  20 shouldn't be able to go to the jury.

01:54  21       And with that, Your Honor, I submit the issue.  Thank you.

01:54  22       THE COURT:  If you'll give me just one second.

01:54  23       (Off-the-record bench conference.)

01:54  24       THE COURT:  The Court is going to deny that motion.

01:55  25       The next motion up I have -- he may be there.  I don't

01:55  1    know who's going to do this for the plaintiffs.  On my chart it

01:55  2    says plaintiffs have a Daubert on damages.  So that's what I

01:55  3    have up next.

01:55  4         Yes, sir.  Good morning -- good afternoon.

01:55  5         MR. FLYNN-O'BRIEN:  Good morning -- good afternoon, Your

01:55  6    Honor.  This is Michael Flynn-O'Brien for Theta IP.  And I'll

01:55  7    be arguing Theta's motion to preclude testimony regarding

01:55  8    alleged comparable licenses.

01:55  9         All right.  In this case Samsung seeks to present the

01:55  10   damages case to the jury based on two prior license agreements.

01:55  11   As this Court is well aware, a reasonable royalty determination

01:55  12   may be based on a prior license agreement, but only if they are

01:56  13   economically and technically comparable to the asserted

01:56  14   patents.

01:56  15        Here Samsung fails both tests.  Its technical expert does

01:56  16   not present any reliable evidence or analysis of technical

01:56  17   comparability.  Its damages expert does not present any

01:56  18   reliable evidence or analysis of economic comparability.

01:56  19        This is Samsung's burden and it has not met it.  As such,

01:56  20   their testimony on these license agreements should be excluded.

01:56  21        As background, even though Samsung has undoubtedly entered

01:56  22   into hundreds of license agreements, it only produced four in

01:56  23   this case.  And it produced no additional information at all

01:56  24   about those four agreements.

01:56  25        When we asked their 30(b)(6) witness on these topics for

01:56  1   additional information, he didn't recognize one of them, one of

01:56  2   which happens to be one of the two that Samsung's damages

01:56  3   expert relies upon in this case.  Their 30(b)(6) witness

01:56  4   couldn't explain why these four agreements had been chosen.

01:56  5   And he couldn't provide any details about the circumstances of

01:57  6   these agreements whatsoever.

01:57  7       Against that background, here comes Samsung's technical

01:57  8   and damages experts.  First instance, Samsung's technical

01:57  9   expert fails to apply any standard for technical comparability

01:57  10  at all.  He bases his opinions on mere cursory statements.  He

01:57  11  provides single-sentence opinions, and provides no analysis

01:57  12  whatsoever as to how the patents at issue in the challenged

01:57  13  licenses are comparable to the technology at issue in this

01:57  14  case.

01:57  15      Here are the two agreements.  On the left there's a

01:57  16  settlement agreement that we've called the ██ agreement.

01:57  17  Dr. Kiaei, Samsung's technical expert's opinion on this

01:57  18  agreement is contained in a single sentence in his report.

01:57  19  There are no citations to the underlying patent.  There's not

01:57  20  assessment of the differences in the technology between the

01:57  21  patent at issue in that agreement and the patents at issue in

01:57  22  this case.  There's no assessment whether or how inventions

01:58  23  would actually work in the context of the technologies at issue

01:58  24  here.  There's no assessment of the power savings or battery

01:58  25  life, if any, that would have been provided by that patent.

01:58   1   There's no assessment of the costs to implement the inventions.

01:58   2   There's no comparison beyond general reference to power

01:58   3   consumption and digital processor or electronics.

01:58   4      But perhaps the most damning here is their citations to

01:58   5   the actual, you know, substantive spec or claims of the patent

01:58   6   at issue in the ███ agreement.

01:58   7      But the other agreement at issue, Dr. Kiaei's analysis

01:58   8   fares no better.  Again, there are -- I think there are five

01:58   9   patents at issue in that agreement.  With respect to each he

01:58   10   provides a single sentence for just generally describing the

01:58   11   field of use, the patent at issue.  Again, he provides no

01:58   12   citations to the underlying patents, no assessment of the

01:58   13   differences in technologies, no assessment of how the patents

01:58   14   would work, no assessment of power savings or battery life,

01:58   15   et cetera.

01:58   16      So as discussed above and in the cases cited in our

01:59   17   motion, merely because patents could be said to be in the same

01:59   18   field of use does not make the patents technically comparable.

01:59   19   This is a sort-of technical comparability or lack of technical

01:59   20   comparability analysis that courts routinely preclude experts

01:59   21   from making.  The Court should do the same here.

01:59   22      Next slide, please.

01:59   23      Samsung's damages expert, Dr. Ugone, doesn't fare any

01:59   24   better on economic comparability.  The portion of his report

01:59   25   related to these two agreements is shown here on this slide.

01:59   1   Again, we have lack of citations.  We have a lack of analysis.

01:59   2   He utterly fails to access the utility of a ██████████████

01:59   3   patents, much less compare the utility of those patents to the

01:59   4   utility of the Theta patents at issue in this case.  He fails

01:59   5   to access the economic circumstances of the parties negotiating

01:59   6   those agreements or the economic circumstances of those

01:59   7   particular negotiations.

01:59   8       He fails to account for the fact that those licenses were

02:00   9   not negotiated under assumptions of validity or infringement.

02:00   10      In his papers, Samsung tries to bob and weave through the

02:00   11  case law on this subject but to no avail.  Because what we have

02:00   12  here is a pair of experts that provide no analysis on the

02:00   13  issues at all.

02:00   14      So the -- here, the threshold question is admissibility,

02:00   15  not weight.  And because Samsung's experts have not shown or

02:00   16  not carried Samsung's burden that the underlying technology is

02:00   17  technically comparable or that the agreements are economically

02:00   18  comparable, Samsung's expert opinions on these licenses should

02:00   19  be excluded.

02:00   20      And I'll pass the podium.

02:00   21      MR. TISHMAN:  Good afternoon, Your Honor.  Daniel Tishman

02:00   22  on behalf of defendants.

02:00   23      May it please the Court.

02:00   24      THE COURT:  Welcome to my court.

02:00   25      MR. TISHMAN:  Thank you.

02:00   1      Your Honor, the first thing I want to address is one of

02:00   2   the things that my co- -- or my counsel discussed at the very

02:01   3   beginning related to discovery disputes.

02:01   4      He talked about the number of licenses that were produced.

02:01   5   That's an issue that -- we're well past discovery, so I just

02:01   6   want to set that aside.

02:01   7      On the issues of technical and economic comparability,

02:01   8   I'll be brief, Your Honor.  This is a fairly straightforward

02:01   9   issue.

02:01   10     Dr. Kiaei offered reliable testimony -- or reliable

02:01   11  opinions on technical comparability.  The law requires an

02:01   12  expert to provide a baseline of comparability, but the degree

02:01   13  of comparability is something that's reserved to the jury.

02:01   14     On technical comparability, Dr. Kiaei explained that the

02:01   15  patents in the ███████████████ licenses related to

02:01   16  technical -- technically comparable technology.  He explained

02:01   17  that the ████ patent related to power conservation within a

02:01   18  specific component of an electrical system and that it could be

02:01   19  incorporated into a mobile phone.

02:01   20     So he explained the field is comparable, the invention is

02:02   21  comparable and the products are comparable.

02:02   22     THE COURT:  Well, he makes that statement.  I get that.

02:02   23  What does he do to support that statement in his report?

02:02   24     I mean, I get someone -- either he or someone helpful to

02:02   25  him put that in there because I know you needed to have that

02:02  1   for your damages expert, but where does he explain the basis of

02:02  2   that just conclusory sentence?  Anywhere?

02:02  3        MR. TISHMAN:  It's a rather short section, but it says

02:02  4   what it needs to say.  He identifies the patent --

02:02  5        THE COURT:  Well, I was going to say, I think I get to be

02:02  6   the judge of that.  Not to be funny, but what I -- I mean, he

02:02  7   makes the statement -- he makes the conclusory statement X.

02:02  8   Where does he explain in his report -- if someone on

02:02  9   plaintiff's counsel says, what is your basis for saying that?

02:03  10       And I restrict the expert to what he has disclosed in his

02:03  11  report in his answer, where is it at in his report, his basis

02:03  12  for saying that?

02:03  13       MR. TISHMAN:  It's in this -- these two paragraphs, Your

02:03  14  Honor, 506 and 507.  He identifies the patent.  He doesn't give

02:03  15  a pincite, but he points to the evidence that he's going to

02:03  16  rely on.

02:03  17       It's the patent.  He quotes it, that it can be

02:03  18  incorporated into a mobile phone.  And then he explains that

02:03  19  Theta's expert, Dr. Larson, didn't even address the ███

02:03  20  agreement whatsoever and didn't dispute the technical

02:03  21  comparability.

02:03  22       THE COURT:  Okay.  Let me try again.

02:03  23       So I have Paragraph 506.  Your expert states that the '███

02:03  24  patent is technically comparable -- let me just say that -- try

02:03  25  it this way.

02:03  1     Your witness is on the stand and you put him on in direct.

02:03  2  And on the stand, he says that the '███ patent that was the

02:04  3  subject of one of the licenses you all want to use is

02:04  4  technically comparable to the asserted patents in that, one,

02:04  5  the patent directly reads on power concentration within a

02:04  6  specific component of an electrical system such as might be

02:04  7  incorporated into a mobile phone, as referred within the patent

02:04  8  specification.

02:04  9     And counsel for plaintiff gets up and says, what is your

02:04  10  basis for making that conclusory statement?

02:04  11     Where in your -- in his report does he give the basis for

02:04  12  making that statement, if anywhere?

02:04  13     MR. TISHMAN:  The basis is 506.  It's the patent.  And

02:04  14  they had a chance to ask him about this in his deposition --

02:04  15     THE COURT:  No, no, no.  I'm sorry.  I didn't mean to

02:04  16  interrupt.

02:04  17     That where -- they have a chance to ask about it, and

02:04  18  deposition doesn't go very far with me.  So what I care about

02:04  19  here is where beyond -- let me try it like this since I'm not

02:05  20  getting very far.

02:05  21     Where, besides in Paragraph 506, does this expert provide

02:05  22  an opinion with respect to why the '███ patent in the CRG

02:05  23  agreement was comparable?

02:05  24     Does he do it anywhere besides 506?

02:05  25     MR. TISHMAN:  It's 506, Your Honor.  And part of that

02:05   1   is -- and if I can turn to Haystack.  Haystack, Dr. Larson, who

02:05   2   put in an opening report, explained why he didn't think

02:05   3   Haystack was comparable.  And Dr. Kiaei responded to each of

02:05   4   his points.

02:05   5        But on ▓▓▓, which was not addressed in Dr. Larson's

02:05   6   report, he explained that it's comparable.  He pointed to the

02:05   7   patent and he explained that Dr. Larson doesn't seem to

02:05   8   disagree with him.

02:05   9        On Haystack he does walk through and explains that it

02:05   10  relates to power consumption and circuit components operating

02:05   11  in parallel such as could be implemented in smartphones.  And

02:06   12  then he walks through and does that.  I've highlighted a few

02:06   13  sentences here, but he does that for each of the patents.  And

02:06   14  he explains how each of those patents address the comparable

02:06   15  field, invention and application.

02:06   16       Now, one of the things that we heard about when my

02:06   17  colleague on the other side was arguing, was there's no

02:06   18  standard provided.  Dr. Kiaei is a technical expert, he's not

02:06   19  required to recite legal standards or memorize legal standards.

02:06   20       He explained how the patents and the comparable licenses

02:06   21  are from a comparable field of technology related to similar

02:06   22  inventions.  And this is what I've put here on the screen, is

02:06   23  Paragraph 35 of their expert, Dr. Larson's, legal standard.

02:06   24  Just to illustrate, Your Honor, that it's -- this is all he

02:06   25  says.  So this is what they're saying that Dr. Kiaei should

02:06  1   have included in his report.  He offered a rebuttal report and

02:07  2   he offers in his opinions the same sorts of things, comparable

02:07  3   field, similar inventions.

02:07  4       On to economic comparability.  Again, the law requires an

02:07  5   expert to account for differences and identify things to allow

02:07  6   the jury to discount as needed.  And the degree of

02:07  7   comparability, again, is left to the jury.

02:07  8       Dr. Ugone analyzed the agreements.  He explained that

02:07  9   they -- what the structure was, the dates, the amounts, the

02:07  10  parties, a number of other factors.  And ultimately he

02:07  11  identified just one adjustment that he felt was needed.  He

02:07  12  adjusted for the difference in the time between the

02:07  13  hypothetical negotiation and the comparable licenses.  He made

02:07  14  a 5X multiplier to account for that.  As to the other

02:07  15  differences, he identified the facts and he made an adjustment

02:08  16  with respect to timing.

02:08  17      And with that, Your Honor, unless you have any further

02:08  18  questions, I'll pass the podium.

02:08  19      THE COURT:  I don't.

02:08  20      MR. TISHMAN:  Okay.  Thank you, Your Honor.

02:08  21      THE COURT:  Thank you, sir.

02:08  22      Yes, sir.

02:08  23      MR. FLYNN-O'BRIEN:  I think one thing that both parties'

02:08  24  presentation make clear is that there's no dispute as to the

02:08  25  relevant paragraphs in Dr. Kiaei's expert report for the CRG

02:08  1    patent.  It's Paragraph 506.  For the ███████ patents it's 508

02:08  2    and 509.  So we're talking about three whole paragraphs.  And

02:08  3    in those paragraphs there are no citations, there are no

02:08  4    discussions, there's no pincites to the patents, there's no

02:08  5    citations to any other materials, there's no additional

02:08  6    discussion.  There's a single sentence for each patent.  Those

02:09  7    are the sorts of vague and conclusory statements that do not

02:09  8    belong before a jury.

02:09  9         As to Dr. Ugone, the only adjustment -- counsel on the

02:09  10   other side referred to an adjustment that Dr. Ugone made.  That

02:09  11   adjustment was only related to the timing of the agreements.

02:09  12        Another problem, of course, with this, he thinks Samsung's

02:09  13   position here is that the two agreements they're relying on are

02:09  14   from 2010, nearly eight years before the hypothetical

02:09  15   negotiation.  Dr. Ugone purports to make an adjustment to

02:09  16   correspond to that time difference and the fact that people's

02:09  17   usage of cell phones changed quite a bit in those eight years.

02:09  18        But he doesn't make any other adjustments.  He doesn't

02:09  19   make any other analysis, assessments or adjustments to reflect

02:09  20   or accommodate the negotiating positions between the parties,

02:09  21   their -- the particular value or utility of the patents at

02:10  22   issue in those agreements versus the utility of the patents at

02:10  23   issue in this case, or any of the other sort of economic

02:10  24   analysis that you would normally expect when you have a

02:10  25   comparable agreement opinion.

02:10  1        With that, I'll turn it back over.

02:10  2        THE COURT:  Anything else?

02:10  3        MR. TISHMAN:  Nothing further, Your Honor.

02:10  4        (Off-the-record bench conference.)

02:12  5        THE COURT:  The Court is going to deny the motion.

02:12  6        The next I have is defendant's motion with respect to --

02:12  7   I'm assuming it's Dr. Bergman, B-e-r-g-m-a-n?

02:13  8        MR. TISHMAN:  Hello, again, Your Honor.  Mr. Edelin is

02:13  9   going to pull up the slides.  Just a moment.

02:13  10       While he's pulling them up, Your Honor, I'll just start by

02:13  11  saying this is an important but fairly straightforward motion.

02:13  12  It really -- there's a number of issues at play, but the big

02:13  13  one is, Mr. Bergman failed to apportion damages for

02:13  14  600,000 units, ███████████████████████████████████████████

02:13  15  ████████████████████████████████████████ if you were to

02:13  16  include the now-dropped earliest patent.

02:13  17       Of course, Your Honor knows well that the entire market

02:13  18  value rule says you cannot claim damages on the entire profits

02:14  19  of a product.  You cannot claim a percentage of the entire

02:14  20  profits of a product unless you can show that the patented

02:14  21  feature alone drives demand for the product.  That's exactly

02:14  22  what Mr. Bergman did with respect to the 600,000 units.

02:14  23       So what we're showing here is Dr. Prince's microeconomic

02:14  24  analysis, and we've got really two aspects of it that

02:14  25  ultimately result in $4.72 per unit.  One is the price effect.

02:14  1   That's the yellow box between the p* and the p** on the left.

02:14  2   We've also shown it on the right, in the bar chart on the right

02:14  3   as well.

02:14  4       The other aspect is the red box.  The red box is the

02:14  5   quantity effect.  Dr. Prince says:  But for the invention and

02:14  6   the 20.9 minutes that it gives, these sales wouldn't have

02:14  7   happened; so therefore, we can take the entire profits for

02:14  8   these sales, that red box.

02:14  9       That's $253.16 per unit.  I'll show in a later slide that

02:15  10  ends up being about ███████████ that then gets fed into a

02:15  11  profit-splitting analysis.

02:15  12      But there's no dispute that for these -- what's in red

02:15  13  here, that entire profits for those units is being counted and

02:15  14  fed into this $4.72 per unit figure.

02:15  15      Now, you're going to hear -- this is in the briefing as

02:15  16  well, and I think it's going to be in the presentation -- these

02:15  17  boxes are going to be drawn a little bit different, but there's

02:15  18  no dispute on the math and the facts that, as to those

02:15  19  600,000 units, they're taking the entire profits.

02:15  20      So what we're asking for, Your Honor, one aspect of our

02:15  21  motion, is to essentially -- for the lack of a better way of

02:15  22  saying it, let's get rid of the red box.  Let's kill the red

02:15  23  box here.

02:15  24      So that's the first aspect of our motion.  I think you'll

02:15  25  hear a bit from my colleagues on the other side about the

02:16  1    entire market value being a really big revenue number.

02:16  2         LaserDynamics says you can't take a percentage of revenues

02:16  3    or profits, and that's what they've done.  They've taken a

02:16  4    percentage of the entire profits for 600,000 units.

02:16  5         You're also going to hear, well, but for the invention,

02:16  6    you wouldn't have these 20.9 minutes and you wouldn't have had

02:16  7    the 600,000 sales.  So therefore it's okay to take all these

02:16  8    profits.  That's exactly what LaserDynamics was about.

02:16  9         Your Honor, I didn't see anything in the opposition brief

02:16  10   about LaserDynamics.  This is really our lead case in our

02:16  11   opening brief.  There was no response on it.  But it's very

02:16  12   analogous.

02:16  13        In that case the issue was an optical disk drive, and it

02:16  14   wasn't enough -- the Federal Circuit said, it's not enough to

02:16  15   show a laptop computer without an optical disk drive.

02:16  16   Practicing the disk discrimination method would be commercially

02:17  17   unviable.  If that were sufficient, a number of other features

02:17  18   could drive demand, including a high-resolution screen.  It

02:17  19   lists a number of other features.

02:17  20        That is not enough, Your Honor.  And the same can be said

02:17  21   about these 600,000 units.  Even without the 20.9 minutes,

02:17  22   there's a number of other features.  The ability to make a

02:17  23   phone call, the screen, a number of other features.

02:17  24        Now, they're going to say, we're not really doing entire

02:17  25   market value rule.  We're not saying that this feature alone

02:17  1  drives demand.  But that's exactly what they're doing, Your

02:17  2  Honor.  They're taking a percentage of the entire profits for

02:17  3  600,000 units.

02:17  4      There's some discussion in Theta's briefing about how they

02:17  5  do a 40 to 60 percent split to what they say further apportion

02:17  6  this.  Your Honor, they do 40 to 60 percent of the entire

02:17  7  profits for 600,000 units.  ████████████████████████████

02:18  8  ████████████████████

02:18  9      There's a second basis, Your Honor.  So the first basis

02:18  10  being let's kill that red box.  The second basis being this

02:18  11  failure to apportion 600,000 units bleeds into the entire

02:18  12  analysis.  The entire damages analysis is based on this change

02:18  13  in profit that includes the profits associated with the red

02:18  14  box.  ███████████████████████████████████████████████

02:18  15  █████████████  And that's the input that leads to the total

02:18  16  that I've shown in the third row on this table here, $4.72 per

02:18  17  unit.

02:18  18      So the second basis would be the entire damages analysis

02:18  19  based on the $4.72 should be excluded.

02:18  20      There's a third aspect of our motion, and this is very --

02:18  21  two very specific points that are somewhat unrelated, but we

02:19  22  included them in the same motion because it's all about

02:19  23  Mr. Bergman.  The fist one is he's not a technical expert.  He

02:19  24  doesn't purport to be a technical expert.

02:19  25      But there's a lengthy discussion in his report where he

02:19  1  explains about battery manufacturing.  He says manufactures

02:19  2  have reached the limit of how much power they can squeeze into

02:19  3  batteries.  He's not an expert in battery technology.  He's not

02:19  4  the right guy to tell the jury about that, Your Honor.

02:19  5      The next sort of similar issue relates to -- you know, we

02:19  6  were talking about just a couple paragraphs, relates to the

02:19  7  form of the license.  He says that it should be a running

02:19  8  royalty.  And to support that there's two things he relies on

02:19  9  that we say are improper.  The first is a national aggregate

02:19  10  study by Varner.  National aggregate studies like that are

02:19  11  untethered to the actual record in the case, so they should be

02:19  12  excluded.  The Southern District of California did that in the

02:20  13  Carucel v. Novatel case.

02:20  14      The next one I don't really think there's a dispute here.

02:20  15  Mr. Bergman, in his report, as damages experts sometimes do,

02:20  16  refers to a Federal Circuit case to support a proposition.  He

02:20  17  shouldn't be allowed to present to the jury anything about

02:20  18  Federal Circuit cases.  He's not a legal expert.  That's for

02:20  19  Your Honor to do, obviously.

02:20  20      So that's -- it doesn't seem like there's an agreement

02:20  21  here, looking at their opposition.  But we submit that 355 and

02:20  22  356 from the report should be out, the reliance on Varner and

02:20  23  the Federal Circuit case.

02:20  24      So just to summarize, the bases of the report, this fourth

02:20  25  aspect, you can set that aside.  You've already denied the

02:20  1  motions on Dr. Larson and Dr. Prince.

02:20  2      So the bases are:  We should eliminate the quantity

02:20  3  effect, the red box; the whole $4.72 has, as an input the red

02:20  4  box.  So it should be eliminated as well.  That's Basis 2.

02:21  5      And the third and fourth have to do with these specific

02:21  6  paragraphs that are listed in our briefing.

02:21  7      Thank you, Your Honor.

02:21  8      THE COURT:  Anything else?

02:21  9      MR. TISHMAN:  That's it for me, Your Honor.  Unless you

02:21  10  have any questions.  Thank you.

02:21  11      THE COURT:  Yes, ma'am.

02:21  12      MS. DE MORY:  Good afternoon, Your Honor.

02:21  13      So this will be pretty quick.  ████████████████████

02:21  14  █████████████████████████████████████████████████████

02:21  15  ████████████████████████  The analysis that was done in this

02:21  16  case does not violate the entire market value rule in any way.

02:22  17  Samsung is just mischaracterizing it or misunderstanding it.

02:22  18      So let's go ahead and -- and Samsung -- and Theta's -- I'm

02:22  19  sorry.  Theta's damages analysis doesn't even rely on these

02:22  20  numbers.

02:22  21      So let's go ahead and go to the next slide.

02:22  22      So this is it.  I showed you the textbook earlier.  This

02:22  23  is the picture that was in the textbook.  And so Dr. Prince

02:22  24  conducted a survey, and he determined what the profit would be

02:22  25  for Samsung with the 20.9 minutes and without the 20.9 minutes

02:22    1    using this model that is depicted here on the screen.

02:22    2        So go ahead and click.

02:22    3        So the first box is Samsung's profit without the benefit

02:22    4    of the inventions, and the second box he calculated is

02:22    5    Samsung's profits with the inventions.  And then he did a

02:23    6    little math, and he subtracted the area between those two

02:23    7    profit numbers.  It is absolutely 100 percent apportioned to

02:23    8    the exact -- exactly tied to the 20.9 minutes that Dr. Larson

02:23    9    calculated.

02:23    10       So there's one area which is how much money would Samsung

02:23    11   make with the 20.9 and one area which is how much would Samsung

02:23    12   make without the 20.9, and it really is -- all Samsung is

02:23    13   challenging --

02:23    14       If you could just click one more, Aaron.

02:23    15       -- is this --

02:23    16       One more.

02:23    17       -- whether or not the math, the difference between these

02:23    18   two boxes, Samsung's total profits with 20.9 and Samsung's

02:23    19   total profits without 20.9, include the yellow box alone or the

02:23    20   yellow- and red-shaded box.  That's it.

02:24    21       It's not a violation of the entire market value rule.  It

02:24    22   is that the area underneath that curve has two components,

02:24    23   price and quantity.  ████████████████████████████████

02:24    24   ████████████████████████████████████████████████████████

02:24    25   ████████████████████████████████████████████

02:24  1  ████████████████████████████████████████

02:24  2      As to the other two issues, the battery stuff, Mr. Bergman

02:24  3  did exactly what he was supposed to do.  He is opining as a

02:24  4  damages expert on battery savings.  He went through and he

02:24  5  studied all the literature that is in -- out there, and he's

02:24  6  going to testify about some background facts about battery

02:24  7  savings and what's happening in the market.  That's what he's

02:24  8  supposed to do.

02:24  9      And as to the final issue, I don't think he's going to

02:24  10  be -- he probably will put up Georgia-Pacific on a slide.  I

02:24  11  don't think he's necessarily going to be opining about the

02:24  12  cases.  But the principles in those cases apply perfectly to

02:25  13  his analysis, and he's going to describe why they apply and,

02:25  14  you know, what the relative bargaining power of these parties

02:25  15  should be.

02:25  16      And so those are, I think, in limine motions; but

02:25  17  nonetheless, they should still be denied in the context of this

02:25  18  Daubert.

02:25  19      MR. TISHMAN:  If we can just keep this slide, Your Honor.

02:25  20      Just one point.  With respect to this, I guess, orange or

02:25  21  red box, I didn't hear a dispute that, as to that box, they're

02:25  22  taking a percent of the entire profits for those 600,000 units.

02:25  23  That violates the entire market value rule, and there's no law

02:25  24  that says you can violate the entire market value rule for just

02:25  25  some of the units and not the others.

02:25  1          With that, Your Honor, unless you have any questions.

02:25  2          THE COURT:  A response to that?

02:25  3          MS. DE MORY:  It's not the entire market value.  It is the

02:25  4  area under the curve, which is the difference -- it's just

02:25  5  calculating the difference under a curve essentially, which is

02:25  6  what's the total profit with the 20 minutes and what's the

02:26  7  total profit without the 20 minutes.  And that's what's here.

02:26  8  And the two -- the axes happen to be quantity and price because

02:26  9  that's how you calculate profit.

02:26  10         THE COURT:  Are you asking for the entire amount of the

02:26  11  profits that the 27 (sic) minutes allegedly gives you -- are

02:26  12  you asking for the entire profit increase that you allege

02:26  13  Samsung enjoys from the 27 (sic) minutes?

02:26  14         MS. DE MORY:  It's apportioned so it is exactly the amount

02:26  15  that is tied to the 20 minutes, the profit that is tied to the

02:26  16  20 minutes.

02:26  17         THE COURT:  Is it all --

02:26  18         MS. DE MORY:  No.  It's the difference in profits between

02:26  19  if they had the 20 minutes and if they didn't have the

02:26  20  20 minutes.

02:26  21         THE COURT:  And are you asking for all of the profits?

02:26  22         MS. DE MORY:  No.  And then that is further apportioned by

02:26  23  Dr. Bergman otherwise in his report.  He actually apportions it

02:26  24  further, which is he said they would have agreed to a 40/60

02:26  25  split after that.  So it is not -- we're not even at -- even

02:26  1   that is not accurate.  So...

02:26  2        THE COURT:  Okay.  Anything else, counsel?

02:26  3        MR. TISHMAN:  Your Honor, I think the issue is they're

02:27  4   asking for a percentage of the entire profits.

02:27  5        THE COURT:  That's a step.  But then they go on to

02:27  6   apportion.

02:27  7        MR. TISHMAN:  That's the percentage.  That's the 40 to 60,

02:27  8   is the percentage of the entire profits of this orange box.

02:27  9        THE COURT:  Well, it's a portion -- it's -- they want X

02:27  10  percent -- or they say the parties would have agreed to X

02:27  11  percent of the increase in profits you made off of all of the

02:27  12  sales of the products as a result of the minutes, if I

02:27  13  understand the damages theory correctly.

02:27  14       MS. DE MORY:  Yes.

02:27  15       THE COURT:  So they have apportioned the value of the

02:27  16  patent in the format of the 27 minutes and used a formula to

02:27  17  then say this is the amount of money that Samsung obtained as a

02:27  18  direct result of the patented feature on all their phones.  And

02:28  19  that they wouldn't have gotten -- but for this patent, they

02:28  20  wouldn't have had that increase.  And then we divide up.  I'm

02:28  21  not sure what your problem with that is.

02:28  22       MR. TISHMAN:  So --

02:28  23       THE COURT:  You may disagree, for example, with the

02:28  24  methodology of the way he did it or whatever that is.  But here

02:28  25  he is -- he has taken the feature and said -- because the

02:28  1   profit -- unlike, for example, you know, the Russian nesting

02:28  2   doll and all that stuff and where, you know, the -- as

02:28  3   Mr. Cordell and team knows, I was actually modestly involved

02:28  4   with some of the cases in the -- in San Diego that this came

02:28  5   from.  So I'm probably more familiar with this or think I am

02:28  6   more familiar with this.

02:28  7          But the apportionment here is not like in the famous case,

02:28  8   the date picker where you were saying you have Outlook and

02:28  9   Outlook is worth X dollars.  And that what is the date feature

02:29 10   worth -- date-picking feature worth?  And then how do we divide

02:29 11   up what that -- how much did the patent contribute to the

02:29 12   date-picking feature?  Let's say it's 100 percent.  So now how

02:29 13   much is the date feature worth to Outlook?  And then how do we

02:29 14   divide up the amount of money we made off that?

02:29 15          Here, as I understand their theory, it is the sales that

02:29 16   Samsung made X number more dollars as a result of the

02:29 17   improvement that the patent provided for -- of the entire

02:29 18   number of sales.  I'm not sure where the apportionment comes

02:29 19   in.

02:29 20          MR. TISHMAN:  The issue is that the bottom line here is

02:29 21   costs, the top line is price.  And for these orange ones,

02:29 22   that's 600,000 units, they are taking 100 percent of that as

02:29 23   the input into a later 40 to 60 percent split.

02:29 24          THE COURT:  Well, your client got 100 percent of the money

02:29 25   they made from the sale of those 600,000 units.  And what

02:29  1   they're saying is the way they've done it is that their patent

02:30  2   allowed for a delta of more dollars, which is that box, and

02:30  3   they want to split that.

02:30  4       If I understand this -- and maybe I'm misunderstanding,

02:30  5   but that's what I think I'm hearing.

02:30  6       MR. CORDELL:  This is what you don't want your partners to

02:30  7   stand up and do, is to get up and argue with you.  But, Your

02:30  8   Honor, I think the disconnect here is that, for the orange box,

02:30  9   they're asking for all of Outlook.

02:30  10      THE COURT:  But I think what they're saying is, unlike the

02:30  11  date picker, which has only added X value, that Microsoft was

02:30  12  able to sell -- Microsoft would have been able to sell -- I'll

02:30  13  make up a number -- $100 million worth of Outlook.  Because of

02:30  14  the date-picker feature itself, they were able to sell

02:30  15  $120 million worth, and what they want to divide up is the

02:30  16  extra $20 million the patented feature provided to Microsoft

02:31  17  because it increased their sales by that number of dollars.

02:31  18      MR. CORDELL:  Correct.  That's exactly what they're doing.

02:31  19      THE COURT:  And I'm not -- and I'm not sure why that's not

02:31  20  okay.

02:31  21      MR. TISHMAN:  So it's exactly what LaserDynamics says.

02:31  22  For Quanta here, those guys wouldn't have sold any of their

02:31  23  laptops if it weren't for the ODD with the disk discrimination

02:31  24  method because it wouldn't be considered commercially viable.

02:31  25  And the Federal Circuit said that's not enough.  Any feature

02:31  1   you could say that about.  You have to show that that alone

02:31  2   drives demand.

02:31  3       THE COURT:  Well, and I don't know that their expert is

02:31  4   going to be able to do that, but that's not what we're arguing

02:31  5   here.  I mean, their argument is that that is what he's going

02:31  6   to say.

02:31  7       MR. TISHMAN:  He does not say that 20.9 minutes alone

02:31  8   drives demand.  He admitted in deposition -- this is in the

02:31  9   briefing -- that he does not allege that the entire market

02:31  10  value comes from 20.9 minutes.

02:31  11      THE COURT:  No.  I think he says the increase in

02:31  12  the profit -- not profits, the increase in the amount of

02:32  13  dollars Samsung got was the -- was -- there was X without it,

02:32  14  there's X plus Y with it, and they want to share Y, is the way

02:32  15  I see it in the simple terms.

02:32  16      And if that's correct, then I'm -- if my understanding of

02:32  17  what they're arguing is correct, then I'm going to deny your

02:32  18  Daubert motion.

02:32  19      MR. TISHMAN:  I believe that your understanding is correct

02:32  20  with the caveat that, for the red box there, it's 100 percent

02:32  21  of them -- 100 percent of those profits are what's fed into a

02:32  22  40/60 profit split.

02:32  23      THE COURT:  100 percent of the profits, the additional

02:32  24  profits.  If I'm wrong on that, I need to know.  But it's

02:32  25  100 percent of the additional profits that they are going to

02:32    1    credit to the patented feature.

02:32    2         MR. TISHMAN:  All of the profits -- that's what

02:32    3    LaserDynamics was.  All of the profits were additional profits.

02:32    4    They wouldn't have sold any but for the invention, so that's

02:32    5    not enough.

02:32    6         THE COURT:  Yeah, but this is a different fact scenario

02:32    7    than that.  Here -- and we got to wind this up because I've got

02:32    8    a Markman in a half hour.  But here, they are asking for a

02:33    9    percentage of the additional profit their person says.

02:33   10         Now, if you want, you can cross-examine on his

02:33   11    methodology, how did he prove that the patent was responsible

02:33   12    for that X percent increase, and so your number is nuts.

02:33   13    You'll get to do that at cross.

02:33   14         But for Daubert purposes, I'm going to deny your motion

02:33   15    with regard to the methodology.  I understand the method and I

02:33   16    don't think it's impermissible.

02:33   17         MR. TISHMAN:  Okay.  Thank you, Your Honor.

02:33   18         THE COURT:  So next up I have -- because you haven't

02:33   19    beaten up on Mr. Bergman enough, I have Daubert -- a Daubert on

02:33   20    Smith and Bergman.

02:33   21         MR. TISHMAN:  That's me as well, Your Honor.  And I think

02:33   22    I can be quick.  While he's flipping to the slides, I'll just

02:33   23    get started.

02:33   24         Our papers are pretty extensive on this, but it's not

02:33   25    really a damages issue.  That's why we split it up this way.

02:33 1 This has to do with both Dr. Smith and Mr. Bergman have a lot
02:33 2 of discussion in their reports about citations to non-asserted
02:34 3 patents.
02:34 4     And there's really two issues with that. One is relevance
02:34 5 and one is reliability. I'll try to do both of them quickly.
02:34 6     On relevance, I'll just show you what they do. Smith
02:34 7 gives a table from Google patents. He identifies a bunch of
02:34 8 citations to patents in the Tsividis patent family. He says
02:34 9 there's at least 26 citations to them.
02:34 10     Sorry. I'm not publishing again.
02:34 11     Bergman says something similar, but he says the '962
02:34 12 patent actually was cited 26 times. So I think there's a
02:34 13 disconnect there, and we'll get to that in a bit, Your Honor.
02:34 14     But on the relevance issue, they give three main relevance
02:34 15 arguments. One is validity. The other is knowledge of the
02:34 16 patents. The third is bargaining position at the hypothetical
02:34 17 negotiation.
02:34 18     On validity, really the thesis of Dr. Smith is it shows
02:35 19 that other people held these patents as important. But when
02:35 20 you're talking about secondary considerations and
02:35 21 nonobviousness, holding non-related -- or related but
02:35 22 non-asserted patents important is not the same as the actual
02:35 23 asserted patents. So there's some relevance issues and
02:35 24 likelihood of confusion here.
02:35 25     On knowledge of the patents it's really the same issue.

02:35  1    We're looking at a table here.  Most of these citations are

02:35  2    before the asserted patents even issued.  So --

02:35  3        THE COURT:  Let me jump ahead here for just a second.  I

02:35  4    don't really see this.  I could be wrong.  You got a lot of

02:35  5    lawyers in the room who are smarter than I am.  But I don't

02:35  6    really see this, although I don't know why the other patents

02:35  7    would come in.

02:35  8        I don't see this as a Daubert as much as I do just a flat

02:35  9    issue of relevance.  So that if -- and maybe I don't have the

02:35  10   connect between they said this, which is irrelevant, to get to

02:36  11   their opinion, and that's the point.

02:36  12       But it seems to me that if the expert, Smith or Bergman,

02:36  13   want to talk about, you know, validity and they go into

02:36  14   something like those other patents that you think are

02:36  15   irrelevant, Mr. Cordell or Mr. Black, who are not shy people,

02:36  16   will be -- can easily stand up and say, objection, Your Honor.

02:36  17   And then they can take him on voir dire or they can explain to

02:36  18   me why they're irrelevant or do it that way.

02:36  19       But I feel like I would understand that objection a lot

02:36  20   better in the context of when I'm listening to the testimony

02:36  21   than I am just arbitrarily whacking things in the form of a

02:36  22   Daubert.

02:36  23       So I'm going to deny your Daubert without any prejudice to

02:36  24   you all being able to make objection -- whatever is in here it

02:37  25   can be made as an objection during trial.

02:37   1      And, now, I think we're going to, at some point, get to

02:37   2  the motions in limine if we have time here.  I will let you all

02:37   3  know that when one of you -- I'll pick on Mr. Cordell again --

02:37   4  stand up and says, Your Honor, that question violates Motion in

02:37   5  Limine 713, I really don't know what any of the motions in

02:37   6  limine were by number.

02:37   7      If something violates a motion in limine so severely that

02:37   8  you need to object, you just need to say may we approach or

02:37   9  something like that, and I can take it up, if you want me to

02:37  10  take it up outside of the presence of the jury.  But I will --

02:37  11  I'm telling you in advance I will not know what Motion in

02:37  12  Limine 16 was or why the question violates it.

02:37  13      And so I'm denying the motion -- the Daubert motion

02:37  14  without prejudice.

02:37  15      Now, let me see what we have next.

02:37  16      MR. TISHMAN:  And, Your Honor, there is a reliability

02:37  17  aspect to this.  I know it's separate from the relevance.  If

02:38  18  you're -- we have your ruling.  I just want to make sure you're

02:38  19  aware there's a reliability aspect to this as well.

02:38  20      THE COURT:  To the extent they're unreliable, I think it's

02:38  21  because it's not relevant.  And from what you've shown me so

02:38  22  far, I don't know why some of that stuff is relevant, but I

02:38  23  don't know why it's relevant.  And another lawyer's going to

02:38  24  get up and say it is relevant, and I won't really know any

02:38  25  better then why -- I won't know who to believe.

02:38  1     But I promise you, I actually most of the time do pay

02:38  2  attention during trial.  And so if you're asking questions

02:38  3  and -- if they ask a question and you object because it's

02:38  4  irrelevant or something, I promise you, I will rule on it then.

02:38  5     MR. TISHMAN:  Okay.  Thank you, Your Honor.

02:38  6     THE COURT:  So let me -- give me one second.

02:38  7     Let's do this.  Let me ask anyone from the defendant who's

02:39  8  going to handle this, I have -- oh, I have -- I'm sorry, for

02:39  9  the plaintiff, there's something about failure to produce

02:39  10  documents with regard to Hutchinson and Bedford.  I'm not sure

02:39  11  what that is.

02:39  12     Yes, ma'am?

02:39  13     MS. DE MORY:  Yes.  So this was the issue that I had stood

02:39  14  up prematurely and said a lot of the issues in those written

02:39  15  objections overlap with some things that are even handled in

02:39  16  better context in the context of our MILs.  And so we were

02:39  17  going to defer consideration of those issues in the context

02:39  18  of -- until in the context of the MILs.  And there may be one

02:40  19  still to take up, which is the Bedford issue.

02:40  20     THE COURT:  Okay.  Let's do that.  And give me just one --

02:40  21  you can come up.

02:40  22     (Off-the-record bench conference.)

02:40  23     THE COURT:  Yes, sir?

02:41  24     MR. BUNSOW:  Your Honor, I'd like to address

02:41  25  Mr. Hutchinson, who is a late disclosed, undiscovered witness

02:41  1    from Qualcomm.

02:41  2        And the last time this came up, we said we wanted to take

02:41  3    his deposition if he was going to testify.  Mr. Black promised

02:41  4    you, no problem.  If he's going to testify, we'll make him

02:41  5    available for deposition.

02:41  6        Since then we've been asking almost every day if we can

02:41  7    have his deposition.  I'd like to know at this late stage:  Is

02:41  8    he going to testify or not; and if he is, when can we take his

02:41  9    deposition?

02:41  10       Now, the subject matter of his testimony is a whole

02:41  11   'nother issue, but at the very least, if they think they're

02:41  12   going to put him up, we need to take his deposition.

02:41  13       THE COURT:  I got it.

02:41  14       MR. CORDELL:  So what Mr. Bunsow said was almost right.

02:41  15   Mr. Black did say that it would be no problem back in August,

02:41  16   and we heard nothing for months and months and months.  We

02:42  17   exchanged witness lists a few weeks ago.  Mr. Hutchinson was on

02:42  18   our list and now they've -- they want to take his deposition.

02:42  19       We've been working with his lawyers.  He's a Qualcomm

02:42  20   employee.  We are working through them, and they've said he's

02:42  21   available.  So there should be no problem to take his

02:42  22   deposition in the next few days.

02:42  23       THE COURT:  Okay.  There you go.  Easy-peasy.

02:42  24       And I was checking with Jeff, to the extent whatever we

02:42  25   don't get finished today, we'll take up Thursday afternoon by

02:42   1    Zoom, so...

02:42   2        MR. CORDELL:  And I can dispose of Mr. Bedford as well,

02:42   3    easily, I think.  We had this discussion on December 16 and we

02:42   4    offered to put him up for deposition, and I thought the

02:42   5    plaintiff had accepted that.  So I think it should be pretty

02:42   6    straightforward.

02:42   7        MS. DE MORY:  Your Honor, we are willing -- what happened

02:42   8    on our last hearing was that Mr. Cordell said that they were

02:42   9    going to replace their corporate rep, and you said things

02:42   10   happen, and that's fine.  And you also said what's he really

02:42   11   going to say?  Hi, I work for Samsung, this is Samsung.

02:42   12       The problem is, they have a proffer which is that he's not

02:43   13   just going to say I work for Samsung.  And we didn't take this

02:43   14   up at the last hearing because we had it in our objections.

02:43   15       So the issue is he's going to do three things.  He's going

02:43   16   to introduce Samsung, fine.  We'll take his deposition on that,

02:43   17   we'll hear what he has to say.

02:43   18       The second thing he's going to do is he is going to

02:43   19   replace Mr. Hawke who was going to be their designee, and he

02:43   20   was a 30(b)(6) witness.  So he's going to testify -- and they

02:43   21   claim that Mr. Hawke is unavailable.  So he's going to testify

02:43   22   for Mr. Hawke.  And they say he's going to testify consistently

02:43   23   with him.  He's at least a marketing person, which Mr. Bedford

02:43   24   is a marketing person, so that -- you know, it doesn't seem

02:43   25   that offensive.  And he says he's unavailable.

02:43  1          The third person, though, they say he's going to testify

02:43  2   for Mr. Lim.  Now, you heard about some of Mr. Lim's testimony

02:43  3   earlier.  Mr. Lim is a witness, a lawyer who was offered as a

02:44  4   30(b)(6) witness on issues of Samsung's knowledge of the

02:44  5   patents.  All he did was read the interrogatory responses and

02:44  6   answer those interrogatory -- consistent with those

02:44  7   interrogatory responses which we don't believe are admissible.

02:44  8   It will be no more admissible if Mr. Bedford comes and now says

02:44  9   what Mr. Lim said about the interrogatory responses that are

02:44 10   not admissible.

02:44 11          And we were otherwise precluded from asking any questions

02:44 12   about who learned of the applications, what did they do after

02:44 13   they learned about them, what did they -- otherwise.

02:44 14          And so what we're getting now is -- and we have no

02:44 15   evidence that Mr. Lim is unavailable.  They have never said

02:44 16   he's not available.

02:44 17          So what they're trying to do with Mr. Bedford is bring in

02:44 18   somebody to replace basically 30(b)(6) testimony that they

02:44 19   don't like.  We think it's improper.  We think it's

02:44 20   prejudicial.  The Lim testimony should be played to the extent

02:44 21   it's admissible.  And otherwise they should not be able to fix

02:44 22   that through a new corporate rep when the other witness is not

02:44 23   unavailable.

02:45 24          MR. CORDELL:  30(b)(6) testimony, as I understand the

02:45 25   rules, is usable by them for whatever purpose they choose.

02:45  1          THE COURT:  It is.

02:45  2          MR. CORDELL:  I don't know exactly why that's --

02:45  3          THE COURT:  Yeah.  I'm not really following -- they're not

02:45  4  going to present him at trial as a 30(b)(6) witness.

02:45  5          MR. CORDELL:  Right.

02:45  6          THE COURT:  He's just going to be him.

02:45  7          MS. DE MORY:  Well, he's going to testify to the things

02:45  8  that Mr. Lim testified to.

02:45  9          THE COURT:  No.  He's not going to testify -- if he

02:45  10  testifies, you can -- if he says something that is consistent

02:45  11  with what the 30(b)(6) witness said, you're fine.  If he says

02:45  12  something contrary to what the 30(b)(6) witness said, you can

02:45  13  impeach him with the 30(b)(6) deposition.

02:45  14          MS. DE MORY:  We don't even believe the 30(b)(6) stuff is

02:45  15  admissible as it is.

02:45  16          THE COURT:  You don't what?

02:45  17          MS. DE MORY:  We do not -- it is our position that that

02:45  18  testimony is not admissible in the first place.  He had no

02:45  19  firsthand knowledge.  He just read the interrogatory

02:45  20  response --

02:45  21          THE COURT:  Well, the 30(b)(6) deposition isn't firsthand

02:45  22  knowledge.  It's corporate knowledge.

02:45  23          And so -- and I would -- I might even go so far as to say

02:45  24  that if this gentleman gets on as a corporate representative,

02:45  25  which he would be -- he's not 30(b)(6), but he would be a

02:46  1   corporate representative.

02:46  2         And if he says -- I'm making this up -- Samsung not only

02:46  3   knew about all these three patents, we infringed them on

02:46  4   purpose and we had a party the week after we found out about

02:46  5   them, if that was -- if the corporate representative had said

02:46  6   the opposite and you showed me that, there's a good chance I

02:46  7   would strike that and tell the jury they have to disregard it

02:46  8   because the corporation has already taken a different position

02:46  9   and what a 30(b)(6) is.

02:46  10        So the way I see it is, this gentleman is going to be a

02:46  11  live person, a human, saying whatever that Samsung wants him to

02:46  12  say about Samsung and whatever they did.  But -- and you get to

02:46  13  depose him tomorrow or Thursday or Friday, whenever, about all

02:46  14  that.

02:46  15        But if he says something that's incongruent in any way

02:46  16  from what the corporate deposition said, you have that

02:47  17  deposition and you can either impeach him with it or I'll

02:47  18  strike it because that's why we take 30(b)(6)s.

02:47  19        This guy's not going to be a 30(b)(6).

02:47  20        MS. DE MORY:  I understand that.  And this is why I wanted

02:47  21  to do it in the context of the motions in limine because that

02:47  22  30(b)(6) deposition is the one that Mr. Bunsow already raised,

02:47  23  that you have cautioned them about twice in other proceedings,

02:47  24  which is they basically instructed him not to answer every

02:47  25  question except for what he read from those interrogatories

02:47   1   responses.

02:47   2   THE COURT:  Well, if Mr. Cordell asks Mr. X, whatever,

02:47   3   whoever he puts on a question that you had asked the corporate

02:47   4   witness and they instructed that corporate witness not to

02:47   5   answer it, he's not going to be allowed to answer it either.

02:47   6   If a corporate witness refused to answer a question

02:47   7   that -- now, let me say, if the objection was that's outside

02:47   8   the scope of the 30(b)(6), he's not the right person, blah,

02:47   9   blah, that's a fuss we'd have to have.

02:47   10   But if you asked them -- I'm making it up again -- if you

02:47   11   asked the corporate representative:  On what date did you know

02:48   12   X?

02:48   13   And they said:  Don't answer that question.

02:48   14   I don't know why they would, but you're telling me they

02:48   15   did.  If they say -- then Mr. Cordell doesn't get to put on

02:48   16   someone from Samsung to say something that would contradict.

02:48   17   They are in concrete with respect to the 30(b)(6).  Whatever

02:48   18   positions they took as lawyers and Samsung at the 30(b)(6) is

02:48   19   what the jury's going to hear.

02:48   20   Anything else?

02:48   21   MR. CORDELL:  Good from our perspective, Your Honor.

02:48   22   Thank you.

02:48   23   THE COURT:  Okay.

02:48   24   MR. CORDELL:  There is one other minor housekeeping

02:48   25   matter.  We had submitted a pretrial order a couple weeks back

02:48  1   and in it we had the order of proof, being the way we are very

02:48  2   accustomed to doing it, where the plaintiff puts on the case.

02:48  3   We then respond and put on our affirmative case.  And then they

02:48  4   rebut our affirmative case.

02:48  5       It now seems that the plaintiff wants to have a rebuttal

02:49  6   that includes their affirmative burdens.  So they want to put

02:49  7   on an infringement case, hear our response.  And then in

02:49  8   rebuttal they want to go back to their infringement case.

02:49  9       THE COURT:  Their rebuttal would be a rebuttal.

02:49  10      MR. CORDELL:  Okay.

02:49  11      THE COURT:  A rebuttal is a rebuttal.  Now, I allow

02:49  12  rebuttal on everything.  In other words, if you -- when you put

02:49  13  your damages guy on, they can put a damages -- their damages

02:49  14  expert back on to rebut what it was he said.  Or she said,

02:49  15  whichever.

02:49  16      But the rebuttal phase for the plaintiff will be rebuttal

02:49  17  of what you all raised in your case-in-chief.

02:49  18      MR. CORDELL:  So you're going to allow them to rebut on

02:49  19  their affirmative burdens.

02:49  20      THE COURT:  I'm going to allow them to rebut what you all

02:49  21  said during their rebuttal, yes.

02:49  22      MR. CORDELL:  Do we then get a rebuttal case?

02:49  23      THE COURT:  You do not.

02:49  24      MR. CORDELL:  Well, what about our validity?

02:49  25      THE COURT:  I understand.  But I've -- it has to quit

02:49  1    somewhere.  And I'm going to allow them to rebut on those

02:50  2    issues and then we'll be done.

02:50  3        MR. CORDELL:  Okay.

02:50  4        THE COURT:  Except I checked with -- maybe we're all

02:50  5    wrong.  I checked with many judges who try a lot of these

02:50  6    cases, and to a person they all said that's the way they do it.

02:50  7    And so I have adopted the procedure of every judge that I know

02:50  8    who's doing it.

02:50  9        MR. CORDELL:  Well, not to put too fine a point on it,

02:50  10   Your Honor, but I believe if you're going to allow a rebuttal

02:50  11   on affirmative burdens, that has to apply to both sides.

02:50  12       THE COURT:  I know that's your position.

02:50  13       MR. CORDELL:  Understood.

02:50  14       MR. BUNSOW:  I'll just say that I don't know how many

02:50  15   cases I've tried, but a few.  And it's always as you described.

02:50  16       THE COURT:  Counsel, you've won.

02:50  17       (Laughter.)

02:50  18       THE COURT:  So, Mr. Cordell, I don't mean to be glib.  I

02:50  19   understand your point.  I've thought it through and that's just

02:50  20   the way I do it.

02:50  21       MR. CORDELL:  Understood.

02:50  22       THE COURT:  And maybe someday -- the Circuit has certainly

02:50  23   not been reluctant in other areas to tell me when they don't

02:51  24   think I'm doing it correctly.  And so this might be another

02:51  25   opportunity.  But maybe they might -- who knows?  Lightning may

02:51  1   strike and they might say it's okay.  So there's that

02:51  2   possibility too.

02:51  3       So what we're going to do is, we'll take up the motions in

02:51  4   limine on Thursday afternoon.  And I'll go through them again

02:51  5   before now and then.  And let me think if there's anything.

02:51  6       Let me just finish with this on the motions in limine so

02:51  7   you know and I don't forget to tell you.  Most things I see in

02:51  8   motions in limine, I see as only a motion in limine.  Meaning

02:51  9   if I say something can't come in, it means until one of you

02:51  10  says we -- Judge, we need to approach.  We need to raise this

02:51  11  because we intend now to offer this evidence and here's why.

02:51  12      So if I grant the motion in limine, I will tell you if

02:52  13  it's -- I'm granting it, meaning it's not coming in ever.  Like

02:52  14  if this were a car accident case, you know, proof of the fact

02:52  15  someone was insured is not coming in.  Yes.  It's a motion in

02:52  16  limine, but it it's not coming in.

02:52  17      But in this case when I'm granting the motions in limine,

02:52  18  keep in mind that if I -- my opinion of motion in limine is I'm

02:52  19  going to -- if they're things I think that I can't fix in front

02:52  20  of the jury by just ruling on them, I will grant the motion in

02:52  21  limine.

02:52  22      But you all will be free to ask me to allow the

02:52  23  information in.  And at that point you can say the reason it

02:52  24  comes in now is someone testified or here's the relevance or

02:52  25  whatever, and I'll be much better able to understand why

02:52   1   something may or may not be admissible at that point.

02:52   2        So the fact that you win a motion in limine doesn't

02:52   3   necessarily mean it's not ever going to come in.  It just means

02:52   4   you'll have to approach the bench first.

02:53   5        Is there anything else we need to take up?

02:53   6        MS. DE MORY:  No, Your Honor.

02:53   7        MR. CORDELL:  Not at this time.

02:53   8        THE COURT:  Well, this was one of those days where I won't

02:53   9   even get paid.  It was a great pleasure.  We'll talk on

02:53  10   Thursday.

02:53  11        THE BAILIFF:  All rise.

02:53  12        (Hearing adjourned at 2:53 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS    )

3

4        I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of Texas, do

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8        I certify that the transcript fees and format comply with

9   those prescribed by the Court and Judicial Conference of the

10  United States.

11       Certified to by me this 5th day of January 2022.

12
                              */s/ Kristie M. Davis*
13                            KRISTIE M. DAVIS
                              Official Court Reporter
14                            800 Franklin Avenue
                              Waco, Texas 76701
15                            (254) 340-6114
                              kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25